**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

PRO EDGE, L.P., d/b/a TRANS OVA
GENETICS, INC., and TRANS OVA
GENETICS, L.C., f/k/a TRANS OVA
GENETICS, INC.,

        Plaintiffs,

vs.

CHARLES S. GUE, III, DVM,
Individually, and PROGENESIS
EMBRYO TRANSFER, LTD., a
Montana Corporation,

        Defendants.

No. C 05-4068-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION; DEFENDANTS'
MOTION TO DISMISS;
AND
PRELIMINARY INJUNCTION**

———————————

**TABLE OF CONTENTS**

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    *B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    *A. Personal Jurisdiction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        *1. Long-arm authority* . . . . . . . . . . . . . . . . . . . . . . . . 13
        *2. Minimum contacts* . . . . . . . . . . . . . . . . . . . . . . . . . 13
            *a. Specific v. general jurisdiction* . . . . . . . . . . . . . . . 15
            *b. The five factor test* . . . . . . . . . . . . . . . . . . . . . . 16
        *3. Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . 17
        *4. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
            *a. Progenesis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

          *b.*    *Dr. Gue* . . . . . . . . . . . . . . . . . . . . . . . . . 19

                 *i.*    *Quantity, quality, and relatedness of contacts* . . 19

                 *ii.*   *"Secondary factors"* . . . . . . . . . . . . . . . . . 28

**B. Standards For A Preliminary Injunction** . . . . . . . . . . . . . . . . . . 29

**C. Conflict of Laws** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      *1.*   *Iowa's choice of law rules in contract cases* . . . . . . . . . . . 33

      *2.*   *Application of § 187* . . . . . . . . . . . . . . . . . . . . . . . . 35

**D. Covenant Not To Compete** . . . . . . . . . . . . . . . . . . . . . . . . . . 38

      *1.*   *Iowa law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

      *2.*   *Enforceability of the 1996 Agreement* . . . . . . . . . . . . . . 39

      *3.*   *Is the 1996 Agreement properly held by a plaintiff in this matter?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

          *a.*   *Arguments of the parties* . . . . . . . . . . . . . . . . . 43

          *b.*   *Corporate structure* . . . . . . . . . . . . . . . . . . . . 44

          *c.*   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

                 *i.*    *Use of a fictitious name* . . . . . . . . . . . . . . . . 47

                 *ii.*   *Transition from Pro Edge, Ltd. to Pro Edge, L.P.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

                 *iii.*  *Capitalization of Trans Ova Genetics, L.C.* . . . 53

**E. Consideration Of The Dataphase Factors** . . . . . . . . . . . . . . . . . 54

      *1.*   *Likelihood of success on the merits* . . . . . . . . . . . . . . . . 54

      *2.*   *Irreparable harm* . . . . . . . . . . . . . . . . . . . . . . . . . . 55

      *3.*   *Balance of harms* . . . . . . . . . . . . . . . . . . . . . . . . . . 59

      *4.*   *The public interest* . . . . . . . . . . . . . . . . . . . . . . . . . 61

**F. Rule 65's Bond Requirement** . . . . . . . . . . . . . . . . . . . . . . . . . 63

**G. Venue** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

      *1.*   *Improper Venue* . . . . . . . . . . . . . . . . . . . . . . . . . . 65

      *2.*   *Forum non conveniens* . . . . . . . . . . . . . . . . . . . . . . . 66

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

This lawsuit arises from an alleged violation of a covenant not to compete contained in an employment agreement between defendant Dr. Charles M. Gue, III, D.V.M., and plaintiffs. In the not so distant past, Dr. Gue was a long-standing employee of Trans Ova Genetics, L.C., specializing in embryo transfer in livestock. During his gestation with Trans Ova Genetics, L.C.'s predecessor Dr. Gue executed an Employment Agreement which contained a non-compete clause prohibiting him from performing similar services within a 250-mile radius of any Trans Ova Genetics facility for one year following his separation from employment. A year and a half after executing the agreement, Trans Ova Genetics, Inc., sought to strengthen its presence in the Belgrade, Montana, area and reassigned Dr. Gue to that area to act as a nucleus for Trans Ova Genetics's Montana location. After many years of apparent symbiotic harmony, Dr. Gue severed his employment relationship with Trans Ova Genetics, L.C., to work in his newly formed closely held corporation, defendant Progenesis Embryo Transfer, Ltd. This act superstimulated the plaintiffs, and they sued in Iowa state court to enjoin Dr. Gue from competing against them in the fertile Montana arena for embryo transfer services—and were granted a temporary restraining order by the state court. This was closely synchronized with the defendants removal of the action to this court, this court's grant of the plaintiffs' motion to extend the temporary restraining order, the plaintiffs' motion for a preliminary injunction, and the defendants' motion to dismiss for lack of personal jurisdiction and improper venue. Needless to say, this activity has successfully impregnated the court with multiple complex issues, some of which are regarding 'transfer' of an entirely different nature, which are now full-term and ready for delivery.

# I. INTRODUCTION

## A. Procedural Background

On April 29, 2005, the plaintiffs in this action, Pro Edge, L.P. ("Pro Edge"), an Iowa limited partnership,[1] and Trans Ova Genetics, L.C.,[2] an Iowa limited liability corporation, filed a petition in the Iowa District Court for Sioux County, Iowa, against defendants Charles S. Gue, III, DVM ("Dr. Gue"), a former employee of Trans Ova Genetics, L.C., and Progenesis Embryo Transfer, Ltd. ("Progenesis"), a wholly-owned Montana corporation created by Dr. Gue. The plaintiffs' business includes embryo transfer services for cattle producers in several states, including Illinois, Iowa, Missouri, Montana and Oklahoma. In the petition, the plaintiffs allege that Dr. Gue was employed with the plaintiffs until April 8, 2005, and that Dr. Gue has violated the non-competition provisions of his employment contract since his separation from employment with the plaintiffs by providing services, similar or identical to those he performed prior to his termination, to Trans Ova Genetics, L.C. customers within a 250-mile radius of Trans Ova Genetics, L.C.'s Belgrade, Montana office. In **Count I** of the petition, the plaintiffs seek injunctive relief enjoining the defendants from violating the non-competition provisions of Dr. Gue's employment contract; in **Count II**, the plaintiffs seek damages and injunctive relief for retention, use, and disclosure by the defendants of the plaintiffs' trade secrets; in **Count III**, the plaintiffs seek injunctive relief and damages for the defendants' intentional interference with contracts between the plaintiffs and their customers; in **Count IV**, the plaintiffs seek injunctive relief and damages for the defendants' intentional

---

[1] The caption specifically lists Pro Edge, L.P., as doing business as Trans Ova Genetics, Inc.

[2] The case caption specifically lists Trans Ova Genetics, L.C., as formerly known as Trans Ova Genetics, Inc.

interference with prospective contracts; and in **Count V**, the plaintiffs seek injunctive relief and damages for the defendants' breach of the covenant of good faith and fair dealing. On April 29, 2005 the Iowa District Court for Sioux County entered an *ex parte* temporary restraining order enjoining the defendants from violating the non-competition provisions of an employment agreement between the plaintiffs and Dr. Gue. Somewhat more specifically, the temporary restraining order temporarily enjoined Dr. Gue from providing embryo transfer services including, but not limited to, in vitro fertilization to any individuals or entities that are cattle producers that have been customers of Trans Ova's Belgrade, Montana, office within the 12-month period prior to the date of Dr. Gue's separation from employment on April 8, 2005. The order stated that it would become effective upon the filing of a bond in the amount of $30,000 with the Clerk of the Iowa District Court for Sioux County and the issuance of a writ of injunction. The order also set a hearing on May 9, 2005, on whether the temporary restraining order should continue. The plaintiffs posted the necessary bond and the Writ of Injunction issued on April 29, 2005. The plaintiffs represent that they provided notice of the temporary restraining order to Dr. Gue's counsel on May 1, 2005. However, they contend that Dr. Gue "evaded service" of the temporary restraining order until May 11, 2005. In the interim, while attempting to effect personal service on Dr. Gue, the plaintiffs represent that the defendants' counsel notified the Iowa District Court's Court Administrator that the May 9, 2005, hearing on the continuation of the plaintiffs' temporary restraining order was "unnecessary." However, they represent that the defendants did not move to dissolve the temporary restraining order.

On May 16, 2005, the defendants removed this action to this federal court. (Doc. No. 2). On May 18, 2005, the plaintiffs filed a Motion to Extend Temporary Restraining Order and Request for Hearing on Preliminary Injunction in which the plaintiffs sought

both an extension of the *ex parte* temporary restraining order issued by the Iowa District Court for Sioux County, as well as a hearing on the accompanying motion for a preliminary injunction. (Doc. No. 3). On May 19, 2005, this court entered an order extending the temporary restraining order to and including May 24, 2005, and setting a hearing on the plaintiffs' motion for preliminary injunction for May 24, 2005, which was the only time the court had available for such a hearing, due to the court being in the midst of trial in a federal death penalty case. (Doc. No. 4).

On May 20, 2005, the defendants filed a Motion to Dismiss and Request For Hearing, in which the defendants contend that the court lacks personal jurisdiction over the defendants, and that, alternatively, the district is an improper venue and the case should be transferred to the District of Montana. (Doc. No. 6). In support of the motion to dismiss, the defendants filed the affidavits of Dr. Gue, and his wife Kristie Gue, in addition to some other materials. (Doc. Nos. 8 & 9). On May 21, 2005, the defendants filed a Resistance to Plaintiffs' Motion for Temporary Injunction and Request For Hearing. (Doc. No. 10). On May 23, 2005, the plaintiffs filed a Pre-Hearing Brief in Support of Preliminary Injunction, to which was attached an affidavit of plaintiffs' counsel. (Doc. No. (13).

At the May 24, 2005, preliminary injunction evidentiary hearing, Trans Ova was represented by Charles T. Patterson and Margaret Prahl, of Heidman Redmond Fredregill Patterson Plaza Dykstra & Prahl in Sioux City, Iowa. The defendants were represented by Richard H. Moeller of Berenstein Moore Berenstein Heffernan & Moeller, L.L.P., in Sioux City, Iowa. The parties presented a full day of evidence in the form of live witnesses, a telephonic witness, and a number of exhibits. At the hearing, counsel for both parties illustrated great professionalism and competence in presenting the evidence—especially in light of the short time in which they had to prepare for such a

developed hearing. Following the evidentiary hearing, the court allowed the parties to submit by letter brief case law pertaining to a number of troublesome legal questions. In person oral argument on the plaintiffs' motion for preliminary injunction and the defendants' motion to dismiss was entertained on May 26, 2005—at which the defendants were represented by Richard Moeller, and the plaintiffs by Charles T. Patterson, and Joel Vos, also of the Heidman law firm. At the hearing, the court allowed additional letter briefing on a discrete issue in the case, with all materials by both sides to be submitted by May 28, 2005.[3]

## B.  Factual Background[4]

Dr. Gue was hired as an embryo transplant specialist by Trans Ova Genetics, Inc., at its Sioux Center, Iowa, facility in 1990. On March 22, 1996, Dr. Gue signed an Employment Agreement on March 22, 1996 ("1996 Agreement"), with Trans Ova Genetics, Inc., which included the following "Non-Compete" provision:

> 5.     Non-Compete. Dr. Gue agrees that he will not compete for a period of one year following the termination of his employment within a 250 mile radius of any Trans Ova facility

---

[3]In addition to the supplemental letter briefing, the parties offered the following exhibits: Plaintiffs' exhibits II, JJ, KK, LL, MM, NN; and Defendants' exhibits 1, 2 and 3. These exhibits were offered, and admitted, without objection.

[4]In this section, the court summarizes only the evidence presented in the preliminary injunction hearing held on May 24, 2005. Any findings of fact here or in the subsequent legal analysis, as well as any conclusions of law forming part of the court's determination of whether the issuance of a preliminary injunction is proper in this case, are intended to be subject to the "general rule" that "'the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'" *U.S. v. Barnes*, 912 F. Supp. 1187, 1191 (N.D. Iowa 1996) (quoting *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 962 (8th Cir. 1995)) (citation and quotation omitted).

> or satellite office that is in existence at the time he terminates his employment with Trans Ova. Dr. Gue further acknowledges good and valuable consideration for this non-compete agreement. He further acknowledges that good and valuable consideration is included in his annual compensation. Dr. Gue further acknowledges and agrees that a one year limitation and a 250 mile radius restriction is a reasonable period of time and a reasonable restriction. This limitation [sic] but not limited to activities that he may perform as an employee, partner, veterinarian, or consultant for services similar to those performed for Trans Ova.

Petition, Doc. No. 2, Exhibit 1. The 1996 Agreement also contained the following choice of law provision:

> 14. <u>Law</u>. This agreement shall be construed pursuant to the laws of the state of Iowa.

*Id.* Finally, with respect to assignment, the 1996 Agreement provides: "This agreement may not be assigned by either party without the prior written consent of the other party." *Id.* Following execution of the 1996 Agreement, Dr. Gue was granted access to additional information that he was not previously privy to—including customer information and information regarding the embryo transfer techniques employed by Trans Ova Genetics, Inc. Additionally, in light of the 1996 Agreement and Dr. Gue's good rapport with customers in the Sioux Center area, Trans Ova Genetics, Inc. determined that it would offer him the opportunity to head up the Belgrade, Montana satellite office with the goals of generating a customer base in that area and solidifying Trans Ova Genetics, Inc.'s presence in that area.

In the months that followed, Trans Ova Genetics, Inc., in anticipation of Dr. Gue's imminent relocation to the Belgrade, Montana, area, made significant improvements to the property they leased for the Belgrade, Montana, office—including building a cattle housing

barn, and adding additional technical equipment. During this time period, but prior to his actual relocation, Dr. Gue traveled back and forth between Sioux Center and Belgrade to facilitate this transition on a couple of occasions. In August 1997, Dr. Gue officially relocated to Belgrade, Montana, and became the only resident veterinarian on staff there. From that point forward, Dr. Gue became a Montana resident. Though he was located in Montana, Dr. Gue did maintain contact with the main Sioux Center office. As all accounting, human resources and information technology functions for all Trans Ova Genetics, Inc. locations remained at the Sioux Center main office, Dr. Gue necessarily had at least weekly, if not daily, contact with the Sioux Center location. Further, Dr. Gue's direct supervisor throughout his tenure with Trans Ova Genetics, Inc. (and eventually Trans Ova Genetics, L.C.), was located in Sioux Center.[5] Dr. Gue also received his pay checks from a Pro Edge, L.P. account in Iowa from 1996 through April 2005. Finally, on at least a couple of occasions since relocating to Belgrade, Montana, Dr. Gue returned to Sioux Center for semi-annual meetings held by Trans Ova Genetics, Inc. / Trans Ova Genetics, L.C.—though the last time he was in Iowa for one such meeting was in 2001.

On November 14, 2000, plaintiff Pro Edge L.P., filed articles of incorporation for Trans Ova Genetics, L.C., a domestic limited liability company in Iowa, with its principal office in Sioux Center, Iowa. Trans Ova Genetics, L.C., remained uncapitalized until August 1, 2003, when at a special meeting of the Board of Supervisors of Pro Management, L.C.—the sole general partner of Pro Edge, L.P.—resolutions were adopted transferring all interests and liabilities, and assigning all contracts, leases and agreements, relating to the Trans Ova Genetics division of Pro Edge, L.P., to Trans Ova Genetics,

---

[5]At the hearing, it was established that Dr. Gue's direct supervisor was Dr. David Faber, DVM, from 1990 through the fall of 2002, Randy Geyerman from Fall 2002 through the middle of 2003, and Korey Krull from the middle of 2003 until April 8, 2005.

L.C.[6]  Trans Ova Genetics, L.C., soon thereafter became registered to do business in Montana, and began filing Montana state income taxes as required by law.  Trans Ova Genetics, L.C., also technically became the employer of those employees at the Belgrade, Montana location.

Early in 2005, Dr. Gue contemplated leaving his employment with Trans Ova Genetics, L.C.  In late February, Dr. Gue discussed with an embryologist at the Belgrade, Montana, facility, whether she would leave Trans Ova Genetics, L.C., to work with him should he decide to terminate his employment with Trans Ova Genetics, L.C., and branch out on his own.  In March 2005, Dr. Gue incorporated defendant Progenesis in Montana as a close corporation in which he is 75% owner, and his wife is 25% owner.  In early March 2005, Dr. Gue contacted Korey Krull, his direct supervisor at the time as well as Chief Operations Officer of Trans Ova Genetics, L.C., to inform him that he would be terminating his employment with Trans Ova Genetics, L.C.  Dr. Gue followed-up this conversation with a letter, dated March 16, 2005, which indicated his present intent to terminate his employment and offered his services for the following two weeks should Trans Ova Genetics, L.C., desire him to stay on through that period.  Dr. Gue admittedly timed his resignation in coordination with the height of breeding season—April/May/June of each calendar year—such that he would have an immediate customer base for his services following his resignation from Trans Ova Genetics, L.C.

Dr. Gue's March 16, 2005, letter immediately precipitated discussions among Trans Ova Genetics, L.C., and Dr. Gue regarding the possibility of Dr. Gue staying on as an independent contractor.  On Trans Ova Genetics, L.C.'s part, the retention of Dr. Gue on

---

[6]The changing corporate structure of the plaintiffs is set out in more detail, *infra*, part II.D.3.b.

*any* basis—independent contractor or otherwise—was contingent on Dr. Gue's execution of another employment agreement containing a covenant not to compete. As Dr. Gue was not willing to enter into any agreement containing such a restrictive covenant, the negotiations fell through. On April 8, 2005, Dr. Gue resigned his employment with Trans Ova Genetics, L.C. The Trans Ova Genetics, L.C., embryologist that Dr. Gue had discussed leaving with also resigned her employment and went with him to Progenesis. Following his resignation, Dr. Gue immediately began providing embryo transfer services to Trans Ova Genetics, L.C.'s customers—including a couple of Trans Ova Genetics, L.C.'s largest and most elite customers. Following his separation from Trans Ova Genetics, L.C., Dr. Gue picked up embryos from Trans Ova Genetics, L.C., for Stevenson's Diamond Dot on April 12, 2005, and Riverbend on April 14, 2005—both of which were Trans Ova Genetics, L.C.'s clients. Additionally, on April 11, 2005, Dr. Gue took out an internet ad which advertised Progenesis as offering services identical to those offered by Trans Ova Genetics, L.C. On April 20, 2005, counsel for the plaintiffs sent Dr. Gue a letter indicating that his current activities were in violation of the non-compete clause of the 1996 Agreement, and requested that he cease and desist providing competing services to Trans Ova Genetics, Inc. customers. Preliminary Injunction Evidentiary Hearing, Exh. C. Dr. Gue, via his Montana counsel, responded by letter dated April 22, 2005, indicating that the 1996 Agreement was unenforceable under Montana law, and that Dr. Gue's activities were not violative of any enforceable contracts or agreements. Preliminary Injunction Evidentiary Hearing, Exh. D. Dr. Gue and Progenesis continued providing competing services—to Trans Ova Genetics, L.C. customers and possibly others within the 250-mile radius of the Belgrade, Montana area—through May 19, 2005.

With this factual background in mind, the court now turns to an analysis of the pertinent issues raised in the pending motions.

## II. LEGAL ANALYSIS

### A. Personal Jurisdiction

Before delving into the issue of whether a preliminary injunction is appropriate in this instance, the court must first determine whether it has personal jurisdiction over Dr. Gue and Progenesis. *See Land-O-Nod Co. v. Bassett Furniture Industries, Inc.*, 708 F.2d 1338, 1339 (8th Cir. 1983) (holding that the district court abused its discretion in granting a preliminary injunction and in finding it had personal jurisdiction over the defendants); *Med-Tec Iowa, Inc. v. Computerized Imaging Reference Sys., Inc.*, 223 F. Supp. 2d 1034, 1035 (S.D. Iowa 2002) (holding that the court lacked personal jurisdiction over defendant, and therefore did not need to reach merits of whether a preliminary injunction should issue).

A two-step analysis is employed in determining whether this court can properly exercise personal jurisdiction over nonresident defendants. *Genetic Implant Sys., Inc. v. Core-Vent Corp.*, 123 F.3d 1455, 1457-58 (Fed. Cir. 1997); *Northrup King Co. v. Compania Productora Semillas Algonderas Selectas, S.A.*, 51 F.3d 1383, 1387 (8th Cir. 1995). First, the court must determine if jurisdiction is appropriate under the long-arm statute of the forum state. *Stanton v. St. Jude Medical, Inc.*, 340 F.3d 690, 692 (8th Cir. 2003). If the state long-arm statute has been satisfied, then the court must next determine if the facts show that the nonresident defendants have minimum contacts with the forum state such that the court's exercise of jurisdiction would be fair and in accordance with the due process clause of the Fourteenth Amendment. *Id.*; *Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1390 (8th Cir. 1997); *Moog World Trade Corp. v. Bancomer, S.A.*, 90 F.3d 1382, 1384 (8th Cir. 1996); *Soo Line R.R. Co. v. Hawker Siddeley Canada, Inc.*, 950 F.2d 526, 528 (8th Cir. 1991).

## 1. Long-arm authority

In this case, the long-arm authority is Iowa Rule of Civil Procedure 1.306, which provides in pertinent part that

> [e]very corporation, individual, personal representative, partnership or association that shall have the necessary minimum contact with the state of Iowa shall be subject to the jurisdiction of the courts of this state, and the courts of this state shall hold such corporation, individual, personal representative, partnership or association amenable to suit in Iowa in every case not contrary to the provisions of the Constitution of the United States.

IOWA RULE OF CIVIL PROCEDURE 1.306 (2004). Rule 1.306 has been interpreted to give Iowa courts jurisdiction to the fullest constitutional extent. *See Waitt v. Speed Control, Inc.*, 212 F. Supp. 2d 950, 954-55 (N.D. Iowa 2002); *Larsen v. Scholl*, 296 N.W.2d 785, 788 (Iowa 1980); *Aquadrill, Inc. v. Envtl. Compliance Consulting Serv.'s, Inc.*, 558 N.W.2d 391, 392 (Iowa 1997) (citing *Larsen*). Because the rule has been interpreted to confer jurisdiction to the fullest extent permitted by the due process clause, the personal jurisdiction inquiry here collapses into the single question of whether exercise of personal jurisdiction comports with due process. *See Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 818 (8th Cir. 1994); *Med-Tec Iowa, Inc.*, 223 F. Supp. at 1036; *Waitt*, 212 F. Supp. 2d at 955; *Pure Fishing, Inc. v. Silver Star Co., Ltd.*, 202 F. Supp. 2d 905, 915 (N.D. Iowa 2002) (citing *Bell*).

## 2. Minimum contacts

Under the due process clause, the constitutional touchstone is whether the plaintiffs have established sufficient minimum contacts with Iowa such that this court's exercise of personal jurisdiction over Dr. Gue and Progenesis does not offend traditional notions of fair play and substantial justice. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474,

105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985); *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945); *Northwest Airlines, Inc.*, 111 F.3d at 1390. In determining minimum contacts, a court properly focuses on "the relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977). In *Dakota Industries Inc. v. Dakota Sportswear*, 946 F.2d 1384 (8th Cir. 1991), the Eighth Circuit Court of Appeals summarized these due process requirements:

> In a series of cases following *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945), the Supreme Court has elucidated the "minimum contacts" standard that must be satisfied before a nonresident can be subjected to the jurisdiction of a state's courts. Due process requires that out-of-state defendants have "'fair warning'" that they could be "haled into" court in a foreign jurisdiction. This requirement "is satisfied if the defendant had 'purposefully directed' his activities at residents of the forum . . . and the litigation results from alleged injuries that 'arise out of or relate to' those activities."
> The contacts with the forum state must be more than "'random,'" "'fortuitous,'" or "'attenuated.'" The due process clause forecloses personal jurisdiction unless the actions of the "defendant himself … create [d] a 'substantial connection' with the forum State." Once the court has found that the defendant purposefully established the requisite minimum contacts with the forum state, the court still must determine whether assertion of jurisdiction comports with "'fair play and substantial justice.'"

*Dakota Indus.*, 946 F.2d at 1389 (citations omitted); *see also Stanton*, 340 F.3d at 694; *Jarvis and Sons, Inc. v. Freeport Shipbuilding and Marine Repair, Inc.*, 966 F.2d 1247, 1249-50 (8th Cir. 1992) (citing same standards); *Gould v. P.T. Krakatau Steel*, 957 F.2d 573, 575-76 (8th Cir. 1992) (citing same standards).

In assessing a defendant's "reasonable anticipation" of being hauled into court, there must be "some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Bell Paper*, 22 F.3d at 818; *Northrup King Co.*, 51 F.3d at 1386-87; *accord Burger King*, 471 U.S. at 474-75, 105 S. Ct. 2174 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)).

### a. *Specific v. general jurisdiction*

There are two broad types of personal jurisdiction: specific jurisdiction and general jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984); *Bell Paper*, 22 F.3d at 819. Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state. *Helicopteros*, 466 U.S. at 414, 104 S. Ct. 1868. Specific jurisdiction may not be exercised where none of the actions complained of occurred within or had any connection to the forum state. *Sondergard v. Miles, Inc.*, 985 F.2d 1389, 1392 (8th Cir. 1993). The non-resident's contacts with the forum may be based on contacts by its representative, in light of the Supreme Court's conclusion that "when commercial activities are carried on in behalf of an out-of-state party those activities may sometimes be ascribed to the party, at least where [it] is a primary participant in the enterprise and has acted purposefully in directing those activities." *Burger King Corp.*, 471 U.S. at 480 n. 22, 105 S. Ct. 2174.

In contrast, general jurisdiction refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose. *Id.* at 415, 104 S. Ct. 1868. For general jurisdiction to exist, the non-resident defendant must be engaged in "continuous and systematic contacts" within the forum. *Helicopteros*, 466 U.S. at 416, 104 S. Ct. 1868. "In this situation the forum state has no direct interest

in the specific cause of action asserted. Accordingly, contacts of a more extensive quality and nature are required." *Dalton v. R & W Marine, Inc.*, 897 F.2d 1359, 1362 (5th Cir. 1990).

### b. The five factor test

The test for evaluating the propriety of personal jurisdiction under the due process clause requires the court to consider the following five factors: (1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. *Stanton*, 340 F.3d at 694; *Epps v. Stewart Information Servs.* Corp., 327 F.3d 642, 648 (8th Cir. 2003); *Guinness Import Co. v. Mark VII Distributors, Inc.*, 153 F.3d 607, 613 (8th Cir.1998); *Aylward v. Fleet Bank*, 122 F.3d 616, 618 (8th Cir.1997); *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir.1996); *Northrup King Co.*, 51 F.3d at 1388; *Bell Paper*, 22 F.3d at 818; *Dakota Indus.*, 946 F.2d at 1390; *Land-O-Nod Co. v. Bassett Furniture Indus., Inc.*, 708 F.2d 1338 (8th Cir.1983). Of these factors, the first three are the most important. *Digi-Tel Holdings, Inc. v. Proteq Telecommunications, Ltd.*, 89 F.3d 519, 523 (8th Cir. 1996); *Minnesota Mining & Mfg. Co. v. Nippon Carbide Indus. Co., Inc.*, 63 F.3d 694, 697 (8th Cir. 1995); *Northrup King Co.*, 51 F.3d at 1388; *Dakota Indus.*, 946 F.2d at 1390. In particular, the Eighth Circuit Court of Appeals has concluded that a defendant has insufficient contacts with the forum state where the defendant has no office, agent, representative or employees in the forum state, does not do business in the forum state, *Jarvis and Sons v. Freeport Shipbuilding*, 966 F.2d 1247, 1250 (8th Cir. 1992), has no bank accounts or property in the forum, does not advertise or solicit any business in the state, and does not design products for use in the state. *Gould*, 957 F.2d at 576.

### 3.    *Arguments of the parties*

Both Dr. Gue and Progenesis argue that the court does not have personal jurisdiction over them.   The defendants first contend that personal jurisdiction over Progenesis is lacking as: (1) Progenesis is a Montana corporation with its principal place of business in Montana; (2) Progenesis is not licensed to do business in Iowa; (3) Progenesis has no telephone listing, bank account, agent, or office in Iowa; and (4) Progenesis does not direct advertisements to Iowa residents.   Turning to Dr. Gue, the defendants argue that while Dr. Gue executed the 1996 Agreement when he was an Iowa resident, "'for a substantial period of time prior to the termination of his employment, he was the . . . employee responsible for the operation of the Trans Ova facility in Belgrade, Montana, and at farms and ranches within a 250-mile radius of Belgrade, Montana.'" Defendants' Brief In Support Of Their Motion To Dismiss, Doc. No. 7, at 4 (quoting Petition, at ¶¶ 9,18).   Further, the defendants contend that since early 2000, Trans Ova Genetics, L.C., an entity registered to do business in Montana, was Dr. Gue's employer from that point until his separation on April 8, 2005.  In support of the position that Dr. Gue's contacts with Iowa are too attenuated, and not purposefully directed at Iowa, the defendants rely on the case of *Roquette America, Inc. v. Gerber*, 651 N.W.2d 896 (Iowa Ct. App. 2002).   For these reasons, the defendants argue that the court lacks personal jurisdiction over both Dr. Gue and Progenesis, and the matter should be dismissed.

Plaintiffs concur with the defendants in that defendant Progenesis lacks sufficient minimum contacts for this court to exercise personal jurisdiction over it in this case. However, the plaintiffs hotly contend that personal jurisdiction over Dr. Gue is proper. In support of this argument the plaintiffs point to the fact that Dr. Gue negotiated and signed the 1996 Agreement in Iowa, that part of his performance was in Iowa, he was paid from an Iowa bank account, returned to Iowa for semi-annual Trans Ova Genetics, L.C.,

meetings on at least two occasions, his direct supervisor was in Iowa throughout his tenure, and he was holder of partnership shares in the Iowa limited partnership Pro Edge, L.P. In support of the position that Dr. Gue has sufficient minimum contacts to support this court's exercise of personal jurisdiction over him, the plaintiffs cite primarily to the case of *Berkley International Co., Ltd. v. Devine*, 289 N.W.2d 600 (Iowa 1980).

### 4. Analysis

#### a. Progenesis

The issue of personal jurisdiction, the court turns first to defendant Progenesis. Looking at Progenesis's contacts, or more aptly *lack* of contacts, with Iowa, the court must conclude that personal jurisdiction does not exist. Progenesis is a Montana corporation with its personal place of business in Montana. It has no office, agent, representative or employee in Iowa, and does not do business in Iowa. *See Jarvis and Sons*, 966 F.2d at 1250. Further, Progenesis has no bank accounts or property in Iowa, and does not advertise or solicit any business in Iowa. *Gould*, 957 F.2d at 576. In establishing personal jurisdiction, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1239, 2 L. Ed. 2d 1283 (1958). In this case there are no such acts by Progenesis—in fact, it appears that Progenesis has absolutely no contacts whatsoever with Iowa. As significant minimum contacts are wholly lacking, the court **grants** the defendants' motion to dismiss to the extent it requests dismissal of Progenesis for lack of personal jurisdiction.

### b.    Dr. Gue

As a preliminary matter, the court notes that if personal jurisdiction exists over Dr. Gue, it will be specific jurisdiction, not general jurisdiction—this is so as Dr. Gue lacks the "continuous and systematic contacts" with Iowa necessary for an Iowa court to adjudicate any cause of action, regardless of where it arose, against Dr. Gue. *See Helicopteros*, 466 U.S. at 416, 104 S. Ct. 1868; *Dalton*, 897 F.2d at 1362. Rather, in this instance, where specific jurisdiction is the only option, "jurisdiction is viable only if the injury giving rise to the lawsuit occurred within or had some connection to [Iowa]." *Romak USA, Inc. v. Rich*, 384 F.3d 979, 984 (8th Cir. 2004) (quoting *Porter v. Berall*, 293 F.3d 1073, 1073 (8th Cir. 2002)). The court now turns to an analysis of whether Dr. Gue has sufficient minimum contacts with Iowa such that exercise of specific personal jurisdiction over him by this court would not offend traditional notions of fair play and substantial justice.

###### i.    *Quantity, quality, and relatedness of contacts*.

Before delving into an analysis of the nature of Dr. Gue's contacts with Iowa, the court must first discuss the case the defendants argue makes exercise of personal jurisdiction untenable in this situation; that being the Iowa Court of Appeals's decision in *Roquette America, Inc. v. Gerber*, 651 N.W.2d 896 (Iowa Ct. App. 2002). In *Roquette*, the plaintiffs were a French Corporation, Roquette Freres ("Roquette"), and its wholly-owned subsidiary Roquette America, Inc. ("RAI"), a Delaware corporation that had a plant in Iowa. Defendant Lauren Gerber ("Gerber"), a French citizen, was employed with Roquette in 1976, and, with Roquette's permission, accepted a position as Vice President-Operations of RAI in Iowa in 1993. Gerber signed a covenant not to compete with RAI on March 15, 1994, which prohibited him from obtaining employment with a competitor for two years after he ceased working for RAI. Gerber left RAI in September 1997, and returned to France to work for

19

Roquette. In April 1998, Gerber was contacted by a Belgium competitor of Roquette—Amylum Group ("Amylum"). Gerber began working for Amylum in November 1998. The plaintiffs—Roquette and RAI—filed a tort action against Gerber and Amylum, among others, alleging breach of covenant not to compete, misappropriation of trade secrets, and intentional interference with contractual relations. On the defendants' motion to dismiss, the Iowa Court of Appeals had to determine whether it had personal jurisdiction over the defendants—Amylum, Gerber, and other foreign entities and individuals. *Id.* at 897-99.

After reciting the relevant factors a court must consider to determine if exercise of personal jurisdiction comports with due process, the *Roquette* court first determined that upon examination of the first two factors, it was evident that the defendants had no direct contacts with Iowa—in that no defendant had offices, agents, employees, or property in Iowa, and though Gerber had lived in Iowa, by the time the suit was filed,, he had been living in France for almost one and one-half years. *Id.* at 899. Turning to the third factor—which the *Roquette* court indicates determines if the jurisdiction is specific or general—the Iowa Court of Appeals employed the "effects" test[7] found in *Calder v. Jones*,

---

[7]The *Calder* "effects" tests "allows for assertion of personal jurisdiction over non-resident defendants whose acts 'are performed for the very purpose of having their consequences felt in the forum state.'" *Dakota Indus.*, 946 F.2d at 1390-91 (quoting *Brainerd v. Governors of Univ. of Alberta*, 873 F.2d 1257, 1260 (9th Cir. 1989)). However, the Eighth Circuit had determined that the *Calder* "effects" test does not eclipse the five factor minimum contacts test traditionally employed to determine if personal jurisdiction is appropriate. *See id.* at 1391. Rather, the "Eight Circuit has used the *Calder* test merely as an additional factor to consider when evaluating a defendant's relevant contacts with the forum" where an intentional tort has been alleged. *Lindgren v. GDT, L.L.C.*, 312 F. Supp. 2d 1125, 1132 (S.D. Iowa 2004); *see Woodke v. Dahm*, 873 F. Supp. 179, 195 (N.D. Iowa 1995).

465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984), which the court found required that the plaintiff show: "(1) the defendant's acts were intentional; (2) these actions were uniquely or expressly aimed at the forum state; and (3) the brunt of the harm was suffered in the forum state, and the defendant knew that harm was likely to be suffered there." *Id.* at 900. The *Roquette* court found the first factor had been satisfied. On the second factor, the *Roquette* court found that there was "not sufficient evidence to show defendants' actions were uniquely or expressly aimed at Iowa." As to the third factor, the *Roquette* court found that there was not substantial evidence that the brunt of the harm of defendants' actions was suffered in Iowa—and further that "more than the effects of a tort is necessary to invoke" jurisdiction of Iowa courts. *Id.* at 902. Ultimately, relying on the case of *Drayton Enterprises, L.L.C. v. Dunker*, 142 F. Supp. 2d 1177, 1187 (D.N.D. 2001)—which held that no personal jurisdiction exists where the sole connection to the forum is the effects of an intentional tort—the *Roquette* court found that there was "no connection between defendants and Iowa, other than the "effects" of the alleged torts" and that this was "insufficient to justify jurisdiction in Iowa." *Id.* at 903.

In discussing *Roquette*'s application, if any, to this case, the court must make note of two facts. First, is that the court could find only one Iowa Supreme Court case which mentioned *Calder* in declining to exercise personal jurisdiction: *Percival v. Bankers Trust Co.*, 494 N.W.2d 658 (Iowa 1993). *Percival* dealt with the tortious acquisition of property in California by a California defendant, in which some persons having an interest in that property were residents of Iowa. *Id.* at 658-59. The Iowa Supreme Court implicitly rejected the plaintiffs' contended reliance on *Calder* as establishing jurisdiction over an individual defendant, holding that tortious acquisition of property

> is not sufficient to support jurisdiction over [the defendant] in
> other states that happen to be residences of others also

> interested in [the acquired property.] The fortuitous residence
> of plaintiffs, alone, is not sufficient to confer personal
> jurisdiction over a nonresident defendant. The minimum
> contacts requirements demand conduct having to do with the
> state itself; they are not satisfied from a mere "effect" felt by
> a plaintiff within his or her state of residence.

*Id.* at 659-60. In essence, *Percival*, in an abbreviated fashion, recognized that mere "effects" alone are not enough to establish personal jurisdiction over a defendant. *See id.* This basic principle has since been recognized by both the Eighth Circuit and this court. *See, e.g., Wooke v. Dahm*, 873 F. Supp. 179, 195 (N.D. Iowa 1995) (noting that the Eighth Circuit Court of Appeals recognized "that the holding in *Calder* was supported by more than 'mere effects'; and, rather, that the *Calder* Court "found that *Calder intentionally aimed his tortious activity at [the forum state*] and could, therefore, have 'reasonably anticipate[d] being hauled into court there,'" and also that the "effects" test did not replace the traditional five-factor minimum contacts test) (quoting *Hinklin Eng'g, Inc. v. Aidco, Inc.*, 959 F.2d 738, 739 (8th Cir. 1992) (citing *Calder*, in turn quoting *World-Wide Volkswagon Corp.*, 444 U.S. at 291, 100 S. Ct. 559) (emphasis added). *Percival* does not contain an analysis specifically guided by *Calder*, and, rather, appears to be grounded in a traditional five-factor analysis of minimum contacts. *Percival*, 494 N.W.2d at 659. Further, *Percival* is grounded in facts clearly distinct from those presented in this case. *Id.* at 659-60.

Second, and related to the lack of an Iowa Supreme Court decision applying *Calder* in a case on point to this matter, the court notes that *Roquette* was decided by a state intermediate appellate court which, although persuasive, does not bind this court as precedent. *See Baxter Intern., Inc. v. Morris*, 976 F.2d 1189, 1196 (8th Cir. 1992) ("Although federal courts are not bound to follow decisions of intermediate state courts

when interpreting state law, state appellate court decisions are highly persuasive and should be followed when they are the best evidence of state law.").[8] This alone would be grounds

---

[8]The concept that a federal district court is not bound by the decisions of a state appellate court is not a novel one in this circuit. *See, e.g.*, *Bockelman v. MCI Worldcom, Inc.*, 403 F.3d 528, 531 (8th Cir. 2005) (noting that in a diversity case where Missouri law controls, the court is bound to apply the decisions of the Missouri Supreme Court regarding issues of substantive state law, but if the Missouri Supreme court had not yet addressed the issue, the decisions of Missouri's intermediate appellate court would be "'particularly relevant,' and must be followed when they are the best evidence of Missouri law."); *United Fire & Cas. Ins. Co. v. Garvey*, 328 F.3d 411, 413 (8th Cir. 2003) (noting both that "[d]ecisions of the "various intermediate appellate courts are not [binding on this court], . . . but they are persuasive authority, and [we] must follow them when they are the best evidence of what [state] law is"; and that "[i]ntermediate state court decisions should not be disregarded 'unless [we are] convinced by other persuasive data that the highest state court would decide [the issue] otherwise.'") (quoting *C.I.R. v. Estate of Bosch*, 387 U.S. 456 465, 87 S. Ct. 1776, 18 l. Ed. 2d 886 (1967); *Evergreen Investments, L.L.C. v. FCL Graphics, Inc.*, 334 F.3d 750, (8th Cir. 2003) ("'[W]here the state's highest court has not ruled, we must follow the decisions of the state's intermediate courts when they are the best evidence of what the state's law is.'") (quoting *Swope v. Siegel-Robert, Inc.*, 243 F.3d 486, 496 (8th Cir. 2001)); *Thorn v. International Business Machines, Inc.*, 101 F.3d 70 (8th Cir. 1996) ("Although federal courts are not bound to follow the decisions of intermediate state courts when interpreting state law, their decisions are highly persuasive and should be followed when they are the best evidence of state law.") (citation omitted); *B.B. v. Continental Ins. Co.*, 8 F.3d 1288, 1291 (8th Cir. 1993) (recognizing that in a diversity case, "[d]ecisions of [a state's] intermediate appellate courts are not binding on this court, but they are persuasive authority, and the court must follow them when they are the best evidence of Missouri law."); *Bureau of Engraving, Inc. v. Federal Ins. Co.*, 5 F.3d 1175 (8th Cir. 1993) (noting that decisions of intermediate appellate courts were not binding, but were "persuasive authority" to be followed when they are the best evidence of the states law); *Hartford Underwriter's Ins. Co. v. Estate of Turks*, 206 F. Supp. 2d 968, 976 (E.D. Mo. 2002) (quoting *Baxter* for same principle); *Brown v. Youth Servs. Intern. of South Dakota, Inc.*, 89 F. Supp. 2d 1095, 1102 (D.S.D. 2000) ("While an opinion from a single state trial court provides some evidence of how the state supreme court might rule, it is not binding."); *In re Kasden*, 186 B.R. 667, 670

(continued...)

for the court to disregard *Roquette* as an aberrant case that is not the best evidence of how

the Iowa Supreme Court would have determined the issue. However, in this instance, the

court need not go that far—as the posture of this case is clearly distinguishable from a

*Roquette* situation in which the *only* contact with the forum are the effects of a tort

committed by a defendant. In *Roquette*, the individual defendant entered into the covenant

not to compete with a Delaware corporation, the wholly-owned subsidiary of a French

company, that had a location in Iowa; while in this case Dr. Gue entered into the 1996

Agreement with an Iowa entity, which at all times has had its principal place of business

in Iowa. At the time Dr. Gue entered into the 1996 Agreement, he was an Iowa

resident—*Roquette* is unclear as to whether Gerber was an Iowa resident at the time he

entered into the covenant not to compete. At this juncture, there is a *possible* similarity

in that both Gerber and Dr. Gue gave partial performance under their respective contracts

in Iowa—note, the court uses *possible*, as *Roquette* indicates only that Gerber signed a

covenant not to compete, whereas Dr. Gue signed an *employment contract* which, while

---

8(...continued)
(D. Minn. 1995) (citing *Bureau of Engraving, Inc.*, for same principle); *Trachsel v. Two Rivers Psychiatric Hosp.*, 883 F. Supp. 442, 443 (W.D. Mo. 1995) ("Although state courts of appeals are almost always followed [where there is no state supreme court authority on point], where no Supreme Court ruling is to the contrary, they are *in no way binding.*") (emphasis added); *Nelson Distrib., Inc. v. Stewart-Warner Indust. Balancers,* 808 F. Supp. 684, 687 (D. Minn. 1992) (recognizing that federal courts sitting in diversity are bound by the decisions of the state's highest court, but that where the area of law is uncleared or unsettled, it is the duty of the federal district court to "apply the rule it believes the state supreme court would follow," and citing *Baxter*); *Galion Iron Works & Mfg. Co. v. Russell*, 167 F. Supp. 304, 310 (D. Ark. 1958) (noting that the "decision of a state trial court is, of course, not binding upon a federal court in diversity actions," but recognizing that "decisions of trial courts, though not binding, are persuasive, particularly when, as here, they deal with subjects peculiarly within the knowledge and experience of state courts.")

it contained a non-compete clause, also contained other terms and conditions of his employment with Trans Ova Genetics, Inc.

The most notable distinction comes when looking at the activities of the respective defendants (Dr. Gue and Gerber) following their Iowa exodus. In Gerber's instance, he left his employment with the wholly-owned subsidiary and returned to France to work for Roquette (a French company) approximately a year before accepting employment at a competing Belgian company and engaging in activities that violated the covenant not to compete. By this time, as the *Roquette* court noted, while Gerber's actions in joining a Belgium competitor would certainly have had an effect on Roquette's North American distributor in Iowa (RAI), any harm felt by RAI was merely an indirect result of Gerber's activity and was not aimed towards Iowa. *See Hicklin Eng'g, Inc. v. Aidco, Inc.*, 959 F.2d 738, 739 (8th Cir. 1992) (finding that though defendant's activities "may have an effect on a competitor, absent additional contacts, this effect alone will not be sufficient to bestow personal jurisdiction," and finding the *Calder* "effects" test "inapposite to the present case"). In contrast, when Dr. Gue moved to Montana he: (1) willfully remained an employee of the Iowa entity Trans Ova Genetics, Inc. (eventually Trans Ova Genetics, L.C.); (2) made numerous contacts, via telephone and e-mail, with the main office in Sioux Center, Iowa in order to deal with accounting and human resources issues; (3) he traveled to at least two semi-annual meetings held in Iowa; and (4) continued receiving a paycheck from an Iowa bank account. Additionally, and importantly, unlike *Roquette*, the evidence shows that Dr. Gue began competing for Trans Ova Genetics, L.C.'s (an Iowa entity) customers *while he was still employed* by them—Dr. Gue approached a Trans Ova Genetics, L.C., embryologist in early 2005 about leaving and coming to work with him, and he formed Progenesis in March 2005 prior to even indicating his intentions of separating his employment with Trans Ova Genetics, L.C. Further, the evidence

establishes that synchronization was vital in determining when embryo transfer services needed to be provided to customers, and that such appointments needed to be set up for weeks prior to the actual visit—this fact, coupled with the fact that Dr. Gue removed embryos from inventory for Trans Ova Genetics, L.C. customers on April 12, 2005, and April 14, 2005, only days after his actual employment ended with Trans Ova Genetics, L.C., supports an inference that Dr. Gue actually scheduled appointments to provide services to Trans Ova Genetics, L.C. customers *while he was still employed* by Trans Ova Genetics, L.C. The bottom line is that Dr. Gue *purposefully availed* himself of employment with his Iowa employer, while concurrently competing with that very employer. Additionally, Dr. Gue took out a web ad around April 11, 2005, accessible by anyone in the country, which puts him and his company out as offering the exact services he had provided for Trans Ova Genetics, L.C. In sum, unlike *Roquette*, this is not a case in which the only contacts with the forum state at the time of the tortious activity are the effects of an intentional tort committed by the defendant.

Having distinguished *Roquette* and finding its ruling not applicable to the case at bar, the court moves on to an analysis of the nature of Dr. Gue's Iowa contacts. The court first notes, that it is a clearly established principle that a *contract alone*, between a resident plaintiff and a nonresident defendant, is not enough to establish the requisite contacts to sustain the exercise of personal jurisdiction. *See, e.g., Burger King*, 471 U.S. at 478, 105 S. Ct. 2174 ("If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."); *Iowa Elec. Light and Power Co. v. Atlas Corp.*, 603 F.2d 1301, 1303 (8th Cir. 1979) ("Merely entering into a contract with a forum resident does not provide the requisite contacts between a defendant and the forum state."); *Ross v. First Savings Bank of Arlington*, 675 N.W.2d 812, 816 (Iowa 2004) ("a

contract alone cannot automatically establish sufficient contacts.")(quoting *Hager v. Doubletree*, 440 N.W.2d 603, 607 (Iowa 1989)). Also insufficient, *standing alone*, are choice-of-law provisions, *see, e.g.*, *Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1390 (8th Cir. 1997) ("a choice of law provision in itself is insufficient to create personal jurisdiction"), use of interstate facilities such as mail and telephones, *see Bell Paper Box*, 53 F.3d at 923, and visits to the forum if they are too few in number and too slight in quality. *Bell v. Fisher*, 887 F. Supp. 1269, 1279 (N.D. Iowa 1995). On the other hand, minimum contacts "need not include physical presence at all," so long as they are more than attenuated. *Bell Paper Box*, 53 F.3d at 922 n.2.

In this case, the quality and quantity of the contacts is sufficient to weigh in favor of exercise of personal jurisdiction over Dr. Gue. As noted above, Dr. Gue, of his own choice, was the employee of an Iowa company for more than fourteen years—during which he availed himself of the benefits of that relationship. Dr. Gue additionally availed himself of the benefits of Iowa in retaining, from at least the time the 1996 Agreement was signed through his last day on April 8, 2005, ownership of partnership units in Pro Edge, L.P. Even after he moved to Montana, Dr. Gue's direct supervisor was *always* in Sioux Center, Iowa. As all human resources and accounting/billing functions were conducted from the main office in Sioux Center, Iowa, Dr. Gue made contact with the main office via telephone anywhere from four to eight times per week. Dr. Gue, up until April 8, 2005, accepted his paycheck from an Iowa bank account. From 1997 through 2001, Dr. Gue also made two trips back to Iowa to attend semi-annual company meetings. Further, though a choice-of-law clause, in and of itself, is not enough to confer personal jurisdiction, it is "a relevant consideration in determining whether a defendant has purposefully availed itself in the forum state." *Northwest Airlines, Inc.*, 111 F.3d at 1390. In this instance, "[Dr. Gue] 'purposefully availed himself of the benefits and protections

of [Iowa's] laws' by entering into [a contract] expressly providing that those laws would govern" disputes arising from the 1996 Agreement. *Burger King Corp.*, 471 U.S. at 482, 105 S. Ct. 2174. Finally, addressing the relatedness between the contacts and the cause of action, the court again notes that even prior to the end of his employment, Dr. Gue utilized the benefits he had received in working for an Iowa company—in the form of customer contacts, and manifestation of goodwill—to compete against Trans Ova Genetics, L.C. Further, though his intentions may have been merely to get his own company off the ground and provide himself with an income, Dr. Gue's allegedly tortious activity was aimed at, and directly affected, Trans Ova Genetics, L.C. to the extent that Chief Financial Officer Chad Feenstra opined that Dr. Gue's continued activities could jeopardize the future of Trans Ova Genetics, L.C.'s Montana location and others. In sum, the court finds that the quality, quantity, and relatedness of Dr. Gue's contacts with Iowa support a finding that sufficient minimum contacts exist such that exercise of personal jurisdiction over Dr. Gue would comport with due process.

      ***ii.***    ***"Secondary factors"***. Turning briefly to the factors of secondary importance, the interest of the forum state in providing a forum for its residents, and the convenience of the parties, *Northrup King Co.*, 51 F.3d at 1388, the court finds no reason to change its determination that the exercise of personal jurisdiction over Dr. Gue is appropriate in this case. With regard to the interest of the forum state, the court notes that "the state of Iowa has a strong interest in protecting Iowa residents from damage as a result of tortious actions and breach of contractual duties by nonresident defendants." *Berkley Intn'l Co., Ltd.*, 289 N.W.2d at 605; *see Caesar's World, Inc. v. Spencer Foods, Inc.*, 498 F.2d 1176, 1179 (8th Cir. 1974) ("Under Iowa law, jurisdiction under the longarm statute will be sustained 'if plaintiff makes a prima facie showing of the existence of a contract to be performed in whole or in part' in Iowa.") (quoting *Midwest Packaging*

*Corp. v. Oerlikon Plastics, Ltd.*, 279 F. Supp. 816 (N.D. Iowa 1968)).  The convenience of the parties is really a wash—as it would be more convenient for the plaintiffs to litigate in an Iowa forum, while it would be more convenient for the defendants to litigate in a Montana forum.  Considering Iowa's strong interest in providing a forum for litigants alleging damage grounded in tort and breach of contract, the court finds that the secondary factors also weigh in favor of an exercise of personal jurisdiction.

As the court has found personal jurisdiction over Dr. Gue proper, and consistent with due process, the defendants' motion to dismiss, insofar as it moves for dismissal of Dr. Gue for lack of personal jurisdiction, is **denied**.

## B.  Standards For A Preliminary Injunction

As this court explained in past cases, it is well-settled in this circuit that applications for preliminary injunctions and temporary restraining orders[9] are generally measured against the standards set forth in *Dataphase Sys., Inc. v CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (*en banc*).  *See Doctor John's, Inc. v. City of Sioux City, Iowa*, 305 F. Supp. 2d 1022, 1033-34 (N.D. Iowa 2004); *Branstad v. Glickman*, 118 F. Supp. 2d 925, 937 (N.D. Iowa 2000); *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405, 1411 (N.D. Iowa 1996).  These factors include (1) the movant's probability of success on the

---

[9]In *Branstad v. Glickman*, 118 F. Supp. 2d 925, 937 (N.D. Iowa 2000), this court also discussed in some detail the differences between a temporary restraining order and a preliminary injunction.  *See Branstad*, 118 F. Supp. 2d at 935-937.  Suffice it to say that, in that case, the court found the following factors should be considered to distinguish a TRO from a preliminary injunction:  (1) whether the hearing was *ex parte* or adversarial; (2) whether the adversarial hearing allowed the basis for the relief requested to be strongly challenged; (3) whether the order expired, by its own terms, within the ten days provided by Rule 65(b); and (4) the "substance" of the order.  *Id.*

merits, (2) the threat of irreparable harm to the movant absent the injunction, (3) the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties, and (4) the public interest. *Dataphase*, 640 F.2d at 114; *accord Doctor John's, Inc.*, 305 F. Supp. 2d at 1033; *Branstad*, 118 F. Supp. 2d at 937 (quoting similar factors from *Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 898 (8th Cir. 2000)); FED. R. CIV. P. 65(b)(1). Although the *Dataphase* standards are *generally* applicable to motions for preliminary injunctions in civil cases in this circuit, the court cannot pass on without comment on another candidate for articulation of the applicable standards—Iowa law. First, in other diversity actions involving efforts by former employers to enjoin competition by former employees in violation of a non-competition agreement, this court considered whether the *Erie* doctrine, requiring application of state law to substantive questions in diversity cases, required application of state or federal standards to issuance of a preliminary injunction: *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405, 1422-23 (N.D. Iowa 1996) and *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1243-44 (N.D. Iowa 1995). In both instances, the court concluded that it should apply federal rather than Iowa law to the determination of whether a preliminary injunction should issue in the case, because, the court found, federal courts are to apply their own rules of civil procedure, including Rule 65, which incorporates traditional federal equity practice for the issuance of preliminary injunctions. *Uncle B's*, 920 F. Supp. at 1422-23; *Curtis 1000*, 878 F. Supp. at 1244. As the parties here have not raised the question of whether state or federal law applies to the issuance of a preliminary injunction in this case, this court has decided the same question in prior decisions and finds no ground to abandon those decisions, and, furthermore, again as in *Uncle B's* and *Curtis 1000*, the court concludes that, as a practical matter, application of federal rather than Iowa law to the question before the court would not be "outcome determinative," as Iowa courts apply roughly the

same tests as do federal courts of this circuit to issuance of a preliminary injunction, although the Iowa standard may in fact be more lenient. *Uncle B's*, 920 F. Supp. at 1422-23; *Curtis 1000*, 878 F. Supp. at 1244; *accord PIC USA v. North Carolina Farm Partnership*, 672 N.W.2d 718, 723 (Iowa 2003) (noting that under Iowa law the standards for granting temporary injunctions are similar to those for permanent injunctions); *Max 100 L.C. v. Iowa Realty Co., Inc.*, 621 N.W.2d 178, 180 (Iowa 2001) (discussing, under Iowa law, the standards governing issuance of temporary injunctions); *Emma Goldman Clinic v. Holman*, 2005 WL 974759 at *1-2 (Iowa Ct. App. Apr. 28, 2005) (discussing, briefly, temporary and permanent injunctive relief). Therefore, the court will look to the federal standards, rather than state standards, for determining if a preliminary injunction should issue in this instance.

"'A district court has broad discretion when ruling on requests for preliminary injunctions, and [the appellate court] will reverse only for clearly erroneous factual determinations, an error of law, or an abuse of that discretion.'" *Entergy, Ark., Inc.*, 210 F.3d at 898 (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998)). As the Eighth Circuit Court of Appeals has also explained,

> These factors are not a rigid formula. However, "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07, 79 S. Ct. 948, 3 L. Ed. 2d 988 (1959). Thus, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm. *See Adam-Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 299 (8th Cir. 1996).

*Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999); *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994) ("No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on

balance, they weigh towards granting the injunction.  However, a party moving for a preliminary injunction is required to show the threat of irreparable harm.") (internal quotation marks and citations omitted).

## C.  Conflict of Laws

Before embarking on a consideration of the *Dataphase* factors, the court must first resolve which state's standards should be used to determine the validity and enforceability of the covenant in question here, the standards of Iowa, the state identified in the parties' choice of law clause in the 1996 Agreement between them, or Montana,[10] the place where

---

[10]The court notes that a conflict of law exists between Iowa and Montana law regarding enforceability of covenants not to compete in employment contracts, in that such covenants are routinely upheld in Iowa, whereas Montana's extremely narrow view of such covenants routinely results in their unenforceability.  In Montana, the enforceability of covenants not to compete is governed by Montana Code § 28-2-703, which provides: "Any contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind  . . . is to that extent void." Montana courts have strictly construed this language and have routinely found covenants not to compete void in violation of this statute. *See, e.g.*, *Montana Mountain Prods. v. Curl*, ___ P.3d ___, 2005 WL 957977 at *2-4 (Mont. Apr. 26, 2005) (holding void covenant not to compete preventing former employee from engaging in competing employment within a 250-mile radius of employer for three years following termination of employment, where only option for former employee to practice her trade within the vicinity she resided was a competing employer in the prohibited area; also noting that on the two cases where the court had found a covenant not to compete in an employment contract was reasonable "the covenant only restricted the employee's stockholdings or profits") (citing *Daniels v. Thomas, Dean & Hoskins, Inc.*, 804 P.2d 359, 371 (Mont. 1990) and *Dobbins, DeGuire & Tucker, P.C. v. Rutherford, MacDonald & Olson*, 708 P.2d 577, 579 (Mont. 1985) as the two cases mentioned).  The court recognizes, as did the parties at oral argument, that it is very likely that under Montana's view of covenants not to compete, the non-compete clause at issue here would be held an unlawful restraint on trade in violation of Montana statutory law and

(continued...)

Dr. Gue performed services for Trans Ova Genetics under the 1996 Agreement, and where Dr. Gue is now allegedly performing competing services, individually and via Progenesis, in violation of the non-compete clause of the 1996 Agreement and the temporary restraining order issued by the state court.

### 1. *Iowa's choice of law rules in contract cases*

It is well established that a federal district court sitting in diversity must apply the substantive law of the state in which it sits, including its choice-of-law rules. *Harlan Feeders, Inc. v. Grand Labs., Inc.*, 881 F. Supp. 1400, 1403-04 (N.D. Iowa 1995) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941)); *accord Colonial Ins. Co. of Cal. v. Spirco Envtl., Inc.*, 137 F.3d 560, 561-62 (8th Cir. 1998) ("'Federal district courts must apply the choice-of-law rules of the state in which they sit when jurisdiction is based on diversity of citizenship." quoting *Whirlpool Corp. v. Ritter*, 929 F.2d 1318, 1320 (8th Cir. 1991)). However, in diversity situations, federal courts *are* allowed to apply their own rules of civil procedure. *Hanna v. Plumer*, 380 U.S. 460, 467, 470-71, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965). Iowa law employs the Second Restatement's "most significant relationship" test of § 188 of the Restatement (Second) of Conflict of Laws for determination of conflict of laws questions pertaining to contract actions. *See, e.g.*, *Veasley v. CRST Intn'l, Inc.*, 553 N.W.2d 896, 897 (Iowa 1996) (recognizing that Iowa has adopted the "most significant relationship" test); *Cameron v. Hardisty*, 407 N.W.2d 595, 597 (Iowa 1987) (same); *Cole v. State Auto. & Cas. Underwriters*, 296 N.W.2d 779, 781-82 (Iowa 1980) (same). The "most significant relationship" test applies both where the parties have not made a choice of law in the

---

[10](…continued)
would be unenforceable.

contract, and as a portion of the analysis where the parties have made a choice of law in the contract. *Joseph L. Wilmotte & Co. v. Rosenman Bros.*, 258 N.W.2d 317, 328 (Iowa 1977) (§ 187 of the Restatement permits parties to agree on the law to be applied to the contract so long as it does not override public policy of a state having a materially greater interest in the transaction as determined under § 188).

Within certain restrictions, the Iowa conflict-of-laws test for contract actions allows the parties to select for themselves the law that will apply to their contract. *Harlan Feeders, Inc.*, 881 F. Supp. at 1411. Restatement (Second) of Conflicts of Laws § 187 governs instances where the parties have designated, in the contract, the law of a particular state to govern. Section 187 provides:

> § 187. Law of the State Chosen by the Parties
> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one in which the parties could have resolved by an explicit provision in their agreement directed to that issue.
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issues is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

> (3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

RESTATEMENT SECOND, CONFLICTS OF LAWS, § 187. Section 187 "permits the parties to agree on the law to be applied to the contract in most cases so long as it does not override the public policy of a state having a materially greater interest in the transaction." *Wilmotte*, 258 N.W.2d at 328.

### 2. Application of § 187

In this case, the 1996 Agreement does have a choice of law provision, selecting Iowa law—therefore, § 187 is applicable in determining the choice of law clause to be honored in selecting the law to be applied to the validity and enforceability of the non-compete clause. In this instance, § 187(1) is inapplicable as the parties could not have provided for the enforceability of the non-complete clause. *Baxter Intern., Inc. v. Morris*, 976 F.2d 1189, 1196 (8th Cir. 1992) (holding that § 187(1) did not apply "because the parties could not have provided for the enforceability of the noncompete covenant") ; *Curtis 1000*, 878 F. Supp. at 1254 (citing *Baxter* for principle that parties could not have provided for enforceability of the noncompete covenant). The court, therefore, turns to an analysis under subsections (a) and (b) of § 187(2) to resolve this issue.

Turning first to § 187(2)(a), the court must consider whether there is "no substantial relationship" between the parties or the transaction and Iowa. Dr. Gue was employed with Trans Ova Genetics, Inc., without the constraints of an employment agreement, from 1990 through March 22, 1996, and during that time he was a resident of Sioux Center, Iowa. Affidavit of David Faber, DVM, Doc. No. 2, at ¶ 5. The 1996 Agreement was entered into on March 22, 1996, in Iowa. And, although Dr. Gue relocated to Trans Ova Genetics, Inc.'s Belgrade, Montana, location in August 1997—following the execution of the 1996 Agreement—he continued to have regular contact with the Sioux City main office

35

via telephone, email and fax, and his direct supervisor was at all times located in Sioux Center. Also, plaintiff Pro Edge, L.P., was formed in, and has its principal place of business in Iowa, and plaintiff Trans Ova Genetics, L.C. is an Iowa limited liability corporation with its principal place of business in Iowa. Therefore, in light of all of these facts, the court finds that a "substantial relationship" within the meaning of § 187(2)(a), does exist between the parties, the transaction, and Iowa.

Next, the court turns to the three-step analysis under § 187(2)(b):

> First, the court must determine which state's law would apply in default under section 188 in the absence of an effective choice of law by the parties. Second, the court must decide whether the default state has a materially greater interest in the outcome of the particular issue than the chosen state. Finally the court must determine whether application of the law of the chosen state would be contrary to a fundamental policy of the default state.

*Baxter*, 976 F.2d at 1196 (footnote omitted). As noted, the court must first determine which state's law would apply under § 188. Section 188 provides, in relevant part:

> (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>> (a) the place of contracting,
>> (b) the place of negotiation of the contract,
>> (c) the place of performance,
>> (d) the location of the subject matter of the contract, and
>> (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

RESTATEMENT, SECOND, CONFLICTS OF LAW § 188(2). The first two inquiries—the place of contracting and the negotiation of the contract—clearly weigh in the plaintiffs' favor.

The third inquiry, place of performance, points to both Iowa and Montana as Dr. Gue performed under the 1996 Agreement from March 1996 through August 1997 in Iowa, but then his performance was in Montana from August 1997 through April 2005. Although the 1996 Agreement itself did not contemplate performance in any particular state, the majority of Dr. Gue's performance under the 1996 Agreement was in Montana—therefore, the third factor cuts in favor of Montana as the default state under § 188. The fourth consideration deals with the location of the subject matter of the contract, which is discussed in the comments to § 188 as follows:

> When the contract . . . affords protection against a localized risk, such as the dishonesty of an employee in a fixed place of employment, the location . . . of the risk is significant (see §§ 189-193). The state where . . . the risk is located will have a natural interest in transactions affecting it.

Restatement (Second) Conflicts of Laws § 188 cmt. e. In this instance, the location of the risk, at least for the bulk of the 1996 Agreement's existence, has been in Montana. Dr David Faber, an original founder of Trans Ova Genetics, Inc., indicated that it was the *Montana* customer base that the plaintiffs feared would be eroded by Dr. Gue's competitive activities. Therefore, the forth factor also cuts in favor of Montana as the default state. The final consideration is the residence of the parties. In this case, the plaintiffs are *both* Iowa business entities, formed in Iowa, with their principal places of business in Iowa. On the other hand, the defendant is a Montana resident, although Dr. Gue was an Iowa resident for a time following the negotiation and execution of the contract. Therefore, the fifth factor cuts equally in favor of both Montana and Iowa. In sum, an analysis of the factors results in a "tie" between Montana and Iowa—Iowa claiming the first two factors, Montana claiming the third and forth factors, and Iowa and Montana dividing equally as to the fifth factor. A "tie" in essence, means that under an

analysis of the § 188 factors, neither Iowa or Montana has a materially greater interest, in reference to each other, in whether that state's law applies to this dispute. As neither state has a materially greater interest in this controversy than the other, there can be no state which satisfies the requirements of § 187(2)(b)—which looks to the public policy of the state which *both* (1) has a materially greater interest in the outcome than the chosen state, *and* (2) whose law would apply under § 188 absent a choice of law by the parties. *See* RESTATEMENT (SECOND), LAW OF CONFLICTS § 187(2)(b). In such a situation, the court will defer to the choice of law provision negotiated for by the parties—in this case, Iowa law. *See Baxter*, 976 F.2d at 1197 (deferring to the parties' choice of law where neither state had a materially greater interest in the controversy than the other). In sum, the choice of law analysis has resulted in the application of Iowa law in conformance with the choice of law provision in the 1996 Agreement.

### D. Covenant Not To Compete

#### 1. Iowa law

Under Iowa law, a court determines if an employment contract containing a restrictive covenant is enforceable by posing three inquiries:

> (1) Is the restriction reasonably necessary for the protection of the employer's business; (2) is it unreasonably restrictive of the employee's rights; and (3) is it prejudicial to the public interest?

*Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 761 (Iowa 1999) (citing *Lamp v. American Prosthetics, Inc.*, 379 N.W.2d 909, 910 (Iowa 1986)); *see also American Express Financial Advisors, Inc. v. Yantis*, 358 F. Supp. 2d 818, 829 (N.D. Iowa 2005); *Lemmon v. Hendrickson*, 559 N.W.2d 278, 282 (Iowa 1997); *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 381 (Iowa 1983); *Cogley Clinic v. Martini*, 112 N.W.2d 678,

681 (Iowa 1962). "Covenants not to compete are unreasonably restrictive unless they are tightly limited as to both time and area." *Revere*, 595 N.W.2d at 761. (quoting *Lemmon*, 559 N.W.2d at 282). "In justifying restraints enforced against an employee, [the Supreme Court of Iowa has] often relied upon the employee's close proximity to customers along with the peculiar knowledge gained through employment that provides a means to pirate a customer." *Iowa Glass*, 338 N.W.2d at 382. However, "[a]n employee cannot be precluded from exercising the skill and general knowledge [the employee] has acquired or increased through experience or even instruction while in the employment." *Iowa Glass*, 338 N.W.2d at 383. Other "[f]actors [the court must] consider in determining the enforceability of a noncompete agreement include the employee's close proximity to customers, the nature of the business, accessibility to information peculiar to the employer's business and the nature of the occupation which is restrained." *Revere*, 595 N.W.2d. at 761.

> Essentially these rules require [the court] to apply a reasonableness standard in maintaining a proper balance between the interests of the employer and the employee. Although [the court] must afford fair protection to the business interests of the employer, the restriction on the employee must be no greater than necessary to protect the employer.

*Iowa Glass*, 338 N.W.2d at 381.

### 2.    *Enforceability of the 1996 Agreement*

The court now turns to an analysis of whether, under Iowa law, the non-compete clause of the 1996 Agreement is enforceable. First, the court finds that this is a classic case in which the restriction is reasonably necessary to protect the plaintiffs' business as there has been a "showing that [Dr. Gue], when he left plaintiff[s'] employment, pirated . . . part of plaintiff[s'] business; took . . . some part of the good will of the plaintiff[s']

business, [and] it can be reasonably expected that some of the patrons or customers he served while in plaintiff[s'] employment will follow him to the new employment." *Dental East, P.C. v. Westercamp*, 423 N.W.2d 553, 555 (Iowa Ct. App. 1988) (citation and quotation omitted). The plaintiffs' business—embryo transfer of livestock cattle and related technologies and services—is a specialized one, and one in which only a select demographic of persons and businesses would be interested in engaging—namely, cattle and livestock producers. Clearly, the plaintiffs have an interest in staking their claim to customers in certain geographical areas, and use of a covenant not to compete to prevent the pirating of their good will and customers by their primary Montana representative is wholly reasonable.

Further, the court finds that the covenant not to compete is not unreasonably restrictive in time or area. The non-compete clause does not prevent Dr. Gue from practicing in the field of veterinary medicine, nor even in the specialty of embryo transfer in livestock. It merely prevents him from doing so within 250-miles of a Trans Ova facility, and for only 1 year following his separation from employment. The court finds the 250-mile radius restriction reasonable in light of the fact that when working for Trans Ova Genetics, L.C., Dr. Gue would routinely travel distances up to 250 miles in order to service certain customers; indeed, Trans Ova Genetics Inc.'s *largest* customers are within that geographical restriction—therefore, the 250-mile radius restriction is adequately tailored to protect the customer base the plaintiffs have established. The 250-mile radius restriction is appropriate and reasonable considering the number of customers that could be included in such a geographical area, and also in light of the fact that there are only a few, discrete, Trans Ova facilities in the country to which the restriction would apply. *See* Petition, Doc. No. 2 (restricting Dr. Gue from engaging in competing activities "within a 250-mile radius of *any Trans Ova facility or satellite office that is in existence at the time*

*he terminates his employment*.") (emphasis added). Also, there is no evidence that there are Trans Ova facilities within 250-miles of *all potential* would-be customers of embryo transfer services which Dr. Gue could lawfully service even under the 1996 Agreement.[11] Additionally, there is no indication that Dr. Gue could not practice a less specific kind of veterinary medicine at his current residence, or become an itinerant mobile embryo transfer specialist, until the one-year period has lapsed. Iowa courts have upheld covenants not to compete that were, in this court's opinion, far more restrictive than the one at hand. See *Farm Bureau Serv. Co. of Maynard v. Kohls*, 203 N.W.2d 209, 212 (Iowa 1972) (finding enforceable covenant restricting employee from competing within six townships and for up to one year); *Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368, 373 (Iowa 1971) (enjoining employee, pursuant to covenant not to compete, from contacting any of employer's customers for two years); *Orkin Exterminating Co. v. Burnett*, 146 N.W.2d 320, 327 (Iowa 1966) (holding enforceable covenant restraining employee from doing business within tem miles for three years); *Phone Connection, Inc. v. Harbst*, 494 N.W.2d 445, 449 (Iowa Ct. App. 1992) (finding restrictive covenant, as modified by the district court, reasonable which prevented former shareholder and employee from competing in counties in Iowa and Minnesota where employer had established a presence for two years); *Dental East,* 423 N.W.2d at 555 (upholding as reasonable covenant not to compete that required partial compensation for services performed for a period of one year on persons who were customers of employer); *but see Rasmussen Heating & Cooling, Inc. v. Idso*, 463 N.W.2d 703, 704 (Iowa Ct. App. 1990) (holding ten year covenant not to compete with company that manufactured and sold boat hoists unenforceable as not tightly

---

[11]In fact, the record establishes that Trans Ova Genetics, L.C. has but five locations in the country: Illinois, Iowa, Missouri, Montana and Oklahoma.

time limited or reasonably necessary for protection of business). Turning briefly to the final consideration of prejudice to the public interest, the court finds, for many of the same reasons the covenant was reasonably restricted in time and scope, that enforcement of the non-compete clause would not be prejudicial to the public interest. In this instance, Dr. Gue would only be restrained from performing services *similar to those he performed for Trans Ova*, and after only one year he would be free to perform any service he chose, anywhere in the country. The court does not find this injurious or prejudicial to public interest.

Finally, the defendants argue that as no separate, valuable consideration was given in exchange for the execution of the 1996 Agreement, the non-compete clause of the 1996 Agreement is unenforceable. Under Iowa law, "continuing employment for an indefinite period is sufficient consideration to support a covenant not to compete." *Farm Bureau Serv. Co. of Maynard v. Kohls*, 203 N.W.2d 209, (Iowa 1972); *see Moore Bus. Forms, Inc.*, 953 F. Supp. at 1064 ("With respect to later-signed employment agreements, the Wilsons' continued employment after entering into the agreement is sufficient consideration to support formation of the covenants not to compete."); *Phone Connection, Inc. v. Harbst*, 494 N.W.2d 445, 449 (Iowa Ct. App. 1992) ("In Iowa, continued employment for an indefinite period of time provides sufficient consideration to support a covenant not to compete.") (citing *Iowa Glass Depot*, 338 N.W.2d at 382 and *Farm Bureau Serv. Co.*, 203 N.W.2d at 212). Therefore, Dr. Gue's continued employment with the plaintiffs from March 22, 1996, through April 8, 2005, was sufficient consideration to support the non-compete clause contained in the 1996 Agreement.

In sum, the court concludes that under Iowa law the non-compete clause of the 1996 Agreement *is* reasonable, was given for consideration and is, therefore, enforceable.

**3.      Is the 1996 Agreement properly held by a plaintiff in this matter?**

**a.      Arguments of the parties**

In this instance, Dr. Gue asserts that from 2000 up until the time of his separation his employer was not Trans Ova Genetics, Inc.—the entity with which he entered into the 1996 Agreement—but, rather Trans Ova Genetics, L.C., the Trans Ova entity licensed to do business in Montana.  Therefore, Dr. Gue claims that when his employer changed from Trans Ova Genetics, Inc. to Trans Ova Genetics, L.C. in 2003, his duties under the 1996 Agreement ended as Trans Ova Genetics, L.C. was not the entity he entered into the 1996 Agreement with and could not enforce any rights Trans Ova Genetics, Inc. had under the 1996 Agreement.  Alternatively, Dr. Gue contends that the 1996 Agreement, even if held by Pro Edge, Ltd. when executed, was never assigned to Pro Edge, L.P., with his consent, and therefore is not enforceable by Pro Edge, L.P.  Dr. Gue also resists any contention that him signing a consent for his shares in Pro Edge, Ltd. to be converted into partnership units in Pro Edge, L.P. was tantamount to his consent of assignment of the 1996 Agreement to Pro Edge, L.P.  In sum, Dr. Gue reiterates that as he never consented, written or otherwise, to the assignment of the 1996 Agreement to Pro Edge, L.P. or to Trans Ova Genetics, L.C., neither plaintiff is in a position to restrict his activities in Montana under the 1996 Agreement.

The plaintiffs argue that throughout his employ, Dr. Gue was in actuality an employee of Pro Edge, Ltd. and then of Pro Edge, L.P. when it was formed in 1996 through April 8, 2005.  The plaintiffs first argue that the fact that Dr. Gue entered into the 1996 Agreement with Trans Ova Genetics, Inc.—a fictitious name used by Pro Edge, Ltd.—is irrelevant to whether the agreement is enforceable or properly owned by Pro Edge, Ltd., as corporations are allowed to entered into contracts under fictitious names.  Second, the plaintiffs aver that Dr. Gue was a shareholder in Pro Edge, Ltd. and *consented*

43

to the transfer of his shares into partnership units at the time that Pro Edge, Ltd. became a limited partner of Pro Edge, L.P.—a consent which acted as a sort of constructive assignment of the 1996 Agreement to Pro Edge, L.P. Alternatively, the plaintiffs argue that Dr. Gue—as a "Selling Shareholder" under the terms of the agreement under which Pro Edge, Ltd. sold off its interest in NOBL Laboratories, Inc. and retained its remaining assets for its movement into Pro Edge, L.P. as the limited partner—gave Everett Hoekstra, the Selling Shareholders' representative in this transaction, the authority to consent to the assignment of the 1996 Agreement to Pro Edge, L.P. Ultimately, the plaintiffs contend that Pro Edge, L.P. properly holds the 1996 Agreement, and can now seek to enforce the terms of that agreement against Dr. Gue.

### b. Corporate structure

In order to understand the court's resolution of this issue, it is integral to have a clear understanding of the changes in the plaintiffs' corporate structure from 1996 through April 2005. The court prefaces this discussion with the recognition that in 1996, Pro Edge Ltd. used the fictitious name Trans Ova Genetics, Inc.—which it had registered as such—in conducting its business. On March 22, 1996, Dr. Gue entered into the 1996 Agreement—which contained a noncompete clause and an assignment clause, among others—with Trans Ova Genetics, Inc.

In 1996, Pro Edge, Ltd., wholly-owned Pro Pork Associates, Inc., Trans Ova Genetics, Bio Edge and NOBL Laboratories, Inc. ("NOBL I"), as well as a 13% interest in Vet Pharm, Inc. and 4% interest in Metabolic Technologies, Inc.[12] At the November 11, 1996, Annual Stockholders' Meeting of Pro Edge, Ltd., the shareholders—including

---

[12]Pro Edge, Ltd.'s interest in Metabolic Technologies, Inc. was divested and dividends paid to the shareholders prior to the end of the 1996 calendar year—hence, prior to the alteration of the corporate structure.

Dr. Gue—unanimously approved the sale of NOBL to Boehringer Ingelheim Corporation ("BIC"), and the formation of a "limited partnership to serve as the new entity for the continued operations" of all of Pro Edge, Ltd.'s other holdings. Plaintiffs' Preliminary Injunction Exhibit KK. In order to prevent adverse tax consequences, the transaction became increasingly more complex. First, NOBL I merged with Pro Edge, Ltd. Pro Edge, Ltd. was the surviving entity of the merger, and it promptly renamed itself NOBL Laboratories, Inc. ("NOBL II"). Immediately after the merger, it appears as though all of the non-NOBL I assets, liabilities and personnel of all entities were spun off to a *new* entity named Pro Edge, Ltd. ("Pro Edge, Ltd. II") and the remaining NOBL II was then sold to BIC.[13] Pro Edge, Ltd. II promptly became the limited partner in Pro Edge, L.P. (which had been formed on December 31, 1996). *See id.*, Exhibits U, II, KK & LL. A newly formed Iowa limited liability company, Pro Management, L.C., served as the general partner for Pro Edge, L.P. The certificate of limited partnership of Pro Edge, L.P. indicates that Pro Edge, Ltd. II, as the limited partner, "contributed at least $3,626,689.00 worth of property" to Pro Edge, L.P. *Id.*, Exhibit U. As part of this transaction, "Selling Shareholders"—defined as those holding shares in Pro Edge, Ltd., some of which were to be sold as part and parcel of the sale of NOBL I to BIC, the others which were held by the resulting Pro Edge, Ltd. II—were given the option of cashing out their remaining shares (held by the now Pro Edge, Ltd. II) or converting those shares into partnership units with Pro Edge, L.P. Dr. Gue was such a "Selling Shareholder," and signed a "Limited Partner Statement Of Intent Regarding Limited Partnership Units Owned" in which he elected the following option:

_____

[13]NOBL II merged with BIC on December 14, 1998. Defendants' Preliminary Injunction Exhibit 2.

> I/We wish to retain our (sic) full investment in Pro Edge LP as
> represented by the Partnership Units originally issued pursuant
> to the spin off and distribution thereof to the former
> shareholders of Pro-Edge, Ltd.

*Id.*, Exhibit NN. After its formation, Pro Edge, L.P. registered and did business under the fictitious name of Trans Ova Genetics.

On November 14, 2000, Pro Edge L.P. filed articles of incorporation with the Iowa Secretary of State to form Trans Ova Genetics, L.C., of which Pro Edge, L.P. was the sole member. On August 1, 2003, a Special Board Meeting of the Board of Supervisors of Pro Management, L.C.—the sole general partner of Pro Edge, L.P.—was held. At this meeting the Board of Supervisors adopted resolutions under which Pro Edge, L.P. capitalized Trans Ova Genetics, L.C., by transferring to it all of Pro Edge, L.P.'s assets and liabilities related to its Trans Ova operating division. Pro Edge, L.P., additionally "assign[ed] its leases, contracts and agreements related to its Trans Ova operating division" to Trans Ova Genetics, L.C. Exhibit W, at 2. With respect to the assignment of leases, contracts and agreements, the meeting minutes adopting the resolution contained an attachment entitled "Exhibit 'C' Leases and Contracts Assigned to Trans Ova Genetics, L.C." which states that "[a]ll contracts and agreements in the name of Pro Edge, L.P. or Trans Ova Genetics which relate to the business of the Trans Ova division of Pro Edge, L.P., including without limitation, the following contracts or agreements." Plaintiffs' Preliminary Injunction Evidentiary Hearing Exhibit W, internal Exhibit "C." The 1996 Agreement is not listed. However, at the end of the list the following appears:

> Should assignment of any of the leases, contracts or
> agreements on this Exhibit "C" require the consent of the
> counterparty, and should such consent not be granted, then
> such lease, contract or agreement shall remain with Pro Edge,
> L.P. but Trans Ova Genetics, L.C. shall perform all functions

and have all responsibilities under such lease, contract or
agreement.

*Id.*

### c.    *Analysis*

Following this rendition of the transitions in the plaintiffs corporate structure from
1996 through April 2005, two issues become apparent: (1) does Pro Edge, Ltd.'s use of
the fictitious name Trans Ova Genetics, Inc., have any effect on whether the 1996
Agreement is enforceable?; (2) Was the 1996 Agreement enforceable by Pro Edge, L.P
following the reorganization of Pro Edge, Ltd.?; and (3) Did the capitalization of Trans
Ova Genetics, L.C. by Pro Edge, L.P, in which Pro Edge, L.P. purported to transfer and
assign all Trans Ova Genetics related assets, affect the enforceability of the 1996
Agreement by Pro Edge, L.P. (or Trans Ova Genetics, L.C.)?  The court will address each
of these issues in turn.

### i.    *Use of a fictitious name*.  The court turns first to Dr. Gue's entry into the

1996 Agreement with Pro Edge, Ltd., operating under the fictitious name Trans Ova
Genetics, Inc.  In 1996, and continuing today, Iowa law has allowed almost any business
entity to operate under a fictitious name so long as the name is properly registered with the
Secretary of State. *See* IOWA CODE § 490.401(5) (1996) (noting that if a domestic or
foreign corporation uses a fictitious name, it must "deliver to the secretary of state for
filing a copy of the resolution of its board of directors, certified by its secretary, adopting
a fictitious name."); *id*. § 490A.401(6) (1996) (containing similar language with respect
to limited liability companies); *id*. § 487.102 (2005) (containing similar language with
respect to limited partnerships); *but see id*. § 487.102 (1996) (containing *no* similar
language with respect to limited partnerships).   Further, entry into the 1996 Agreement
by the fictitious entity Trans Ova Genetics, Inc. on behalf of Pro Edge, Ltd., is acceptable

under Iowa law, as the Iowa Supreme Court has noted that "[a] corporation, like an individual, may do business *and contract* in a name other than its legal name." *Butler Mfg. Co. v. Elliott & Cox*, 233 N.W. 669, 670 (Iowa 1930) (emphasis added).[14]

---

[14]The concept that a corporation can do business and/or enter into a contract under a fictitious or assumed name is recognized by a majority of other states. *See, e.g. Miami Credit Bureau, Inc. v. Credit Bureau*, 276 F.2d 565, 567 (5th Cir. 1960) ("Like a natural person, a corporation can acquire a fictitious or trade name particularly where it has a secondary meaning, as here."); *Kitchell Corp. v. Hermansen*, 446 P.2d 934, 989 (Ariz. Ct. App. 1968) ('The validity of a contract entered into by a corporation under a name other than its incorporated name does not depend upon whether the name is known to be fictitious, but upon whether the name is used in good faith by the party adopting it."); *John L. Hutchenson Mem. Tri-County Hosp. v. Oliver*, 171 S.E.2d 649, 650 (Ga. Ct. App. 1969) ("A corporation conducting business in a trade name may sue or be sued in the trade name."); *Moon Motor Car Co. v. Savannah Motor Car Co.*, 152 S.E. 611, 612 (Ga. Ct. App. 1930) ("A corporation may transact business within its corporate powers in a name other than its legally authorized corporate name.") (quoting *Golden's Foundry & Mach Co. v. Wight*, 132 S.E. 138, 138 (Ga. Ct. App. 1926)); *Colorado Milling & Elevator Co. v. Proctor*, 76 P.2d 438, 440 (Idaho 1938) ("In absence of a statutory prohibition, a corporation may have and be known to the public by more than one name, and, in addition to name given by charter, corporation may acquire other names by user or reputation, and a contract entered into by or with corporation under an assumed name may be enforced by either party, if corporation's identity is established."); *Kansas Milling Co. v. Ryan*, 102 P. 2d 970, 975 (Kan. 1940) ("A contract entered into by or with a corporation under an assumed name may be enforced by either of the parties if the identity of the corporation is established by the proof."); *Griffith v. St. Walburg Monastery*, 427 S.W.2d 802, 803 (Ky. 1968) ("'It seems to be universally recognized that a corporation may do business under an assumed name, or under a name differing from its true corporate name.'") (quoting 56 A.L.R. 450); *Pro Source Roofing, Inc. v. Boucher*, 822 So.2d 881, 884 (La. Ct. App. 2002) ("The mere change in a corporation's name generally does not create a new entity, nor does it affect the corporation's property, rights, or liabilities."); *Ready Portion Meat Co. v. Michael's, A Catering Experience*, 542 So.2d 207, 209 (La. Ct. App. 1989) ("Absent fraud or deceit, there is no prohibition against a corporation from contracting or doing business under a trade name other than its registered corporate

(continued...)

[14](...continued)
name."); *National Oil Works v. Korn Bros.*, 114 So. 659, 661 (La. 1927) ("If a not or deed is executed by a corporation under an assumed name, it is just as much bound as if it had used its proper name, and the same is true of any other contract.") (citation and quotation omitted); *General Motors Acceptance Corp. v. Haley*, 109 N.E.2d 143, 147 (Mass. 1952) ("The validity, so far as third parties are concerned, of contracts entered into by a person or corporation under a name other than his or its own proper name does not depend upon whether he or it is as well known by that name as by his or its true name, but upon whether . . . the name is used in good faith by the party adopting it . . . .") (citation and quotation omitted); *Staples Coal Co. v. City Fuel Co.*, 55 N.E.2d 934, 937 (Mass. 1944) ("A corporation has right to assume a trade-name, and, in absence of fraud, to conduct its business in that name."); *Blanchard v. Stone's, Inc.*, 24 N.E.2d 688, 690 (Mass. 1939) ("A corporation may assume a trade name and conduct business under a name other than the one designated in its charter, and is bound to persons who have dealt with it under such assumed name."); *Coca-Cola Bottling Co. v. Groeper*, 691 S.W.2d 395, 397 (Mo. Ct. App. 1985) ("[A] corporation may adopt or assume a fictitious name, different from its true name, and make and enter into valid and binding contracts under such assumed or fictitious name, even though the same is not registered as required by statute."); *All Nite Garage, Inc. v. AAA Towing, Inc. of Reno*, 452 P.2d 902, 905 (Nev. 1969) (holding that a corporation was not required to file statutory notice of doing business under an assumed or fictitious name); *Spain Mgmt Co. v. Packs' Auto Sales*, 213 P.2d 433, 435 (N.M. 1950) (citing 56 A.L.R. 451); *Mail & Express Co. v. Parker Axles, Inc.*, 204 A.D. 327, 328, 198 N.Y.S. 20, 21 (N.Y. App. Div. 1923) ("A contract entered into by a corporation under an assumed name may be enforced by either of the parties."); *W.F. Meyers Co., Inc. v. Stoddard*, 526 A.2d 446, 448 (Pa. Super. 1987) ("Failure to register fictitious name does not impair or affect validity of any contract to which corporation is a party, but merely precludes corporations from instituting an action or gaining recovery until requirements for registration are met."); *Long v. Carolina Baking Co.*, 8 S.E.2d 326, 332 (S.C. 1939) ("A corporation, as well as individuals, may have or be known by several names in the transaction of its general business so that it may enforce, as well as be bound by, contracts entered into in an adopted name other than the regular name under which it was incorporated.") (citation and quotation omitted); *Kemmons Wilson, Inc. v. Allied Bank of Tex.*, 836 S.W.2d 104, 108 (Tenn. Ct. App. 1992) (noting that both Texas and Tennessee have statutes authorizing a corporation to operate under a trade or assumed

(continued...)

Therefore, the fact that the 1996 Agreement was entered into between Dr. Gue, and a fictitious entity—Trans Ova Genetics, Inc.—is of no moment in determining the enforceability of the 1996 Agreement. However, the practical effect of the use of the fictitious name is merely that the 1996 Agreement was in actuality held by Pro Edge, Ltd., not its fictitious counterpart—it has no effect on the enforceability of the 1996 Agreement *by Pro Edge, Ltd.*

      ***ii.***     ***Transition from Pro Edge, Ltd. to Pro Edge, L.P.*** The court now turns to an examination of whether the 1996 Agreement is enforceable by Pro Edge L.P. in light of the convoluted transition from Pro Edge, Ltd. to Pro Edge, L.P. First, the court reiterates that the 1996 Agreement contains the following provision regarding assignment: "This agreement may not be assigned by either party without the prior written consent of the other party." Petition, Doc. No. 2, Exh. 1. In evidence is a document entitled "STOCK PURCHASE AGREEMENT" which states that it is "By and Among" Pro-Edge, Ltd., NOBL Laboratories, Inc., Certain Selling Shareholders and BIC ("Stock Purchase Agreement"). Plaintiffs' Preliminary Injunction Exhibit II. The document is dated January 24, 1997—and was signed on that same day in New York City. *Id.*, Exhibit KK. The Stock Purchase Agreement sets forth, in excruciating detail, the reorganization of the

---

[14](…continued)

name); *Seattle Ass'n of Credit Men v. Green*, 273 P.2d 513, 515 (Wash. 1954) ("A corporation may contract and do business under an assumed name as well as can an individual, and be bound thereby in its corporate capacity.") (citing *Brotherhood State Bank of Spokane v. Chapman*, 259 P. 391, 392 (Wash. 1927); *Grafton Grocery Co. v. Home Brewing Co. of Grafton*, 54 S.E. 349, 350 (W. Va. 1906) ("A contract entered into by a corporation under an assumed name may be enforced by either of the parties, and the identity of the company may be established by the ordinary methods of proof.") (citation and quotation omitted).

plaintiffs' structure including NOBL I's merger into Pro Edge, Ltd., the renaming of Pro Edge, Ltd. to NOBEL II, the spin off of all non-NOBL I assets into the limited partner of Pro Edge, L.P., and the sale of the resulting NOBL II to BIC. *Id.*, Exhibit II. The Stock Purchase Agreement also indicates that non-NOBL I employees would be employed by Pro Edge, L.P. following the execution of the Stock Purchase Agreement: "As part of, and pursuant to, the Spin-Off, [Pro Edge, L.P.] shall employ all of the Employees which will not be employed by [NOBL II] from and after the Closing Date." *Id.* Exhibit II at ¶7.2(b). Relating to employee relations, the Stock Purchase Agreement states, in pertinent part:

> *Except as set forth in Schedule 3.28*, neither Pro-Edge nor NOBL is a party to any written, oral or implied contract or agreement with any employee or director of Pro-Edge or NOBL relating to the employment of any such employee or director, including, but not limited to, any contract or agreement that governs or is related to the terms and conditions of employment or the termination of such employment. Pro-Edge and NOBL have provided [BIC] with true and correct copies of each contract or agreement listed in Schedule 3.28. Pro-Edge and NOBL are and have been in compliance with the terms and conditions of all such written, oral and implied contracts and agreements.

*Id.*, Exhibit II, at ¶3.28(a) (emphasis added). Unfortunately, the plaintiffs did not provide Schedule 3.28 (or any other "Schedule" referred to in the Stock Purchase Agreement) as an exhibit—however, this will not prevent resolution of the issue at hand. This is because of another section of the Stock Purchase Agreement which appoints a representative on behalf of the Selling Shareholders:

> 2.7 <u>Appointment of Representative</u>. *By executing this Agreement*, each Selling Shareholder hereby appoints Everett Hoekstra as his, her or its agent and attorney-in-fact (the "Shareholders' Representative"), with full power and authority (including power of substitution), except as otherwise

> expressly provided in this Agreement, in the name of and for
> and on behalf of the Selling Shareholder, or in his, her or its
> own name as Shareholders' Representative, *to take all actions*
> *required or permitted under this Agreement* (including giving
> and receiving all accountings, reports, notices *and consents*),
> the Related Agreements and the signing of such Related
> Agreements . . . . The authority conferred under this Section
> 2.7 shall be an agency coupled with an interest, and all
> authority conferred *hereby is irrevocable and not subject to*
> *termination by the Selling Shareholders or any of them, or by*
> *operation of law*, whether by the death or incapacity of any
> Selling Shareholders, the termination of any trust or estate or
> the occurrence of any other event. . . .

*Id.*, Exhibit II at ¶ 2.7 (emphasis added). The express intent of the Stock Purchase Agreement was for BIC to acquire all of Pro Edge, Ltd.'s interest and stake in NOBL I, and for all of Pro Edge, Ltd.'s remaining assets to be spun off into Pro Edge, Ltd. II as a limited partner of Pro Edge, L.P. By executing the Stock Purchase Agreement, Dr. Gue—and all of the other Selling Shareholders—appointed Everett Hoekstra as his attorney-in-fact and authorized him to take all actions and give all consents required, or permitted, for this separation of assets to occur. In this court's opinion, by virtue of this provision, Dr. Gue's execution of the Stock Purchase Agreement gave Everett Hoekstra the authority to consent, on Dr. Gue's behalf, to the assignment of the 1996 Agreement from Pro Edge, Ltd. to Pro Edge, L.P. in furtherance of the reorganization plan laid out in the Stock Purchase Agreement. Therefore, the court finds that the 1996 Agreement was properly transferred from Pro Edge, Ltd. to Pro Edge, L.P., and consequently that Pro Edge, L.P. properly owns, and can sue to enforce, the provisions of the 1996 Agreement.

*iii.*    *Capitalization of Trans Ova Genetics, L.C.*    Finally, the court briefly addresses the capitalization of Trans Ova Genetics, L.C. by Pro Edge, L.P. on August 1, 2003. As previously noted, when Pro Edge, L.P. capitalized Trans Ova Genetics, L.C. on August 1, 2003, it transferred all of Pro Edge L.P.'s assets, liabilities and leases related to its Trans Ova operating division to Trans Ova Genetics, L.C. Exhibit "C" to the meeting minutes detailing the Board's adoption of a resolution authorizing the capitalization states that Trans Ova Genetics, L.C. would acquire "[a]ll contracts and agreements in the name of Pro Edge, L.P. or Trans Ova Genetics which relate to the business of the Trans Ova division of Pro Edge, L.P., including without limitation, the following contracts or agreements." Plaintiffs' Preliminary Injunction Evidentiary Hearing Exhibit W, internal Exhibit "C." Although the 1996 Agreement is not listed, the following statement appears following the listed contracts and agreements:

> Should assignment of any of the leases, contracts or agreements on this Exhibit "C" require the consent of the counterparty, and should such consent not be granted, then such lease, contract or agreement shall remain with Pro Edge, L.P. but Trans Ova Genetics, L.C. shall perform all functions and have all responsibilities under such lease, contract or agreement.

*Id.* Therefore, as the 1996 Agreement required Dr. Gue's written consent, it expressly remained with Pro Edge, L.P. Therefore, Pro Edge, L.P., properly holds, and has the legal authority to enforce the provisions of the 1996 Agreement.

As the court has found that Pro Edge, L.P., a plaintiff in this matter, properly holds and can sue to enforce, the 1996 Agreement, including the non-compete clause, the court now moves on to consider whether a preliminary injunction should issue in this case.

### E. Consideration Of The Dataphase Factors

#### 1. Likelihood of success on the merits

In prior cases, this court has explained the meaning of "likelihood of success on the merits" in the context of a motion for a preliminary injunction as follows:

> "[A]t the early stage of a preliminary injunction motion, the speculative nature of this particular ['likelihood of success'] inquiry militates against any wooden or mathematical application of the test. Instead, a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998) (internal citations and quotation marks omitted). Thus, the court is not deciding whether the movant for a preliminary injunction will ultimately win. *Heather K. v. City of Mallard*, 887 F. Supp. 1249, 1258 (citing *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991)). Rather, as this court explained in its consideration of the "*Dataphase* factors" in *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224 (N.D. Iowa 1995),
>
> > Likelihood of success on the merits requires that the movant find support for its position in governing law. In order to weigh in the movant's favor, the movant's success on the merits must be "at least . . . sufficiently likely to support the kind of relief it requests."
>
> *Youngblade*, 878 F. Supp. at 1247 (citations omitted).

*Branstad*, 118 F. Supp. 2d at 939; ; *accord Doctor John's, Inc.*, 305 F. Supp. 2d at 1034 (quoting this section of *Branstad*); *B & D Land and Livestock Co. v. Veneman*, 231 F. Supp. 2d 895, 906-07 (N.D. Iowa 2002) (also quoting this section of *Branstad*). Thus, "likelihood of success on the merits" necessarily requires consideration of the law applicable to the plaintiffs' claims.

With respect to the first consideration, the plaintiffs argue that Iowa's position that restrictive covenants, including covenants not to compete, are enforceable if reasonable in duration and scope, is sufficient to meet the likelihood of success prong of the *Dataphase* analysis. Stated differently, the plaintiffs contend that the likelihood of success inquiry is met because the law supports the kind of relief the plaintiffs are requesting in seeking to enforce a reasonable covenant not to compete in the 1996 Agreement. The defendants argue that there is not a likelihood of success on the merits as Montana law applies to this dispute, and under Montana statutory law covenants not to compete are void as restraints on trade. Further, the defendants argue that likelihood of success is minimal as no entity in existence today has the right to enforce the non-compete clause in the 1996 Agreement, and Dr. Gue never provided written consent for assignment of the 1996 Agreement to either of the plaintiffs in this matter.

The court does not see it necessary, at this juncture, to regurgitate the lengthy analysis of why Iowa law applies to this matter, and why the non-compete clause is valid and enforceable under Iowa law. Suffice it to say that the court has already previously disposed of the defendants' arguments that Montana law should apply to the 1996 Agreement, and that the non-compete clause contained in the 1996 Agreement is an unreasonable restraint on trade in violation of Montana law. The court here adopts its previous determinations that Iowa law would apply to this matter, and that the covenant not to compete is enforceable and valid under Iowa law, as supporting the court's finding here that a likelihood of success on the merits has been established.

### 2.      *Irreparable harm*

The second *Dataphase* factor is "irreparable harm." *See, e.g., Dataphase*, 640 F.2d at 114. As this court has also explained,

> "'The basis of injunctive relief in the federal courts has

always been irreparable harm and inadequacy of legal remedies.'" *Bandag, Inc.*, 190 F.3d at 926 (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506- 07, 79 S. Ct. 948, 3 L. Ed. 2d 988 (1959)). "Thus, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm." *Id.*; *Adam-Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 299 (8th Cir. 1996) ("'[T]he failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction.'") (quoting *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987)). Various considerations may be relevant to a determination of "irreparable harm." For example, a movant's delay in seeking relief or objecting to the actions the movant seeks to enjoin "belies any claim of irreparable injury pending trial." *Hubbard Feeds v. Animal Feed Supplement*, 182 F.3d 598, 603 (8th Cir. 1999). Moreover, an adequate showing of "irreparable harm" cannot be something that has never been the focus of the underlying lawsuit. *See United States v. Green Acres Enters., Inc.*, 86 F.3d 130, 133 (8th Cir. 1996). A sufficient showing on this factor can be made, for example, by showing that the movant has no adequate remedy at law. *Baker Elec. Co-op.*, 28 F.3d at 1473. Conversely, where the movant has an adequate legal remedy, a preliminary injunction will not issue. *See Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025 (8th Cir. 1992). Even where money damages are available to compensate for some of the harm to the movant, other less tangible injuries cannot be so easily valued or compensated, so that the availability of money damages that do not fully compensate the movant do not preclude a preliminary injunction. *Glenwood Bridge*, 940 F.2d at 371-72.

*Branstad*, 118 F. Supp. 2d at 941-42; *accord Doctor John's, Inc.*, 305 F. Supp. 2d at 1039 (quoting this portion of *Branstad*); *B & D Land and Livestock Co.*, 231 F. Supp. 2d at 910 (also quoting this portion of *Branstad*).

The plaintiffs argue that there is a significant threat of irreparable harm in this

instance as Dr. Gue had access to all information pertaining to the plaintiffs' Montana customers and operations, and that if he continues to pirate the plaintiffs' customers it threatens to undo the many years it took for the plaintiffs to establish a customer base in the Belgrade, Montana area. Further, there is no guarantee that these client relationships could ever be mended, and they are of significant value to the plaintiffs' continued presence in the Belgrade, Montana area.

Initially, the court notes that "[i]ntangible injuries, such as injury to goodwill and business relationships with customers, may be found to constitute irreparable harm." *American Express Fin. Advisors, Inc. v. Yantis*, 358 F. Supp. 2d 818, 835 (N.D. Iowa 2005) (citing *Moore Bus. Forms, Inc. v. Wilson*, 953 F. Supp. 1056 (N.D. Iowa 1996)). On many occasions, courts in a number of states, as well as this court, have held that the mere violation of a valid covenant not to compete supports an inference of the existence of a threat of irreparable harm. *See, e.g.*, *Moore Bus. Forms, Inc.*, 953 F. Supp. at 1056 (citing cases arising in other states finding irreparable harm from the violation of a valid covenant not to compete); *Uncle B's Bakery*, 920 F. Supp. at 1434-36 (finding threat of irreparable harm in form of trade secret misappropriation in violation of confidentiality agreement where former employee went to work for competitor); *Curtis 1000*, 878 F. Supp. at 1273 (finding irreparable harm arising from covenant not to compete). The Eighth Circuit Court of Appeals has previously adopted and employed this approach without consideration or reference to any particular state's law. *See N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984).

In this case, the evidence firmly establishes that Dr. Gue, from the time of his resignation on April 8, 2005, through at least May 19, 2005, provided embryo transfer services, and other related services, to customers of Trans Ova Genetics, L.C., within a 250-mile radius of the Belgrade, Montana, office. Dr. Gue candidly admitted as much.

Further, the evidence establishes that absent an injunction Dr. Gue would continue to offer competing services to past, current and future Trans Ova Genetics, L.C. customers. The possibility of irreparable harm is magnified where, as here, Trans Ova Genetics, L.C.'s largest and most 'premiere' customers, are located within the restricted area. Further, the court notes the significant customer relationships Dr. Gue fostered and established while with Trans Ova Genetics, L.C.'s Belgrade, Montana office. The evidence demonstrates that providing embryo transfer, and other related, services requires continued personal contact with ranch owners—and, as far as many of Trans Ova Genetics, L.C.'s customers were concerned, Dr. Gue *was* Trans Ova Genetics, L.C.; he was goodwill personified. In a situation such as this, where Dr. Gue's position with Trans Ova Genetics, L.C., put him in a position of intimacy and trust with Trans Ova Genetics, L.C.'s largest clients—it is readily apparent that failure to enjoin Dr. Gue's competitive activities could severely, if not permanently, damage Trans Ova Genetics, L.C.'s customer base and erode any goodwill Trans Ova Genetics, L.C. has established. Customer relations and goodwill are two very important commodities that monetary damages are completely incapable of compensating. *See Moore Bus. Forms*, 953 F. Supp. at 1063 (finding that "[i]f the restrictive covenants at issue prove to be valid and enforceable, continued violation of the covenants will cause the plaintiff to suffer some irreparable harm to goodwill and its established relationships."); *Presto-X-Company v. Ewing*, 442 N.W.2d 85, 89 (Iowa 1989) (finding that the plaintiff's harm would "be irreparable in the absence of an injunction [where] the customers [the defendant] pirated from the company would be permanently lost"). Moreover, hand in hand with a decrease in the customer base and erosion of goodwill comes a decrease in revenues—the plaintiffs testified that Dr. Gue's activities have resulted in a significant decrease in revenues just over the past few months, a trend which, were it to continue, could jeopardize the future of Trans Ova Genetics, L.C.'s

Belgrade, Montana location. Additionally, Dr. Gue admitted he would continue to provide competing service should a preliminary injunction not issue. On this record, the court finds that there has been an adequate showing of irreparable harm.

### 3. *Balance of harms*

As this court explained in *Branstad*,

> The next factor in the *Dataphase* analysis, the "balance of harms," requires the court to consider "the balance between the harm [to the movant] and the injury that the injunction's issuance would inflict on other interested parties, and the public interest." *Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926, 929 (8th Cir. 1994). Whereas "irreparable harm" focuses on the harm or potential harm to the plaintiff of the defendant's conduct or threatened conduct, *Dataphase*, 640 F.2d at 114, the "balance of harm" analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public, as well. *Id.*; *see also Glenwood Bridge*, 940 F.2d at 272. Thus, an illusory harm to the movant will not outweigh any actual harm to the nonmovant. *Frank B. Hall*, 974 F.2d at 1023. What must be weighed is the threat to each of the parties' rights and economic interests that would result from either granting or denying the preliminary injunction. *See Baker Elec. Co-op.*, 28 F.3d at 1473. Another consideration is whether the nonmovant has already voluntarily taken remedial action, which either eliminated or reduced the harm to the movant, or showed that such remedial action did not harm the nonmovant. *See Heather K.*, 887 F. Supp. at 1260.

*Branstad*, 118 F. Supp. 2d at 942-42; *accord Doctor John's, Inc.*, 305 F. Supp. 2d at 1040 (quoting *Branstad*); *B & D Land and Livestock Co.*, 231 F. Supp. 2d at 911 (also quoting *Branstad*).

With respect to this inquiry, the plaintiffs contend that the balance of harms tips in

their favor as there is a national market for embryo transfer services and this non-compete clause only restricts Dr. Gue from providing such services within a 250-mile radius of Trans Ova facilities. Further, the harm in restricting Dr. Gue's services to a limited geographical area is exponentially outweighed by the potential loss of revenue, customer relations and goodwill that Trans Ova would experience due to his continued illegal activity—especially in this situation where the defendant has not taken any remedial action to prevent or lessen the harm to the plaintiffs. The defendants, again, couch their arguments in terms of the application of Montana law and the fact that the plaintiffs are not proper parties to this action. However, the defendants add that a preliminary injunction would, for all practical purposes, divest Dr. Gue of any meaningful employment in his field. Dr. Gue argues that although he is licensed to perform other types of veterinary medicine, he has been out of other fields of veterinary medicine for almost fifteen years, and could not practically catch up with the changes that have occurred within other fields over that period of time. Moreover, Dr. Gue states that he suffers from an essential tremor, which prevents him from practicing many other types of veterinary medicine which require heightened dexterity.

As previously discussed, should Dr. Gue continue his competitive activities, significant, irreparable harm will likely occur to Trans Ova Genetics, L.C.'s customer base and goodwill in Belgrade, Montana. Chief Financial Officer Chad Feenstra ("Feenstra") indicated that the largest customers in the Belgrade, Montana area normally generate nearly 40-50% of the total customer sales—and, that since Dr. Gue began his competing activities, revenue from those customers has dropped to nearly nothing. Feenstra also opined that continued loss of more than 50% of the expected revenue could make it difficult for Trans Ova Genetics, L.C. to continue its operations in Belgrade, Montana. A number of witnesses, including Dr. Gue, noted was that the work was extremely

seasonal, and that the majority of Trans Ova Genetics, L.C.'s profits would be generated in the months of April, May and June. On Dr. Gue's side of this balancing act, the court notes that he does suffer from an essential tremor condition that would make it difficult, in addition to his years of practicing only one specialty, for him to transition into many other areas of veterinary medicine. However, as previously noted, the 250-mile restriction is reasonable as Dr. Gue can practice as an itinerant embryo transfer specialist throughout many areas of the country, and the restriction is only through April 8, 2006—after which time, Dr. Gue can service anyone, anywhere in the country, regardless of their proximity to a Trans Ova Genetics, L.C., facility. Though the court cannot help but feel sympathy for the predicament that Dr. Gue would be in should a preliminary junction issue, the court finds that the balance of the harms still weighs in favor of the plaintiffs as they could suffer permanent damage to their customer base, and severe financial repercussions should an injunction not issue at this time as it is the height of the breeding season.

### 4. *The public interest*

The last *Dataphase* factor the court must consider is the "public interest." *Entergy, Ark., Inc.*, 210 F.3d at 898; *Bandag, Inc.*, 190 F.3d at 926; *Iowa Right to Life Committee, Inc.*, 187 F.3d at 966. In *Branstad*, this court observed,

> [C]onsideration of the "public interest" factor has frequently invited courts to indulge in broad observations about conduct that is generally recognizable as costly or injurious. *See Heather K.*, F. Supp. at 1260. However, there are more concrete considerations, such as reference to the purposes and interests any underlying legislation was intended to serve, *see id.*, a preference for enjoining inequitable conduct, *see id.* at 1260 n.16, and the "public's interest in minimizing unnecessary costs" to be met from public coffers. *Baker Elec. Co-op.*, 28 F.3d at 1474.

*Branstad*, 118 F. Supp. 2d at 943; *accord Doctor John's, Inc.*, 305 F. Supp. 2d at 1042

(quoting *Branstad*); *B & D Land and Livestock Co.*, 231 F. Supp. 2d at 912 (also quoting *Branstad*).

Finally, with respect to this fourth *Dataphase* consideration, the plaintiffs argue that it is in the public interest to enjoin inequitable conduct, such as the conduct that the defendant is engaging in by thwarting the non-compete clause of the 1996 Agreement. The plaintiffs contend it is inequitable, in this instance, to allow Dr. Gue to utilize the knowledge and client contacts he gained during his substantial employment in order to compete with the plaintiffs. The defendants argue that Dr. Gue has not obtained any knowledge that is held only by Trans Ova Genetics, L.C., and further reiterate their position that Montana law applies to this controversy, and that Montana public policy, as evinced by Montana statutory law, is strongly opposed to enforcement of covenants not to compete in employment contracts.

As the court has previously held, Iowa, not Montana, law applies to this controversy. Because Iowa law routinely enforces reasonable restrictive covenants and grants injunctions in appropriate cases, the public policy of Iowa would be served by imposing an injunction to the extent necessary under the balancing test provided under Iowa law and the other *Dataphase* factors. *See, e.g.*, *N.I.S.*, 724 F.2d at 710 ("[I]f these non-compete agreements are valid, the public interest calls for their enforcement."). Absent any other overriding public policy, the propriety of an injunction rests on the threat of irreparable harm, the plaintiffs' probability of prevailing on the merits, and on the relative balance of the harm to the plaintiffs if an injunction is not imposed. Here, each of the other factors has weighed in favor of the grant of a preliminary injunction, and the court finds the grant of a preliminary injunction congruent with the terms of the non-compete clause contained in the 1996 Agreement is appropriate.

### F. Rule 65's Bond Requirement

Because the court finds that it is proper, upon balancing the *Dataphase* factors" in the circumstances presented here, to issue a preliminary injunction, the court turns to the question of security for its issuance. Rule 65(c) provides, in pertinent part, as follows:

> **(c) Security.** No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof.

FED. R. CIV. P. 65(c). The bond posted under Rule 65(c) "is a security device, not a limit on the damages the defendants may obtain against [the movant] if the facts warrant such an award." *Minnesota Mining & Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305, 1309 (8th Cir. 1997). The Eighth Circuit Court of Appeals has warned that, "[a]lthough we allow the district court much discretion in setting bond, we will reverse its order if it abuses that discretion due to some improper purpose, or otherwise fails to require an adequate bond or to make the necessary findings in support of its determinations." *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991) (citing *Rathmann Group v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989)). In *Rathmann-Group v. Tanenbaum*, 889 F.2d 787 (8th Cir. 1989), the Eighth Circuit Court of Appeals determined that the district court abused its discretion by not requiring a bond in addition to the $10,000.00 already posted on the issuance and continuation of a temporary restraining order—a holding which could be read to mean that the bond for a preliminary injunction was mandatory even where a previous bond for a temporary restraining order was in place. *Rathmann-Group*, 889 F.2d at 789. On the other hand, the court cited as support for its decision to remand, *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978), which found

error, according to the *Rathmann-Group* court, "not because [the] trial court failed to require a bond in any particular amount, but because [the] court failed to exercise discretion required by Rule 65(c) by expressly considering [the] question of requiring [a] bond," *id.*, which suggests that whether or not a bond is required is in the discretion of the court.

In this case, neither party has expressly suggested that a bond should issue upon the finding that a preliminary injunction was appropriate—though the defendants have stated that the bond required by the state court for issuance of the temporary restraining order was woefully inadequate to cover any damages Dr. Gue could suffer. In this case, the court notes that there is no evidence that the plaintiffs are financially insolvent and would be unable to compensate Dr. Gue for the damages he could incur if this preliminary injunction was wrongfully entered. On the other hand, however, is the fact that with Iowa law applying to the controversy, Dr. Gue has little chance of success on the merits. As there is no strong public policy for waiving the bond requirement in this case, and as Dr. Gue has little likelihood of success on the merits of the controversy under Iowa law, the court, in the exercise of the discretion granted to it by Rule 65(c), finds that a bond equivalent in amount to that ordered by the state court to secure the temporary restraining order is appropriate security in this instance. *See Rathmann Group*, 889 F.2d at 789 (suggesting that whether or not a bond is required is in the discretion of the trial court). Therefore, a preliminary injunction shall issue upon the plaintiffs posting of a bond in the amount of thirty thousand dollars ($30,000.00).

## G.  Venue

### 1.  Improper Venue

In the motion to dismiss, the defendants seek to have this court dismiss the plaintiffs' Petition on the ground of improper venue under Federal Rule of Civil Procedure 12(b)(3).  In removing this action to federal court, the defendants admitted that jurisdiction was based on diversity under 28 U.S.C. § 1332.  In their motion to dismiss, the defendants now contend that venue in this district is improper under 28 U.S.C. § 1391(a), which provides:

> (a) A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial party of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced.

28 U.S.C. § 1391(a) (2004).  In *Setco Enterprises Corp. v. Robbins*, 19 F.3d 1278 (8th Cir. 1994), the Eighth Circuit Court of Appeals stated that under the amended venue statute,[15] "we no longer ask which district is the 'best' venue" but rather "we ask whether the district the plaintiff chose had a substantial connection to the claim, [and] whether or not other  forums had greater contacts." *Id.* at 1281.  In light of the facts in this case, including Dr. Gue's residence in Iowa from 1990 through August 1997 while employed by Trans Ova Genetics, Inc., his employment operating under a contract negotiated and

---

[15]In 1990, Section 1391(a)(2) was amended to provide that venue was proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." *See* Judicial Improvements Act of 1990, Pub. L. 101-650, Title III, § 311, 104 Stat. 5114 (codified at 28 U.S.C. § 1391(a)(2)).

executed in Iowa, and his employment by Iowa entities up to April 8, 2005, the court finds that a substantial part of the events giving rise to this claim occurred in this judicial district making venue proper pursuant to 28 U.S.C. § 1391(a). Further, the previous finding of personal jurisdiction over Dr. Gue supports the court's finding of appropriate venue under 28 U.S.C. § 1391(a)(3) which states that the matter can be brought in a "judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(a)(3). In summary, the court holds that venue in this action, in which Dr. Gue is the only remaining defendant, is appropriate in this district under 28 U.S.C. § 1391(a) and the defendants' motion to dismiss is **denied in part** to the extent it seeks dismissal on this ground. In light of this holding, the court turns to the final remaining contention—transfer of the case to the District of Montana under the *forum non conveniens* doctrine pursuant to 28 U.S.C. § 1404(a).

### 2. *Forum non conveniens*

Under the doctrine of *forum non conveniens*, "'where an alternate forum has jurisdiction to hear [a] case, and when trial in the chosen forum would establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience, or when the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems, 'the court may, in the exercise of its sound discretion,' dismiss the case, even if jurisdiction and proper venue are established.'" *American Dredging Co. v. Miller*, 510 U.S. 443, 447-48, 114 S. Ct. 981, 127 L. Ed. 2d 285 (1994) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981)). It is a discretionary doctrine which vests in the district courts the power to abstain from the exercise of jurisdiction "even where authorized by statute if 'the litigation can more appropriately be conducted in a foreign tribunal.'" *de Melo v. Lederle Labs., Div. of Am. Cyanamid Corp.*, 801 F.2d 1058, 1060

(8th Cir. 1986); *see also Mizokami Bros. of Arizona v. Mobay Chemical Corp.*, 660 F.2d 712, 717 (8th Cir. 1981) (quoting *Dahl v. United Technologies Corp.*, 632 F.2d 1027, 1029 (3d Cir. 1981) ("The principle of *forum non conveniens* permits a court to decline jurisdiction even though venue and jurisdiction are proper, on the theory that for the convenience of the litigants and witnesses, the action should be tried in another forum."); *American Dredging Co.*, 510 U.S. at 449 n.2.

The principles that govern a motion to dismiss on *forum non conveniens* grounds are well settled. The court must first determine whether there is an adequate alternative forum available in which the dispute can be resolved. This is a two-part inquiry; availability and adequacy. *Reid-Walen v. Hansen*, 933 F.2d 1390, 1393 (8th Cir. 1991). Generally, an alternate forum will be considered adequate when the defendant is "amenable to process" there. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 506-07, 67 S. Ct. 839, 91 L. Ed. 1055 (1947); *see also R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir. 1991) (citing *Piper Aircraft*, 454 U.S. 235). Here the defendants argue that the United States District Court for the District of Montana would be an appropriate forum. As the remaining defendant, Dr. Gue, is a Montana resident—there is no question that he is amenable to process in Montana. Thus, the first inquiry into whether Montana is an adequate and available forum is satisfied.

However, there is a second inquiry that must be made before a transfer on *forum non conveniens* grounds should be granted. If there is such an adequate alternative forum, the court must balance a number of factors in order to determine whether they outweigh the deference ordinarily attended to the plaintiff's choice of forum. *See Mizokami Bros. of Arizona*, 660 F.2d at 717-18. In the seminal decision of *Gulf Oil Corporation v. Gilbert*, 330 U.S. 501, 509, 67 S. Ct. 839, 91 L. Ed. 1055 (1947), the Supreme Court enumerated a nonexhaustive list of factors which must be considered in the *forum non*

*conveniens* equation. The Court categorized these considerations into "private interest," and "public interest" factors. The private interest factors consist of the following:

> 1) relative ease of access to sources of proof;
> 2) availability of compulsory process for attendance of unwilling, and cost of obtaining attendance of willing, witnesses;
> 3) possibility of view of the premises, if view would be appropriate to the action; and
> 4) all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Piper Aircraft*, 454 U.S. at 241 n.6 (quoting *Gilbert*, 330 U.S. at 508). The public interest factors consist of the following:

> 1) administrative difficulties flowing from court congestion;
> 2) the forum's interest in having localized controversies decided at home;
> 3) the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action;
> 4) the avoidance of unnecessary problems in conflicts of laws, or the application of foreign law; and
> 5) the unfairness of burdening citizens in an unrelated forum with jury duty.

*Id.* (quoting *Gilbert*, 330 U.S. at 509). Under this analysis, the defendant bears the ultimate burden of persuasion in satisfying the court that a *forum non conveniens* dismissal is appropriate. *Northrup King Co.*, 51 F.3d at 1389. In addition, the Eighth Circuit Court of Appeals reiterated that the "central principle of the *Gilbert* doctrine" is that, in weighing these factors, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Reid-Walen*, 933 F.2d at 1393 n.2.

The defendants contend that considerations of the interests of justice, the convenience of the parties and the convenience of the witnesses all mitigate in favor of this court transferring the case on grounds of *forum non conveniens* to the District of Montana.

First, the defendants contend that as all of the operative events leading to this controversy occurred in Montana, interests of efficiency weigh in favor of a transfer. Second, the defendants argue that convenience of the parties and the witnesses mitigate in favor of transferring the case, as the District of Montana is equally convenient for both parties as the plaintiffs have a Belgrade, Montana, office, and the remaining defendant, Dr. Gue, resides in Montana. Further, the defendants argue that the documents, discovery, and witnesses necessary to resolution of the dispute are located in Montana—where the events precipitating this litigation occurred. Moreover, transferring the case would allow for live testimony of witnesses, rather than having depositions read into the record, at trial. Finally, the defendants contend that the public interest weighs in favor of transferring the matter to Montana, in that Montana has a significant interest in a dispute involving a Montana resident and a company licensed to do business in Montana.

After evaluating the relevant public and private factors, the court concludes that there is nothing inherent about the Northern District of Iowa's location regarding the parties' themselves that suggests that their convenience favors dismissal. The court has not been presented with any compelling evidence that litigating in Iowa will be more inconvenient to Dr. Gue as a party than litigating in Montana will be to Pro Edge, L.P. and Trans Ova Genetics, L.C. Accordingly, as the 1996 Agreement was negotiated and executed between the parties in Iowa, Iowa law applies to this controversy, therefore Iowa has a genuine and legitimate interest in the resolution of the issue here. Moreover, as Iowa law applies to this controversy, transfer to the District of Montana would require the Montana court to apply law with which it is not familiar—such is not the case should the case remain in the Northern District of Iowa. Moreover, this case would not impose a burden on the court, and, in fact, interests of judicial economy will be served in having the case here, before a court that is familiar and well-versed in the intricacies of the

controversy. As a result, the plaintiffs' chosen forum, Iowa, will not be disturbed. *See Reid-Walen*, 933 F.2d at 1394 (quoting *Gilbert*, 330 U.S. at 508, 67 S. Ct. 839).

After taking into consideration all of the possible factors, the court, in its discretion, has determined that a transfer on *forum non conveniens* grounds is not appropriate in this matter. *See de Melo*, 801 F.2d at 1060 (8th Cir. 1986). Therefore, the defendants' motion to dismiss, insomuch as it requests transfer of the case to the District Court of Montana, is **denied.**

## III. CONCLUSION

For the reasons set forth in detail above, the court holds as follows:

- The Defendants' Motion To Dismiss (Doc. No. 6), to the extent it is based on lack of personal jurisdiction over defendant Progenesis, is **granted in part**.

- The Defendants' Motion To Dismiss (Doc. No. 6), to the extent it is based on lack of personal jurisdiction over defendant Dr. Gue, is **denied in part**.

- The Defendants' Motion To Dismiss (Doc. No. 6), to the extent it seeks dismissal for improper venue under 28 U.S.C. § 1391(a), is **denied in part**.

- The Defendants' Motion To Dismiss (Doc. No. 6), to the extent it seeks transfer to the United States District Court for the District of Montana pursuant to the *forum non conveniens* doctrine embodied in 28 U.S.C. § 1404(a), is **denied in part**.

- The Plaintiffs' Motion to Extend Temporary Restraining Order and Request for Hearing on Preliminary Injunction (Doc. No. 3), is **granted.**

Upon the foregoing, the court concludes that the plaintiffs' request for a preliminary injunction should be, and hereby is, **granted** to the extent that the court will issue the

attached preliminary injunction. *See* Doc. No. 3.

In closing, the court would like to emphasize that it found the issue of whether personal jurisdiction existed over Dr. Gue an exceedingly close one, and the question of whether Iowa or Montana law should apply to determine the enforceability of the non-compete clause in the 1996 Agreement, even closer. To this end, the court would not want the promptness or the thoroughness of this order to dissuade Dr. Gue from exercising his appeal of right of the court's grant of a preliminary injunction. *See El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 482, 119 S. Ct 1430, 143 L. Ed. 2d 635 (1999) ("Preliminary injunctions are, after all, appealable as of right") (citing 28 U.S.C. § 1292(1)(a)). In fact, these issues are such close questions that the court *encourages* Dr. Gue to seek review of this order from the Eighth Circuit Court of Appeals.

**IT IS SO ORDERED.**

**DATED** this 1st day of June, 2005.

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

PRO EDGE, L.P., d/b/a TRANS OVA
GENETICS, INC., and TRANS OVA
GENETICS, L.C., f/k/a TRANS OVA
GENETICS, INC.,

        Plaintiffs,

vs.

CHARLES S. GUE, III, DVM,
Individually, and PROGENESIS
EMBRYO TRANSFER, LTD., a
Montana Corporation,

        Defendants.

No. C 05-4068-MWB

**PRELIMINARY
INJUNCTION**

_____

**WHEREAS**, this matter came before the court pursuant to the May 19, 2005, request of the plaintiffs for a preliminary injunction,

**AND WHEREAS**, pursuant to Rule 65 of the Federal Rules of Civil Procedure, the court finds that defendant Charles S. Gue, III, DVM, has been and will continue to violate the non-competition provisions of an employment contract between the plaintiffs and Dr. Gue, and that failure to enjoin such conduct would impose irreparable harm or injury or the threat of such irreparable harm or injury upon the plaintiffs, and upon further consideration of all other relevant factors,

**DEFENDANT CHARLES S. GUE, III, DVM,** is hereby **preliminarily enjoined** from performing *any* services similar to those he provided while employed at Trans Ova Genetics, L.C.—including, but not limited to, embryo transfer services and in vitro

fertilization—within a 250-mile radius of any Trans Ova Genetics, L.C., facility or satellite office that was in existence as of April 8, 2005.

This preliminary injunction shall be binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this order.

This preliminary inunction shall issue upon the posting by the plaintiffs herein of a bond, in compliance with Rule 65(c) of the Federal Rules of Civil Procedure in the sum of thirty thousand dollars ($30,000.00).

This preliminary injunction shall remain in full force and effect until the trial of this matter or until this order is modified or dissolved by this or a reviewing court.

**IT IS SO ORDERED.**

**DATED** this 1st day of June, 2005.

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA