# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

PRO EDGE L.P. d/b/a TRANS OVA
GENETICS, INC. and TRANS OVA
GENETICS, L.C. f/k/a TRANS OVA
GENETICS, INC.,

        Plaintiffs,

vs.

CHARLES S. GUE, III, DVM,

        Defendant.

No. C05-4068-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANT'S MOTION TO
AMEND FINDINGS AND
JUDGMENT AND/OR FOR
RECONSIDERATION AND
REQUEST FOR NONEVIDENTIARY
HEARING**

————————————

**TABLE OF CONTENTS**

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   *A. Standards For Modification Or Reconsideration* . . . . . . . . . . . . . . . 4
   *B. June 1, 2005, Order* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   *C. Arguments Of The Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      *1. Dr. Gue's arguments for reconsideration and modification*
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      *2. The plaintiffs' arguments in resistance* . . . . . . . . . . . . . . 14
   *D. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      *1. Rules of contract interpretation and construction* . . . . . . . 16
      *2. Did Dr. Gue "execute" the Stock Purchase Agreement?* . . . 18
      *3. Implication of termination provisions in paragraphs 7.1 and*

*7.2(b)* ................................... 20

    *4.*      *Hoekstra's authority under paragraph 2.7* ............ 25

    *5.*      *Contention as to Hoekstra's consent to assignment* ...... 28

*III. CONCLUSION* ..................................... 30

## I. INTRODUCTION

This matter comes before the court on the defendant's Motion to Amend Findings and Judgment and/or Reconsideration and Request for Nonevidentiary Hearing filed June 10, 2005. (Doc. No. 21) ("Motion to Reconsider"). The defendant's motion follows this court's extensive order granting the plaintiffs' motion for a preliminary injunction, and granting in part and denying in part the defendants' motion to dismiss.[1] Memorandum Opinion and Order Regarding Plaintiffs' Motion For Preliminary Injunction; Defendants' Motion to Dismiss; and Preliminary Injunction, Doc. No. 20 ("June 1, 2005, Order"). In conjunction with this order, the court also issued a preliminary injunction restricting Dr. Gue from performing any services similar to those he provided while employed with the plaintiffs within a 250-mile radius of any Trans Ova Genetics, L.C., facility or satellite office in existence as of April 8, 2005. (Doc. No. 20). The factual background precipitating this controversy is thoroughly addressed in the June 1, 2005, Order and will not be regurgitated here except by reference to the defendant's specific arguments. Though numerous issues were addressed in the June 1, 2005, Order, in the current motion defendant Charles S. Gue, III, DVM ("Dr. Gue") takes issue with the court's findings as

---

[1] The court granted the defendants' motion to dismiss as to defendant Progenesis Embryo Transfer, Ltd. ("Progenesis"), after finding that the court could not properly maintain personal jurisdiction over Progenesis. June 1, 2005, Order at 18.

to a discrete area of contention—whether the 1996 Agreement, which contains the non-compete clause, is properly held by plaintiff Pro Edge, L.P.  Dr. Gue did request "nonevidentiary" oral argument on his motion.  The plaintiffs filed their Resistance to the Motion to Amend and/or Reconsider on June 21, 2005. (Doc. No. 24).

Although it has been the court's strong preference over the years to grant oral arguments whenever requested, the court has not found oral arguments necessary to the resolution of the defendant's motion.  Moreover, the court's busy schedule—including post-trial motions in one federal death-penalty case, recent completion of a second in which the trial lasted nine weeks, and the numerous other cases on the court's docket that require attention—has not permitted the scheduling of oral arguments sufficiently in advance to permit timely resolution of the defendant's motion.  Further, in this instance, the defendant does not request the opportunity to admit additional evidence, but rather seeks only oral argument on the motion—as such, all of the evidence necessary to determine the outcome of the defendant's motion has already been admitted into the record.  Therefore, the court will resolve the defendant's Motion to Reconsider on the written submissions.

The court will first delineate the authority under which it can reconsider the findings and legal conclusions of the June 1, 2005, Order, followed by excerpts of the disputed portion of the June 1, 2005, Order, the arguments of the parties, and finally a resolution of the defendant's motion.

## II. LEGAL ANALYSIS

### A. Standards For Modification Or Reconsideration

The defendant asserts that the court has authority under Federal Rule of Civil Procedure 52(b) to correct its findings and amend the judgment—which, if Dr. Gue's position is adopted, would require vacating the preliminary injunction. Federal Rule of Civil Procedure 52(b), which is entitled "Findings by the Court; Judgment on Partial Findings," provides in relevant part:

> **(a) Effect.** In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. . . . Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. . . .
>
> **(b) Amendment**. On a party's motion filed no later than 10 days after entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly. . . .

FED. R. CIV. P. 52(b) (2005). Rule 52(b) is "intended to permit a party to move the trial court to clarify or supplement factfindings to enable the appellate court to understand the factual issues determined at trial." *Clark v. Nix*, 578 F. Supp. 1515, 1516 (D. Iowa 1984). "Motions made under [Rule 52(b)] . . . are not intended merely to relitigate old matters nor are such motions intended to allow the parties to present the case under new theories of law." *Evans, Inc. v. Tiffany & Co.*, 416 F. Supp. 224, 244 (D.C. Ill. 1976). The purpose of 52(b) is to provide the court an opportunity to correct manifest errors of law

or fact at trial. *Clark*, 578 F. Supp. at 1516; *see Luxton v. State Farm Life Ins. Co.*, 2002 WL 254023 (D. Minn. Jan. 15, 2002)): *Baufield v. Safelite Glass Corp.*, 831 F. Supp. 713, 716 n.4 (D. Minn. 1993); *Piekarski v. Home Owners Sav. Bank, F.S.B.*, 759 F. Supp. 542, 545 (D. Minn. 1991).

Though Dr. Gue frames his request in terms of Rule 52(b), he actually contends that the court, in the June 1, 2005, Order, committed a "manifest error of fact and law," Motion To Reconsider at ¶5, not that the court failed to engage in fact finding and legal analysis. *See Boatmen's First Nat'l Bank of Kansas City v. Kansas Public Employees Retirement Sys.*, 57 F.3d 638, 639 (8th Cir. 1995) (finding, on defendant's appeal from grant of preliminary injunction, that district court had failed to "engage in the fact finding and legal analysis required by Rule 52(b)"); *Accord Cody v. Hillard*, 139 F.3d 1197, 1200 (8th Cir. 1998) (remanding the case to the district court to enter findings of fact and conclusions of law sufficient for the Eighth Circuit to review the decision, and noting that though Rule 52 (a) "generally requires findings of fact and conclusions of law for rulings on injunctions," the court need not decide whether Rule 52(b) applied to motion to dissolve an injunction in order to remand in this instance).   As Dr. Gue's contends amendment and/or reconsideration is appropriate based on "manifest error of fact and law," rather than on a failure to conduct sufficient factfinding, the court believes that the defendant's motion is, in fact, an improperly styled Rule 59(e) motion. *See Norman v. Arkansas Dept. of Educ.*, 79 F.3d 748, 750 (8th Cir. 1996) ("'any motion that draws into question the correctness of the judgment is functionally a motion under [Rule 59(e)], whatever its label.'") (quoting *Quartana v. Utterback*, 789 F.2d 1297, 1300 (8th Cir. 1986)).   The substance of the motion, not its nomenclature, is controlling. *BBCA, Inc. v. U.S.*, 954 F.2d 1429, 1431-32 (8th Cir. 1992), *cert. denied*, 506 U.S. 866, 113 S. Ct. 192 121 L. Ed. 2d 136 (1992).

Rule 59(e) reads:

> **(e) Motion to Alter or Amend Judgment.** Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment.

FED. R. CIV. P. 59(e) (2003).  Rule 59(e) was adopted to clarify a district court's power to correct its own mistakes in the time period immediately following entry of judgment. *Norman v. Ark. Dep't of Educ.*, 79 F.3d 748, 750 (8th Cir. 1996) (citing *White v. New Hampshire Dep't of Employment Sec.*, 455 U.S. 445, 102 S. Ct. 1162, 71 L. Ed. 2d 325 (1982)).  Like Rule 52(b) motions, Rule 59(e) motions "serve the limited function of correcting manifest errors of law or fact or to present newly discovered evidence." *Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills*, 141 F.3d 1284, 1286 (8th Cir. 1998); *see Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 413 (8th Cir.), *cert. denied*, 488 U.S. 820, 109 S. Ct. 63, 102 L. Ed. 2d 40 (1988).  A motion to amend a judgment under Rule 59(e) can be granted to: (1) incorporate an intervening change of law; (2) present new evidence previously unavailable; or (3) correct clear error or prevent manifest injustice.  *See Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 414 (8th Cir. 1988) (citation omitted); *Van Horn v. Specialized Support Servs., Inc.*, 269 F. Supp. 2d 1064, 1069 (S.D. Iowa 2003); *Baker v. John Morrell & Co.*, 266 F. Supp. 2d 909, 919 (N.D. Iowa 2003).  Importantly, Rule 59(e) motions cannot be used to "introduce new evidence, tender new legal theories, or raise arguments which could have been offered or raised prior to entry of judgment." *Baker*, 266 F. Supp. 2d at 919 (citing *Hagerman*, 839 F.2d at 414).  "A district court has broad discretion in determining whether to grant a [Rule 59(e)] motion to alter or amend judgment . . . ." *Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills*, 141 F.3d 1284, 1286 (8th Cir. 1998) (quoting *Global Newtork Techs., Inc. v. Regional Airport Auth.*, 122 F.3d 661, 665 (8th

Cir. 1997)) (citation and quotations omitted). Denial of a Rule 59(e) motion is reviewed for abuse of discretion and the district court abuses its discretion only if its judgment was "'based on clearly erroneous factual findings or erroneous legal conclusions.'" *Innovative Home Health Care, Inc.*, 141 F.3d at 1286 (quoting *Perkins v. U.S. West Communications*, 138 F.3d 336, 340 (8th Cir. 1998))(citations and quotations omitted); *see also Compturol, Inc. v. Newtrend, L.P.*, 203 F.3d 1064, 1070 (8th Cir. 2000); *Roark v. City of Hazen, Ark.*, 189 F.3d 758, 761 (8th Cir. 1999); *Baker*, 266 F. Supp. 2d at 919. In this case, Dr. Gue's motion, filed June 10, 2005, is timely under Rule 59(e)—therefore Rule 59(e) can provide a basis for relief, if such relief is appropriate. *See Brandstad v. Veneman*, 2001 WL 34008494 at *2 (N.D. Iowa July 19, 2001) (noting that failure to file within the time specified by Rule 59(e) "eliminates that rule as the basis for the district court's actions").

### B. June 1, 2005, Order

As briefly noted above, Dr. Gue's Motion to Reconsider focuses on the sole issue of whether the 1996 Agreement (which contains the non-compete clause) was properly transferred from Pro Edge, Ltd. to Pro Edge, L.P. Though the background of the business reorganization that occurred in 1996 is fully detailed in the June 1, 2005, Order, the court finds it helpful, at this juncture, to restate here the relevant portions of the June 1, 2005, Order's synopsis on the plaintiffs' corporate structure and reorganization, as well as the analysis on that issue so as to give proper context to the defendant's argument that the findings of fact and conclusions of law were manifestly erroneous.

With regard to the plaintiffs' corporate structure, and reorganization of that structure—to the extent relevant to the specific issues raised by the Motion to Reconsider—the June 1, 2005, Order stated:

In 1996, Pro Edge, Ltd., wholly-owned Pro Pork Associates, Inc., Trans Ova Genetics, Bio Edge and NOBL Laboratories, Inc. ("NOBL I"), as well as a 13% interest in Vet Pharm, Inc. and 4% interest in Metabolic Technologies, Inc. At the November 11, 1996, Annual Stockholders' Meeting of Pro Edge, Ltd., the shareholders—including Dr. Gue—unanimously approved the sale of NOBL to Boehringer Ingelheim Corporation ("BIC"), and the formation of a "limited partnership to serve as the new entity for the continued operations" of all of Pro Edge, Ltd.'s other holdings. Plaintiffs' Preliminary Injunction Exhibit KK. In order to prevent adverse tax consequences, the transaction became increasingly more complex. First, NOBL I merged with Pro Edge, Ltd. Pro Edge, Ltd. was the surviving entity of the merger, and it promptly renamed itself NOBL Laboratories, Inc. ("NOBL II"). Immediately after the merger, it appears as though all of the non-NOBL I assets, liabilities and personnel of all entities were spun off to a *new* entity named Pro Edge, Ltd. ("Pro Edge, Ltd. II") and the remaining NOBL II was then sold to BIC. Pro Edge, Ltd. II promptly became the limited partner in Pro Edge, L.P. (which had been formed on December 31, 1996). *See id.*, Exhibits U, II, KK & LL. A newly formed Iowa limited liability company, Pro Management, L.C., served as the general partner for Pro Edge, L.P. The certificate of limited partnership of Pro Edge, L.P. indicates that Pro Edge, Ltd. II, as the limited partner, "contributed at least $3,626,689.00 worth of property" to Pro Edge, L.P. *Id.*, Exhibit U. As part of this transaction, "Selling Shareholders"—defined as those holding shares in Pro Edge, Ltd., some of which were to be sold as part and parcel of the sale of NOBL I to BIC, the others which were held by the resulting Pro Edge, Ltd. II—were given the option of cashing out their remaining shares (held by the now Pro Edge, Ltd. II) or converting those shares into partnership units with Pro Edge, L.P. Dr. Gue was such a "Selling Shareholder," and signed a "Limited Partner Statement Of Intent Regarding Limited Partnership Units

Owned" in which he elected the following option:

> I/We wish to retain our (sic) full investment in Pro Edge LP as represented by the Partnership Units originally issued pursuant to the spin off and distribution thereof to the former shareholders of Pro-Edge, Ltd.

> *Id.*, Exhibit NN. After its formation, Pro Edge, L.P. registered and did business under the fictitious name of Trans Ova Genetics.

June 1, 2005, Order at 44-46 (footnotes omitted).

In regard to the specific issue raised by Dr. Gue in his Motion to Reconsider, the June 1, 2005, Order found as follows:

> The court now turns to an examination of whether the 1996 Agreement is enforceable by Pro Edge L.P. in light of the convoluted transition from Pro Edge, Ltd. to Pro Edge, L.P. First, the court reiterates that the 1996 Agreement contains the following provision regarding assignment: "This agreement may not be assigned by either party without the prior written consent of the other party." Petition, Doc. No. 2, Exh. 1. In evidence is a document entitled "STOCK PURCHASE AGREEMENT" which states that it is "By and Among" Pro-Edge, Ltd., NOBL Laboratories, Inc., Certain Selling Shareholders and BIC ("Stock Purchase Agreement"). Plaintiffs' Preliminary Injunction Exhibit II. The document is dated January 24, 1997—and was signed on that same day in New York City. *Id.*, Exhibit KK. The Stock Purchase Agreement sets forth, in excruciating detail, the reorganization of the plaintiffs' structure including NOBL I's merger into Pro Edge, Ltd., the renaming of Pro Edge, Ltd. to NOBL II, the spin off of all non-NOBL I assets into the limited partner of Pro Edge, L.P., and the sale of the resulting NOBL II to BIC. *Id.*, Exhibit II. The Stock Purchase Agreement also indicates that non-NOBL I employees would be employed by Pro Edge, L.P. following the execution of the Stock Purchase

Agreement: "As part of, and pursuant to, the Spin-Off, [Pro Edge, L.P.] shall employ all of the Employees which will not be employed by [NOBL II] from and after the Closing Date." *Id.* Exhibit II at ¶7.2(b). Relating to employee relations, the Stock Purchase Agreement states, in pertinent part:

> *Except as set forth in Schedule 3.28*, neither Pro-Edge nor NOBL is a party to any written, oral or implied contract or agreement with any employee or director of Pro-Edge or NOBL relating to the employment of any such employee or director, including, but not limited to, any contract or agreement that governs or is related to the terms and conditions of employment or the termination of such employment. Pro-Edge and NOBL have provided [BIC] with true and correct copies of each contract or agreement listed in Schedule 3.28. Pro-Edge and NOBL are and have been in compliance with the terms and conditions of all such written, oral and implied contracts and agreements.

*Id.*, Exhibit II, at ¶3.28(a) (emphasis added). Unfortunately, the plaintiffs did not provide Schedule 3.28 (or any other "Schedule" referred to in the Stock Purchase Agreement) as an exhibit—however, this will not prevent resolution of the issue at hand. This is because of another section of the Stock Purchase Agreement which appoints a representative on behalf of the Selling Shareholders:

> 2.7 <u>Appointment of Representative</u>. *By executing this Agreement*, each Selling Shareholder hereby appoints Everett Hoekstra as his, her or its agent and attorney-in-fact (the "Shareholders' Representative"), with full power and authority (including power of substitution), except as otherwise expressly provided in this Agreement, in the name of and for and on behalf of the Selling Shareholder, or in his, her or its

10

> own name as Shareholders' Representative, *to take all actions required or permitted under this Agreement* (including giving and receiving all accountings, reports, notices *and consents*), the Related Agreements and the signing of such Related Agreements . . . . The authority conferred under this Section 2.7 shall be an agency coupled with an interest, and all authority conferred *hereby is irrevocable and not subject to termination by the Selling Shareholders or any of them, or by operation of law*, whether by the death or incapacity of any Selling Shareholders, the termination of any trust or estate or the occurrence of any other event. . . .

*Id.*, Exhibit II at ¶ 2.7 (emphasis added). The express intent of the Stock Purchase Agreement was for BIC to acquire all of Pro Edge, Ltd.'s interest and stake in NOBL I, and for all of Pro Edge, Ltd.'s remaining assets to be spun off into Pro Edge, Ltd. II as a limited partner of Pro Edge, L.P. By executing the Stock Purchase Agreement, Dr. Gue—and all of the other Selling Shareholders—appointed Everett Hoekstra as his attorney-in-fact and authorized him to take all actions and give all consents required, or permitted, for this separation of assets to occur. In this court's opinion, by virtue of this provision, Dr. Gue's execution of the Stock Purchase Agreement gave Everett Hoekstra the authority to consent, on Dr. Gue's behalf, to the assignment of the 1996 Agreement from Pro Edge, Ltd. to Pro Edge, L.P. in furtherance of the reorganization plan laid out in the Stock Purchase Agreement. Therefore, the court finds that the 1996 Agreement was properly transferred from Pro Edge, Ltd. to Pro Edge, L.P., and consequently that Pro Edge, L.P. properly owns, and can sue to enforce, the provisions of the 1996 Agreement.

June 1, 2005, Order at 50-52.

With this background in mind, the court turns to the arguments of the parties,

followed by an analysis of the grounds raised in Dr. Gue's Motion to Reconsider as requiring modification of the June 1, 2005, Order.

### C. Arguments Of The Parties

#### 1. Dr. Gue's arguments for reconsideration and modification

Dr. Gue advances four arguments as to why the quoted portion of the June 1, 2005, Order amounts to a manifest error of law and fact. First, Dr. Gue takes issue with the court's statement that Dr. Gue "executed" the Stock Purchase Agreement—claiming that there is no evidence supporting that factual conclusion. Dr. Gue points out that the copy of the Stock Purchase Agreement admitted into evidence was not signed (i.e. executed) by anyone, including Dr. Gue. Dr. Gue also argues that reliance should not be placed on the Limited Partner Statement of Intent Regarding Partnership Units Owned ("Statement of Intent")—in which Dr. Gue was given the opportunity to elect between retaining or redeeming his investment in Pro Edge L.P. Plaintiffs' Preliminary Injunction Exhibit ("Plf.s' Exhibit") NN. This is so, according to Dr. Gue, because the Statement of Intent was merely an election between two options, and was signed after the transfer of assets from Pro Edge, Ltd. to Pro Edge L.P. ("Spin Off") and after the execution of the Stock Purchase Agreement. In summary, Dr. Gue contends there is no basis in the record for finding that he executed the Stock Purchase Agreement, and therefore paragraph 2.7 does not operate to confer upon Everett Hoekstra ("Hoekstra") the authority to consent, on Dr. Gue's behalf, to the assignment of the 1996 Agreement.

Second, Dr. Gue advances some less than clear arguments that paragraphs 7.1 and 7.2(b) of the Stock Purchase Agreement demonstrate that Pro Edge, L.P. can not properly hold the 1996 Agreement. Dr. Gue contends that, under paragraph 7.1 of the Stock Purchase Agreement, Pro Edge, Ltd. was *required to terminate* the 1996 Agreement before

12

it could have been assigned by Hoekstra to Pro Edge, L.P.—therefore, Hoekstra could not have assigned the 'terminated' contract to Pro Edge, L.P. Further, Dr. Gue argues that under paragraph 7.2(b) he was "*terminated* as an employee of Pro Edge, Ltd. *before* he was employed by Pro Edge, L.P.," Deft.'s Brief at 7 (emphasis in original). Dr. Gue contends that any interest held by Pro Edge, Ltd. in the 1996 Agreement ceased—and therefore could not be transferred to Pro Edge, L.P.—when the 1996 Agreement was terminated under paragraph 7.1 and/or Dr. Gue's employment with Pro Edge, Ltd. was terminated under paragraph 7.2(b).

Third, Dr. Gue contends that there is no evidence that Hoekstra actually exercised any power granted to him under paragraph 2.7—and there is no evidence from which the court could infer that Hoekstra exercised any such authority to consent to assignment of the 1996 Agreement.

Fourth, and finally, Dr. Gue contends that even if he executed the Stock Purchase Agreement, and paragraph 2.7 gave Hoekstra the authority to consent to actions on Dr. Gue's behalf, paragraph 2.7 is limited to those actions required of Dr. Gue as a shareholder, not as an employee. Dr. Gue contends that it is clear from the Stock Purchase Agreement's definitions of certain terms in paragraph 2.7 that Hoekstra's consent to assignment of the 1996 Agreement was not an action required or permitted under the Stock Purchase Agreement. Finally, Dr. Gue asserts that any authorization given to Hoekstra was as a shareholder, and not as an employee—as each of these terms ("Shareholder" and "Employee") are given separate meanings within the Stock Purchase Agreement. Dr. Gue argues that it was his consent as an *employee*, not as a shareholder, that was required for transfer of the 1996 Agreement to Pro Edge, L.P.—and there is no evidence that Dr. Gue gave that consent, or that Hoekstra was authorized to give Dr. Gue's consent as an employee to the assignment of the 1996 Agreement.

### 2.    *The plaintiffs' arguments in resistance*

First, as to Dr. Gue's contention that the court committed a manifest error of fact in finding that Dr. Gue executed the Stock Purchase Agreement, the plaintiffs note that the argument was 'carefully' couched in terms of a lack of evidence to support the finding, not in denial by Dr. Gue that he did not execute the Stock Purchase Agreement. The plaintiffs assert that the court, as the trier of fact, has the authority to draw reasonable inferences from the evidence—and that the reasonable inference to be drawn from the portions of the Stock Purchase Agreement that were submitted, in conjunction with other plaintiffs' exhibits, is that the Stock Purchase Agreement was duly executed and the transaction detailed in the Stock Purchase Agreement was completed. The plaintiffs argue that additional evidence supporting this inference exists in the January 24, 1997, letter to stockholders which indicates that the shareholders had previously executed a document authorizing Hoekstra to act on their behalf, and requesting the execution of a second stock power to authorize further actions on the shareholders' behalf. The plaintiffs also contend that Dr. Gue himself submitted several exhibits which are consistent with the transaction described in the Stock Purchase Agreement—including a document indicating that the merger of NOBL I into Pro Edge, Ltd. received the unanimous consent of the stockholders. Finally, the plaintiffs argue that though the court did not rely on the theory of ratification in support of its finding, the consent of Dr. Gue to the Stock Purchase Agreement makes reasonable a finding that Dr. Gue ratified the transfer of his employment to Pro Edge, L.P.

Second, the plaintiffs address Dr. Gue's arguments directed at the 'termination' paragraphs 7.1 and 7.2(b) of the Stock Purchase Agreement. The plaintiffs suggest that the wording of paragraph 7.1 indicates that the Stock Purchase Agreement did not cancel *all* agreements between Pro Edge, Ltd. and the Selling Shareholders—but only those

agreements similar to those specifically enumerated by that section, which included shareholder's agreements, stock purchase agreements, options agreements and redemption agreements. The plaintiffs contend that as employment agreements are not similar in nature to those listed agreements, paragraph 7.1 is inapplicable to the 1996 Agreement. Further, the plaintiffs argue that section 7.2(b) cannot be properly read as requiring termination of all employment agreements existing between Pro Edge, Ltd., NOBL I, NOBL II and the Selling Shareholders. The plaintiffs aver that as written, "the permissible actions for transferring the employment of employees to the limited partnership included, but were not limited to, termination of the employee." Plaintiffs' Brief in Resistance to Defendant's Motion to Amend and/or Reconsider ("Plf.s' Resistance"), Doc. No. 24, at 5.

Finally, the plaintiffs address Dr. Gue's final contention that there is no evidence supporting a finding that Hoekstra did, in fact, exercise the authority granted to him under the Stock Purchase Agreement. The plaintiffs again point out that the Stock Purchase Agreement was not the only evidence submitted to the court, and that a series of documents were available to the court in making its determination. As one example, the plaintiffs point to a "Statement of Unanimous Consent To Action Taken In Lieu Of A Special Meeting Of The Shareholders Of Pro-Edge, Ltd.," which recorded the affirmative vote of each shareholder to enter into the various transactions contemplated by the Stock Purchase Agreement. The plaintiffs argue that it was reasonable for the court to infer that Dr. Gue's consent was obtained by authorizing "Hoekstra to take the actions necessary to consummate the transactions contemplated by the Stock Purchase Agreement, and that the contemplated transactions included the transfer of employment to the Limited Partnership." Plf.s' Resistance at 6.

In sum, the plaintiffs argue that the court's June 1, 2005 Order was firmly grounded

in law and fact, that the court was entitled to draw the reasonable inferences it did from the evidence before it, and that the defendant's Motion to Reconsider should be denied.

## D. Analysis

Some of the arguments Dr. Gue advances in support of his Motion to Reconsider implicate principles of contract construction and interpretation. Therefore, the court will first briefly set forth Iowa law pertaining to contract interpretation and construction for reference where appropriate, and then will address each of Dr. Gue's arguments for modification and/or reconsideration *seriatim*.

### 1. Rules of contract interpretation and construction

Iowa law recognizes a distinction between "interpretation" and "construction" of a contract. *See Kaydon Acquisition Corp. v. America Central Indus., Inc.*, 179 F. Supp. 2d 1022, 1037 (N.D. Iowa 2001). When the dispute concerns the meaning of certain contract terms, the court must engage in the process of interpretation, rather than construction. *See id.* (citing *Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001)). As this court has noted:

> The Iowa Supreme court has explained that:
> The primary goal of contract interpretation is to determine the parties' intentions at the time they executed the contract. *See Hartig Drug Co. [v. Hartig]*, 602 N.W.2d [794,] 797 [(Iowa) 1999)]. Interpretation involves a two-step process. First, from the words chosen, a court must determine "what meanings are reasonable possible." *Restatement (Second) of Contracts* § 202, cmt. a, at 87 (1981). In so doing, the court determines whether a disputed term is ambiguous. A term is not ambiguous if, "after all pertinent rules of interpretation have been

> considered," "a genuine uncertainty exists concerning which of two reasonable interpretations is proper." *Id.*
>
> Once an ambiguity is identified, the court must then "choos[e] among possible meanings." *Restatement (Second) of Contracts* § 202 cmt. a, at 87. If the resolution of ambiguous language involves extrinsic evidence, a question of interpretation arises which is reserved for the trier of fact. *Fausel*, 603 N.W.2d at 618.

*Walsh*, 622 N.W.2d at 503.

*Kaydon Acquisition Corp.*, 179 F. Supp. 2d at 1037-38. Further, the Iowa Supreme Court has stated that "We . . . do not interpret [any] contractual term apart from the context of the agreement as a whole. . . . The parties' intent as evidenced by all of the terms of the contract controls our conclusion." *Koenigs v. Mitchell County Bd. of Supervisors*, 659 N.W.2d 589, 594 (Iowa 2003). "Interpretation" is a question of law for the court unless the meaning of disputed terms turns on extrinsic facts or choices among reasonabe inferences." *Grinnell Select Ins. Co. v. Continental Western Ins. Co.*, 639 N.W.2d 31, 33 (Iowa 2002).

However, when the dispute centers on determining the legal effect of contractual terms, the court engages in the process of construction, rather than interpretation. *See Fausel v. JRJ Enterps., Inc.*, 603 N.W.2d 612, 618 (Iowa 1999); *Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 25 (Iowa 1978). "In the construction of written contracts, the cardinal principle is that the intent of the parties must control; and except in cases of ambiguity, this is determined by what the contract itself says." Iowa R. App. P 6.14(6)(n). The Iowa Supreme Court has explained that "construction" is "always a question of law." *See Grinnell Select Ins. Co.*, 639 N.W.2d at 33.

With these principles and tenants of contract construction and interpretation under

Iowa law in mind, the court now turns to consideration of each of Dr. Gue's arguments for modification and/or reconsideration.

## 2. Did Dr. Gue "execute" the Stock Purchase Agreement?

First, the court turns to the finding that Dr. Gue "executed" the Stock Purchase Agreement—and takes this opportunity to further clarify the analysis advanced in the June 1, 2005, Order. Dr. Gue is correct in that the copy of the Stock Purchase Agreement submitted into evidence does not bear any signatures, and is incomplete in some respects (specifically as to some of the pages of the document and as to the "Schedules" referred to internally in the Stock Purchase Agreement). However, the court would direct attention to two additional documents received into evidence. First is the The Proposal To Stockholders, given at the November 11, 1996, Annual Stockholders' Meeting—and unanimously approved by the stockholders of record which states, in part:

> **PROPOSED**
> That Pro-Edge enter into a Limited Partnership (LP) with a Limited Liability Company (LLC) acting as general partner for the LP, for the purpose of contributing the net assets of Pro-Edge's non-NOBL operating activities and investments (i.e. Trans Ova Genetics, Pro Pork Associates, Bio Edge, Vet Pharm, and Metabolic Technologies) to the LP in exchange for partnership units in said LP. . . . .

Plf.s' Exhibit JJ. The court does note that the November 11, 1996, Proposal To Stockholders in the record is an unsigned copy. Second, the court looks to the January 27, 1997, letter from Hoekstra (on behalf of the Board of Directors) to the "Stockholder/Partner[s]." Plf.s' Exhibit KK. The letter indicates that negotiations with BIC for the sale of NOBL I were "concluded Friday, January 24, 1997, with the signing of the Stock Purchase Agreement in New York City." Plf.s' Exhibit KK at 1. The Stock Purchase Agreement in evidence bears the date January 24, 1997—creating a strong, and

as yet unrebutted, inference that the Stock Purchase Agreement in evidence was that referred to in the January 27, 1997 letter.  The January 27, 1997, letter further indicates:

> As you know, this transaction was *unanimously approved* by the shareholders of record at our November 11, 1996, Annual Stockholder's Meeting.  In addition to approving the proposed sale of NOBL Laboratories at that time, the shareholders also approved the formation of a limited partnership to serve as the new entity for the continuing operations of Trans Ova Genetics, Pro Pork and Bio Edge, as well as the holder of the Company's 13% interest in Vet Pharm . . . .
>
> * * *
>
> On January 1, 1997, NOBL was merged with its parent company, Pro-Edge.  As the parent company, Pro-Edge remained as the surviving corporation of this merger and promptly renamed itself NOBL Laboratories, Inc. *Immediately after the merger, the assets, liabilities and personnel* of the Company's Trans Ova Genetics, Pro Pork and Bio Edge activities, along with its 13% interest in Vet Pharm were transferred to a newly formed Iowa limited partnership known as Pro Edge LP.

Plf.s' Exhibit KK at 1 (emphasis added).  Though the November 11, 1996, Proposal to Stockholders in the record is unsigned, the January 27, 1997, letter indicates that the proposal was *unanimously* approved by the shareholders of record—which includes Dr. Gue.  Coupled with these documents is Dr. Gue's Statement of Intent, indicating that he intended to retain his ownership interest in Pro Edge L.P. and Dr. Gue's letter of resignation in which he indicates a need, at some point in the future, to communicate with certain personnel at the main office regarding those retained "LP units." *See* Plf.s' Exhibits B & NN.  Dr. Gue does not contend that the transformation of Pro Edge, Ltd. into Pro Edge, L.P.—an entity embodying all of Pro Edge, Ltd.'s assets except for those related to NOBL I—did not take place; nor could he as he was the beneficiary of certain

partnership units in Pro Edge, L.P. as a result. The shareholders of record, by unanimously approving the reorganization of Pro Edge, Ltd. into the limited partner of Pro Edge, L.P. concurrently with the sale of all NOBL I assets to BIC, evidences the execution of the Stock Purchase Agreement by the Selling Shareholders—despite the fact that there is no Stock Purchase Agreement bearing Dr. Gue's signature in the record. Further evincing the execution of the Stock Purchase Agreement by the Selling Shareholders is the fact that the reorganization and sale of NOBL I assets to BIC, as laid out in the Stock Purchase Agreement, did, in fact, take place. Therefore, taking all of this evidence as a whole, the court will not reverse its finding of fact that Dr. Gue, as a Selling Shareholder, executed the Stock Purchase Agreement—thus implicating paragraph 2.7 of the Stock Purchase Agreement as set forth in the June 1, 2005, Order.

In sum, the court finds that the statement that Dr. Gue executed the Stock Purchase Agreement is not a manifest error of fact—and is an inference which the court reasonably drew from the evidence in the record. At this juncture, the court will progress to Dr. Gue's remaining arguments which he avers justify reconsideration and modification even *though* the court has found that Dr. Gue executed the Stock Purchase Agreement.

### 3.    *Implication of termination provisions in paragraphs 7.1 and 7.2(b)*

The court turns next to Dr. Gue's argument that even if paragraph 2.7 did grant Hoekstra the authority to give consent as Dr. Gue's attorney-in-fact, paragraphs 7.1 and 7.2(b) of the Stock Purchase Agreement indicate that Pro Edge, Ltd. was required to terminate the 1996 Agreement prior to it ever being assigned by Hoekstra to Pro Edge, L.P.

Paragraphs 7.1 and 7.2(b) of the Stock Purchase Agreement fall under Article 7, which is entitled "CERTAIN EVENTS PRIOR TO CLOSING," and provide:

> 7.1 <u>Cancellation of Certain Agreements</u>.    All agreements,

whether written or oral, direct or indirect, between or among Pro-Edge, the Surviving Corporation or NOBL and any of the Selling Shareholders or any of their Affiliates including, *without limitation*, any shareholder's agreement, stock purchase agreement, option agreement, pre-emptive right agreement, redemption agreement, guarantee of any obligations of the Selling Shareholders or such Affiliates to third parties, shall have terminated at or prior to the Closing.

7.2 <u>Transactions</u>.

* * *

(b) <u>Spin Off</u>. The Surviving Corporation shall have contributed all of the assets (including, without limitation, all rights to the name "Pro-Edge") set forth on Schedule 7.2 and assigned all of the liabilities set forth on Schedule 7.2 hereto to the Limited Partnership and the creditors of such liabilities shall have agreed to same. Such assets and liabilities are those not related to the swine health business. Such contribution by the Surviving Corporation shall be in exchange for all of the limited partnership interests of the Limited Partnership. As part of, and pursuant to, the Spin-Off, the Limited Partnership shall employ all of the Employees which will not be employed by the Surviving Corporation from and after the Closing Date, and the Surviving Corporation (prior to Closing) shall take such actions actions (sic) including, without limitation, the termination of the employment of such Employees so they may be employed from and afer the Closing Date by the Limited Partnership.

Plf.s' Exhibit II at 36-37 (emphasis added).

At first glance, the court notes that the express language of paragraph 7.1 negates the plaintiffs' argument that the paragraph purports to terminate *only* agreements similar in nature to those listed. Paragraph 7.1, by its wording, specifically applies to the types of agreements enumerated, but includes the qualification "without limitation." To read the

provision to apply only to agreements of the nature of those agreements listed in paragraph 7.1 fails to give effect to the express wording of paragraph 7.1 that it applies to "[a]ll agreements" between Pro Edge, Ltd., NOBL I, NOBL II, and the Selling Shareholders "without limitation"—therefore the plaintiffs' interpretation of this language is unreasonable.

Next, the court turns to the defendant's contention that paragraph 7.1 mandated that the *only* disposition of the 1996 Agreement was termination, and that termination occurred prior to when Hoekstra could have assigned the agreement, under his paragraph 2.7 authority, to Pro Edge, L.P. Needless to say, the court also rejects the defendant's less than clear argument as to the appropriate interpretation of this language. In relevant part, paragraph 7.1 states that "[a]ll agreements, . . . , between or among Pro-Edge, the Surviving Corporation or NOBL and any of the Selling Shareholders. . . . *shall have terminated prior* to the Closing." Plf.s' Exhibit II at 36-37 (emphasis added). However, in the context of the Stock Purchase Agreement in its entirety, it would be unreasonable to interpret this to conclude that absolutely *all* agreements existing between Pro Edge, Ltd., NOBL I, NOBL II and the Selling Shareholders terminated in the sense that they could never exist in Pro Edge, L.P. or any other entity. This is especially so in light of other provisions in the Stock Purchase Agreement. The recitals of the Stock Purchase Agreement indicate that prior to the closing date "[NOBL II] intends to *contribute certain of its assets including, without limitation*, all of the Surviving Corporation's right, title and interest in and to the name "Pro-Edge" and assign certain of its liabilities, to Pro-Edge LP, an Iowa limited partnership (the "Limited Partnership"), in exchange for all of the limited partnership interests of the Limited Partnership." Plf.s' Exhibit II at 1 (emphasis added). The language indicates an intended *contribution* of assets from NOBL II to Pro Edge, L.P. prior to the closing. The 1996 Agreement would qualify as an asset. Further, in

describing the state of affairs *prior to closing*, the Stock Purchase Agreement states that Pro Edge, Ltd., NOBL I and NOBL II "shall have received all Permits, consents to assignment, and other approvals necessary to consummate and close the foregoing transaction," *Id.* ¶ 7.2(e), and that *at closing* Pro Edge Ltd., NOBL I and NOBL II "shall have received all Permits, consents to assignment, and other approvals necessary to consummate and close the transactions contemplated by this Agreement and the Related Agreements including, *without limitation* . . . ." *Id.* 8.3(b). Therefore, the consents to assignment necessary to *contribute assets* to Pro Edge, L.P. would have been obtained prior to the closing date of the Stock Purchase Agreement. In this context, interpreting the 'termination' language in paragraph 7.1 to *require* that all agreements between Pro Edge, Ltd., NOBL I, NOBL II and the Selling Shareholders must *both* terminate *and* be non-transferrable to Pro Edge, L.P., is unreasonable. It may well be that *all* agreements, including the 1996 Agreement, were terminated as to Pro Edge, Ltd., NOBL I, NOBL II, and the Selling Shareholders prior to the closing date—but that does not mean that the termination as between these parties was not due to *assignment or transfer* to Pro Edge, L.P. as contemplated by the recitals. Viewed in light of the intent, purpose, and other provisions of the Stock Purchase Agreement, paragraph 7.1 merely indicates that at the time of closing, no agreements between the former Pro Edge, Ltd., NOBL I, NOBL II and the Selling Shareholders must be in existence—such that the former Pro Edge, Ltd., at the time of closing, is completely divested and unencumbered by any non-NOBL I related agreements. For these reasons, the court rejects Dr. Gue's contention that paragraph 7.1 operates to make assignment or transfer of the 1996 Agreement impossible. Looking at the Stock Purchase Agreement in its entirety, the court concludes that it is far more reasonable to interpret paragraph 7.1 as merely a "double-check" provision which confirms that BIC would take Pro Edge, Ltd. divested from all non-NOBL I assets,

liabilities, and employees.

The court turns next to paragraph 7.2(b), which provides, in relevant part, that all of the assets and liabilities of Schedule 7.2 (which was not provided) would be contributed to Pro Edge, L.P., prior to closing, and that pursuant to the Spin Off, Pro Edge, L.P. would

> employ all of the Employees which [would] not be employed by [NOBL II] from and after the Closing Date, and [NOBL II] (prior to Closing) [will] take such actions actions (sic) including, without limitation, the termination of the employment of such Employees so that they may be employed from and after the Closing Date by [Pro Edge L.P.]

Plf.s' Exhibit II at 37. The Stock Purchase Agreement defines "Employee" as "any employee of Pro-Edge, [Ltd.], the Surviving Corporation [(NOBL II)] or NOBL [I]."[2] Plf.s' Exhibit II at ¶ 1.20, p.3. Again, read in light of the complex reorganization contemplated by the recitals of the Stock Purchase Agreement, this language indicates only that Pro Edge, Ltd./NOBL II would sever any employer-employee ties to any non-NOBL I employees by means which would allow for non-NOBL I employees to be employed by Pro Edge, L.P. In fact, the court is somewhat puzzled at Dr. Gue's argument that this provision operates to somehow terminate the 1996 Agreement. It follows that Dr. Gue's employment with Pro Edge, Ltd./NOBL II must have ended before he could be employed by Pro Edge, L.P. But, how this change in employment—alone—could affect the enforceability and/or termination of the 1996 Agreement is never fully explained. In fact, it appears to the court that paragraph 7.2 bolsters the court's inference that Hoekstra had, and exercised, the authority to consent to assignment of the 1996 Agreement—for Dr.

_____

[2]The court notes that this definition does not make Selling Shareholders and Employees mutually exclusive.

Gue's acceptance of employment with Pro Edge, L.P. would have otherwise *violated the 1996 Agreement's non-compete clause.* Therefore, the court finds that there is no indication, that even if Dr. Gue's employment with Pro Edge, Ltd/NOBL II was terminated and transferred to employment with Pro Edge, L.P. (an action which Dr. Gue consented to by virtue of the execution of the Stock Purchase Agreement) that this in any way affected the viability of the transfer of the 1996 Agreement from Pro Edge, Ltd. to Pro Edge, L.P.—an entity which, under the analysis accorded to paragraph 7.1, this court has inferred either already held or simultaneously acquired the 1996 Agreement at that time.

Viewed in context of the recitals, paragraphs 7.1 and 7.2(b) merely give homage to one of the specific details in the transaction—that being that the former Pro Edge, Ltd., at the time of closing, must be divested of all non-NOBL I assets, liabilities and employees—and in no way required the 1996 Agreement, or any other agreement, be terminated before it could have been transferred—by Hoekstra or otherwise—to Pro Edge, L.P. As such, paragraphs 7.1 and 7.2(b) do not destroy the court's reasonable inference that Dr. Gue executed the Stock Purchase Agreement, that Hoekstra exercised the authority granted to him by paragraph 2.7. or that the 1996 Agreement was capable of being transferred to Pro Edge, L.P. under the terms of the Stock Purchase Agreement.

### 4. Hoekstra's authority under paragraph 2.7

Dr. Gue's next challenge is that even if he did execute the Stock Purchase Agreement, paragraph 2.7 did not give Hoekstra the authority to consent to the assignment of the 1996 Agreement from Pro Edge, Ltd. to Pro Edge, L.P. The plaintiffs, in resistance, claim that the court could reasonably infer, from the evidence presented, that Hoekstra was granted this authority.

As previously indicated, paragraph 2.7 provides:

2.7    Appointment of Representative.    *By executing this Agreement*, each Selling Shareholder hereby appoints Everett Hoekstra as his, her or its agent and attorney-in-fact (the "Shareholders' Representative"), with full power and authority (including power of substitution), except as otherwise expressly provided in this Agreement, in the name of and for and on behalf of the Selling Shareholder, or in his, her or its own name as Shareholders' Representative, *to take all actions required or permitted under this Agreement* (including giving and receiving all accountings, reports, notices *and consents*), the Related Agreements and the signing of such Related Agreements including, *without limitation*, the taking of all actions necessary or advisable with respect to payment of debts encumbering the Remaining Shares and releasing liens thereon, and delivering share certificates and stock powers therefor. The authority conferred under this Section 2.7 shall be an agency coupled with an interest, and all authority conferred *hereby is irrevocable and not subject to termination by the Selling Shareholders or any of them, or by operation of law*, whether by the death or incapacity of any Selling Shareholders, the termination of any trust or estate or the occurrence of any other event. . . .

Plf.s' Exhibit II at ¶ 2.7 (emphasis added).  As Dr. Gue notes, there are some capitalized terms in paragraph 2.7 which the Stock Purchase Agreement defines as follows:

- "Related Agreements" shall mean collectively each of the Confidentiality Agreements, the Deferred Payment Agreement, each of the Employment Agreements, the Escrow Agreement, and the Noncompetition and Indemnity Agreement.[3]
- "Selling Shareholders" shall have the meaning set forth in the introduction of this Agreement.

---

[3]Each of the specific agreements comprising the definition of "Related Agreements" is defined by reference to a specific attachment—which were not submitted with the Stock Purchase Agreement by the plaintiffs.

26

- "Shareholders' Representative" shall have the meaning
  set forth in Section 2.7 hereof.

Plf.s' Exhibit II at ¶¶ 1.56, 1.59, 1.61.

Dr. Gue makes a conclusory argument that the assignment of the 1996 Agreement was not something "required or permitted" under the Stock Purchase Agreement, and therefore was outside of the scope of the authority granted to Hoekstra by paragraph 2.7. However, Dr. Gue fails to really explain why such an act would *not* be "required or permitted" by a Stock Purchase Agreement which details a complicated transaction, the central purpose of which, was to extricate all non-NOBL I assets, liabilities and employees from Pro Edge, Ltd. and place them in Pro Edge, L.P. prior to BIC's acquisition of the NOBL I assets, liabilities and personnel. The court is at a loss as to why Hoekstra's consent to assignment of an employment agreement, a non-NOBL I asset, to Pro Edge L.P. would not be permitted or contemplated by the Stock Purchase Agreement. Dr. Gue also contends that any consent he granted to Hoekstra by virtue of his execution of the Stock Purchase Agreement was as a shareholder, not as an employee—and that his consent *as an employee* is what was required to properly transfer the 1996 Agreement from Pro Edge, Ltd. to Pro Edge, L.P. Dr. Gue does not cite, nor could the court locate, any authority which stands for the proposition that giving Hoekstra authority, as his attorney in fact, to give all consents required and contemplated by the Stock Purchase Agreement is insufficient to grant Hoekstra the ability to consent to the transfer of the 1996 Agreement. Dr. Gue's argument is further unpalatable when viewed in light of the fact that paragraph 2.7 granted Hoekstra the authority to enter into agreements of a type that are uniquely employee-oriented—such as confidentiality or noncompetition agreements—on the Selling Shareholders' behalf, without limitation. *See* Plf.s' Exhibit II at ¶ 2.7. Hoekstra was additionally granted authority under the Stock Purchase Agreement to enter

into a Release on behalf of the Selling Shareholders with regard to all of the transactions contemplated by Article 7—which, as previously stated, relates to events that must occur prior to closing. *See id.* ¶¶ 7.2(f), 10.9. At this juncture, the court finds no merit in Dr. Gue's contention that paragraph 2.7 did not grant Hoekstra the authority to consent to the assignment of the 1996 Agreement from Pro Edge, Ltd. to Pro Edge, L.P.

### 5. Contention as to Hoekstra's consent to assignment

Dr. Gue's final argument is that even if Hoekstra had the ability to consent to the assignment of the 1996 Agreement, there is no evidence that he *actually did so* and therefore the court was incorrect in holding that the 1996 Agreement was properly held by Pro Edge, L.P. Again, the plaintiffs resist on the ground that the evidence was sufficient for the court to infer that Hoekstra did so exercise his authority.

In this instance, the court finds sufficient inference arising from the combination of the provisions of the Stock Purchase Agreement—and the fact that the plan detailed in the Stock Purchase Agreement was carried out in the sense that BIC purchased NOBL II and the former Pro Edge Ltd.'s non-NOBL I assets, liabilities and employees were spun off into Pro Edge L.P.—that Hoesktra did consent to the assignment of the 1996 Agreement and that the 1996 Agreement is therefore properly held, and enforceable, by Pro Edge, L.P. The Stock Purchase Agreement provides that Hoekstra was appointed by each Selling Shareholder—including Dr. Gue—as his attorney-in-fact for the transactions contemplated by the Stock Purchase Agreement, which included the authority to give Dr. Gue's consent in all actions "required or permitted" under the agreement. The Stock Purchase Agreement contains a subsection entitled "Covenants of All Parties" which reads:

> The parties shall cooperate fully with one another in security or obtaining any *consents*, approvals, authorizations or clearances of any third parties or governmental authorities or regulatory bodies required for the execution, delivery and

> performance of this Agreement or any of the Related
> Agreements and shall cooperate fully with one another to
> accomplish the transactions contemplated by this Agreement
> and the Related Agreements.

Plf.s' Exhibit II at ¶ 5.3(a) (emphasis added). Further, in describing the state of affairs prior to closing, the Stock Purchase Agreement states that Pro Edge, Ltd., NOBL I and NOBL II "shall have received all Permits, consents to assignment, and other approvals necessary to consummate and close the foregoing transaction," *Id.* ¶ 7.2(e), and that at closing Pro Edge Ltd., NOBL I and NOBL II "shall have received all Permits, consents to assignment, and other approvals necessary to consummate and close the transactions contemplated by this Agreement and the Related Agreements including, *without limitation* . . . ." *Id.* 8.3(b). Under the Stock Purchase Agreement, Hoekstra was vested with the power to consent to the assignment of the 1996 Agreement on Dr. Gue's behalf—and when viewed at in light of the covenants of the parties, and the events that *must* occur prior to closing, was also vested with the *obligation* to do so. In addition, from the evidence it is reasonable to infer that the transaction contemplated by the Stock Purchase Agreement did take place—in that all non-NOBL I assets, liabilities and employees were extracted from Pro Egde, Ltd. and transferred to Pro Edge L.P. and the NOBL I assets were thereafter purchased by BIC. These things taken together, without any evidence to the contrary, give rise to an inference that Hoekstra fulfilled his *obligations* under the Stock Purchase Agreement—which included consenting to the assignment of all non-NOBL I agreements (and intangible assets) to Pro Edge, L.P. prior to the closing date.

It is, of course, abstractly possible—as many things are—that the plaintiffs "dropped the ball" with regard to the 1996 Agreement and that Hoekstra did not consent its assignment as he was authorized to do under paragraph 2.7. However, at the preliminary injunction stage the court must make factual determinations from limited evidence and the

inferences arising therefrom. The fact that, at the preliminary injunction stage, factual findings and legal conclusions are based on a necessarily incomprehensive record is the reason behind the "'general rule' that 'the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'" *U.S. v. Barnes*, 912 F. Supp. 1187, 1191 (N.D. Iowa 1996). This is precisely the reason why a preliminary injunction is temporary in nature. Should evidence arise during the course of discovery which destroys or rebuts this inference, the court would reconsider its position at that time upon the defendant's proper Rule 60(b) motion.

### III. CONCLUSION

For the foregoing reasons, the defendant's Motion to Amend Findings and Judgment and/or Reconsideration and Request for Nonevidentiary Hearing is **denied**.

**IT IS SO ORDERED.**

**DATED** this 5th day of July, 2005.

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA