**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| PRO-EDGE L.P. d/b/a TRANS OVA GENETICS, INC. and TRANS OVA GENETICS, L.C. f/k/a TRANS OVA GENETICS, INC., | |
| Plaintiffs, | No. C05-4068-MWB |
| vs. | **MEMORANDUM ORDER AND OPINION REGARDING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MOTION TO DISSOLVE PRELIMINARY INJUNCTION** |
| CHARLES S. GUE, III, DVM, | |
| Defendant. | |

_____

**TABLE OF CONTENTS**

*I.  INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
      *1.  Undisputed facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
      *2.  Disputed facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*II.  LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
   *A. Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . . . 19
   *B. Arguments Of The Parties* . . . . . . . . . . . . . . . . . . . . . . . . 21
      *1.  The defendant's arguments for dismissal* . . . . . . . . . . . . . 21
      *2.  The plaintiffs' arguments in resistance* . . . . . . . . . . . . . 24
      *3.  The defendant's reply* . . . . . . . . . . . . . . . . . . . . . . 27
   *C. Is The 1996 Employment Agreement Properly Held By A Plaintiff In This Matter?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
      *1.  Was the 1996 Employment Agreement included in the*

             *transfer of Pro-Edge, Ltd.'s assets to Pro-Edge, L.P.?* . . . . 28
    **2.**     **Did the transfer of Pro-Edge, Ltd.'s assets to Pro-Edge L.P.**
           *work an "assignment"?* . . . . . . . . . . . . . . . . . . . . . . . . . 30
    **3.**     **Did Pro-Edge, Ltd. obtain prior written consent from Dr.**
           *Gue?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    **4.**     **Was the assignment ratified by Dr. Gue?** . . . . . . . . . . . . . 38
  **D. Dissolution Of The Preliminary Injunction** . . . . . . . . . . . . . . . . . . . 41

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

---

O̲ne of the important the purposes of commemorating an agreement in writing is to avoid potential lawsuits by clearly defining the rights and obligations of the parties. Thus, a delicately crafted contract is priceless in the sense that it has the ability to prevent costly litigation. This recognition, however, has created somewhat of a paradox. In an attempt to account for every conceivable possibility and to encompass and include every contingency, contracts often become increasingly complex and convoluted. The paradox then, is that contracts, originally designed to prevent lawsuits, are increasingly becoming the source of litigation. This paradox is aptly demonstrated by this controversy arising out of an alleged violation of a covenant not to compete contained in an employment agreement executed between the parties. As this court once again attempts to describe and interpret the intricate and complex nuances of this lawsuit, this time as a result of the defendant's Motion For Partial Summary Judgment and the plaintiffs' opposition thereto, the pricelessness of a precisely drafted, yet simplistic, contract becomes rapidly apparent.

# I. INTRODUCTION

## A. Procedural Background

On April 29, 2005, the plaintiffs in this action, Pro Edge, L.P. ("Pro Edge"), an Iowa limited partnership,[1] and Trans Ova Genetics, L.C.,[2] an Iowa limited liability company, filed a petition in the Iowa District Court for Sioux County, Iowa, against defendants Charles S. Gue, III, DVM ("Dr. Gue"), a former employee of Trans Ova Genetics, L.C., and Progenesis Embryo Transfer, Ltd. ("Progenesis"), a wholly-owned Montana corporation created by Dr. Gue. The plaintiffs' business includes embryo transfer services for cattle producers in several states, including Illinois, Iowa, Missouri, Montana and Oklahoma. The complaint was in five counts, but its chief concerns involved fears of disclosure of trade secrets and violation of a non-competition agreement supposedly signed by Dr. Gue. Specifically, in Count I of the complaint, the plaintiffs seek injunctive relief enjoining the defendant from violating the non-competition provisions of Dr. Gue's employment contract; in Count II, the plaintiffs seek damages and injunctive relief for retention, use, and disclosure by the defendants of the plaintiffs' trade secrets; in Count III, the plaintiffs seek injunctive relief and damages for the defendants' intentional interference with contracts between the plaintiffs and their customers; in Count IV, the plaintiffs seek injunctive relief and damages for the defendants' intentional interference with prospective contracts; and in Count V, the plaintiffs seek injunctive relief and damages for the defendants' breach of the covenant of good faith and fair dealing. On April 29, 2005, the Iowa District Court for Sioux County entered an *ex parte* temporary

---

[1]The case caption specifically lists Pro Edge, L.P., as doing business as Trans Ova Genetics, Inc.

[2]The case caption specifically lists Trans Ova Genetics, L.C., as formerly known as Trans Ova Genetics, Inc.

restraining order enjoining Dr. Gue from providing embryo transfer services including, but not limited to, in vitro fertilization to any individuals or entities that are cattle producers that have been customers of Trans Ova's Belgrade, Montana, office within the 12-month period prior to the date of Dr. Gue's separation from employment on April 8, 2005. The order stated that it would become effective upon the filing of a bond in the amount of $30,000 with the Clerk of the Iowa District Court for Sioux County and the issuance of a writ of injunction. The plaintiffs posted the necessary bond and the Writ of Injunction issued on April 29, 2005. The plaintiffs represent they provided notice of the temporary restraining order to Dr. Gue's counsel on May 1, 2005. However, they contend Dr. Gue "evaded service" of the temporary restraining order until May 11, 2005.

On May 16, 2005, the defendants removed this action to this federal court. (Doc. No. 2). On May 18, 2005, the plaintiffs filed a Motion To Extend Temporary Restraining Order and Request For Hearing On Preliminary Injunction in which the plaintiffs sought both an extension of the *ex parte* temporary restraining order issued by the Iowa District Court for Sioux County, as well as a hearing on the accompanying motion for a preliminary injunction. (Doc. No. 3). On May 19, 2005, this court entered an order extending the temporary restraining order to and including May 24, 2005, and setting a hearing on the plaintiffs' Motion For Preliminary Injunction for May 24, 2005. (Doc. No. 4). On May 20, the defendants filed a Motion To Dismiss and Request For Hearing, in which the defendants alleged, among other arguments, that the court lacked personal jurisdiction over all of the named defendants.

Following the May 24, 2005, preliminary injunction evidentiary hearing, a number of troublesome legal questions remained outstanding. Accordingly, the court allowed the parties to submit, by letter brief, case law addressing the more complex legal questions before the court. Following the receipt of the parties' briefs, the court entertained oral

argument on the plaintiffs' Motion For Preliminary Injunction and the defendants' Motion To Dismiss on May 26, 2005. On June 1, 2005, this court issued its Memorandum Opinion and Order Regarding Plaintiffs' Motion For Preliminary Injunction; Defendants' Motion To Dismiss; and Preliminary Injunction. Essentially, with respect to the Defendants' Motion To Dismiss, the court's June 1, 2005, order granted the motion with respect to defendant Progenesis for lack of personal jurisdiction, thus leaving Dr. Gue as the sole remaining defendant in the controversy. The remaining arguments raised by Dr. Gue were denied. With respect to the plaintiffs' Motion To Extend Temporary Restraining Order and Request For Hearing on Preliminary Injunction, the court granted the plaintiffs' motion. Accordingly, the court entered a preliminary injunction, which enjoined the defendant, Dr. Gue, from performing any services similar to those he provided while employed at Trans Ova Genetics, L.C. (Doc. No. 18).[3] On July 10, 2005, Dr. Gue filed

---

[3]The terms of the preliminary injunction were as follows:

**WHEREAS**, this matter came before the court pursuant to the May 19, 2005, request of the plaintiffs for a preliminary injunction,

    **AND WHEREAS**, pursuant to Rule 65 of the Federal Rules of Civil Procedure, the court finds that defendant Charles S. Gue, III, DVM, has been and will continue to violate the non-competition provisions of an employment contract between the plaintiffs and Dr. Gue, and that failure to enjoin such conduct would impose irreparable harm or injury or the threat of such irreparable harm or injury upon the plaintiffs, and upon further consideration of all other relevant factors,

    **DEFENDANT CHARLES S. GUE, III, DVM,** is hereby **preliminarily enjoined** from performing *any* services similar to those he provided while employed at Trans Ova Genetics, L.C.—including, but not limited to, embryo transfer services and in vitro fertilization—within a 250-mile radius of any Trans Ova Genetics, L.C., facility or satellite office that was in existence as of April 8, 2005.

(continued...)

a Motion To Amend Findings and Judgment and/or For Reconsideration and Request For Nonevidentiary Hearing (Doc. No. 21).  The plaintiffs filed their Resistance To Motion To Amend and/or Reconsider on June 21, 2005 (Doc. No. 24).  Prior to the court's ruling on Dr. Gue's Motion To Amend, Dr. Gue filed a timely Notice of Appeal (Doc. No. 25) and corresponding Motion For Certification (Doc. No. 26) on June 30, 2005.  On July 5, 2005, this court denied Dr. Gue's Motion To Amend Findings and Judgment and/or Reconsideration and Request For Nonevidentiary Hearing (Doc. No. 30).  On this same day, the court also granted Dr. Gue's Motion For Certification (Doc. No. 31).  Pursuant to the Trial Management Order (Doc. No. 46) filed on January 5, 2006, trial on this matter is set for June 26, 2006 (Doc. No. 46).

On November 4, 2005, Dr. Gue moved to modify the preliminary injunction by fixing a specific date, prior to the anticipated trial date, for the dissolution of the preliminary injunction (Doc. No. 42).  The plaintiffs resisted Dr. Gue's motion by filing a Resistance To Motion To Modify Preliminary Injunction on November 10, 2005 (Doc. No. 43).  A hearing on Dr. Gue's Motion To Modify Preliminary Injunction was

---

[3](...continued)
This preliminary injunction shall be binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this order.

This preliminary inunction shall issue upon the posting by the plaintiffs herein of a bond, in compliance with Rule 65(c) of the Federal Rules of Civil Procedure in the sum of thirty thousand dollars ($30,000.00).

This preliminary injunction shall remain in full force and effect until the trial of this matter or until this order is modified or dissolved by this or a reviewing court.

Preliminary Injunction, June 1, 2005 (Doc. No. 18).

scheduled for January 25, 2006.  Prior to the hearing, however, on December 30, 2005, Dr. Gue further filed a Motion For Partial Summary Judgment And Motion To Dissolve Preliminary Injunction (hereinafter Motion For Partial Summary Judgment) (Doc. No. 45), seeking summary judgment with respect to only Count I of the plaintiffs' complaint—the count seeking injunctive relief enjoining the defendant from violating the non-competition provisions of Dr. Gue's employment contract . On January 23, 2006, the plaintiffs filed their resistance to Dr. Gue's Motion For Partial Summary Judgment.  Due to the overlapping issues presented in both Dr. Gue's Motion To Modify Preliminary Injunction and his Motion For Partial Summary Judgment the court heard oral argument on both motions simultaneously on January 25, 2006.  At the January 25, 2006, hearing, Trans Ova was represented by Charles T. Patterson, Margaret Prahl and Joel Vos, of Heidman Redmond Fredregill Patterson Plaza Dykstra & Prahl in Sioux City, Iowa.  Dr. Gue was represented by Richard H. Moeller of Berenstein Moore Berenstein Heffernan & Moeller, L.L.P., in Sioux City, Iowa.

Following the hearing, on January 27, 2006, Dr. Gue submitted his Reply Brief To Plaintiffs' Resistance To Motion For Partial Summary Judgment (Doc. No. 51).  Also on January 27, 2006, the parties agreed to hold a settlement conference before Magistrate Judge Paul A. Zoss.  Accordingly, an order was entered setting a settlement conference for March 9, 2006 (Doc. No. 50).  Typically, in the interest of promoting resolution of the issues between the parties, this court would reserve ruling on the merits of the parties' arguments until after the settlement conference.  However, during oral argument, both parties requested this court proceed with its rulings on both of the motions pending before the court even though the parties were at that time contemplating negotiating a settlement.  Accordingly, on January 31, 2006, this court issued its decision with respect to Dr. Gue's Motion To Modify Preliminary Injunction (Doc. No. 52).  In this order, the court

determined that equity demanded modification of the Preliminary Injunction to reflect an exact expiration date of May 18, 2006. In its January 31, 2006, order, the court reserved ruling on Dr. Gue's Motion For Partial Summary Judgment until a later date. As the matter is fully submitted and the court is now in a position to make its determination, the court will proceed to issue its decision pursuant to the parties' request.

## B. Factual Background

The core undisputed facts and sufficient detail of the disputed facts are set forth below to put in context the parties' arguments for and against summary judgment.

### 1. Undisputed facts

Many of the core facts surrounding this controversy are largely undisputed. Charles S. Gue, III, DVM, (hereinafter Dr. Gue) first became associated with the entity known as Pro-Edge, Ltd. d/b/a Trans Ova Genetics, Inc. in 1990. Dr. Gue worked as an embryo transplant specialist at Trans Ova Genetics's Sioux Center, Iowa facility. What is clear, however, is that in March of 1996, Dr. Gue entered into an Employment Agreement (hereinafter 1996 Employment Agreement) with Trans Ova Genetics, Inc. At the time the 1996 Employment Agreement was executed, Trans Ova Genetics, Inc. was not itself the legal entity under the 1996 Employment Agreement. Rather, "Trans Ova Genetics, Inc." was a fictitious name that was reserved and registered by Pro-Edge, Ltd., a corporation organized under the laws of the State of Iowa. Pro-Edge, Ltd. commonly used the name "Trans Ova Genetics, Inc." in the conduct of its business, but a separate legal entity was never actually incorporated under the exact name "Trans Ova Genetics, *Inc.*" Thus, the 1996 Employment Agreement was entered into between Dr. Gue and essentially, Pro-Edge, Ltd. The 1996 Employment Agreement contained a non-compete clause, which essentially prohibited him from performing similar services within a 250-mile radius of any

Trans Ova Genetics facility for one year following his separation from employment. Specifically, the agreement provided, in pertinent part, as follows:

> 5.    Non-Compete. Dr. Gue agrees that he will not compete for a period of one year following the termination of his employment within a 250 mile radius of any Trans Ova facility or satellite office that is in existence at the time he terminates his employment with Trans Ova.    Dr. Gue further acknowledges good and valuable consideration for this non-compete agreement.  He further acknowledges that good and valuable consideration is included in his annual compensation. Dr. Gue further acknowledges and agrees that a one year limitation and a 250 mile radius restriction is a reasonable period of time and a reasonable restriction.  This limitation [sic] but not limited to activities that he may perform as an employee, partner, veterinarian, or consultant for services similar to those performed for Trans Ova.

*Employment Agreement*, Joint Appx., at 33.  Further, the 1996 Employment Agreement contained a choice of law provision that indicated the agreement was to be construed pursuant to the laws of the state of Iowa.[4]  The 1996 Employment Agreement also contained a provision governing its assignability by the parties.  Specifically, that provision provided:  "This Agreement may not be assigned by either party without the *prior written consent* of the other party."  *Id.* (emphasis added).  Shortly after the 1996 Employment Agreement was executed, Pro-Edge, Ltd. entered into a series of complex corporate transactions that essentially operated to completely revamp its corporate structure.  In 1996, prior to any shift in its business form, Pro-Edge, Ltd., wholly-owned Pro Pork

---

[4]In its June 1, 2005, order, this court previously determined that Iowa's choice of law rules required application of Iowa law to the merits of this case.  *See Pro Edge, L.P. v. Gue*, 374 F. Supp. 2d 711, 737-39 (N.D. Iowa 2005).

Associates, Inc., Trans Ova Genetics, Bio Edge and NOBL Laboratories, Inc. (hereinafter "NOBL I"), as well as a 13% interest in Vet Pharm, Inc. and a 4% interest in Metabolic Technologies, Inc.[5] At the November 11, 1996, Annual Stockholders' Meeting of Pro-Edge, Ltd., the shareholders—including Dr. Gue—unanimously approved the Board of Directors' comprehensive proposal to sell NOBL I to Boehringer Ingelheim Corporation (hereinafter "BIC"), and the formation of a limited partnership to serve as the new entity for the continued operations of all Pro-Edge, Ltd.'s other holdings. This proposal was subject to the successful conclusion of negotiations with BIC. Apparently, in order to avoid adverse tax consequences, the proposed transaction became increasingly more complex. First, NOBL I merged with Pro-Edge, Ltd. Pro-Edge, Ltd. was the surviving entity of the merger, and it promptly renamed itself NOBL Laboratories, Inc (NOBL II). Thus, essentially Pro-Edge, Ltd. was converted into NOBL II. The articles of merger commemorating this transaction were filed on January 2, 1997.

With respect to the non-NOBL I operations of Pro-Edge, Ltd., (essentially the Trans Ova Genetics, Inc. operations), the Stock Purchase Agreement provided that immediately after the merger between NOBL I and Pro-Edge, Ltd., all of the non-NOBL I assets, liabilities and personnel of all entities would be contributed to capitalize a new limited partnership named Pro-Edge, L.P. The contribution of these assets was to occur after the date of merger, but prior to the Closing Date of the stock purchase. *Stock Purchase Agreement*, Joint Appx., at 82. The contribution of assets took place on December 31, 1996, commensurate with the filing of Pro-Edge, L.P.'s Certificate of Limited Partnership. Essentially, the Stock Purchase Agreement provided that Pro-Edge, Ltd., along with all

---

[5]Pro-Edge, Ltd.'s interest in Metabolic Technologies, Inc. was divested and dividends paid to the shreaholders prior to the end of the 1996 calender year—hence, prior to the alteration of the corporate structure.

of its shareholders, intended to spin-off its Trans Ova Genetics, Inc. assets and liabilities to Pro-Edge, L.P., leaving the corporation with only its swine health business assets (the NOBL-related operations), so that the swine health business would be owned by BIC. Subsequent to the formation of the limited partnership, NOBL II, left with only the swine health business assets was sold to BIC in accordance with the terms of the Stock Purchase Agreement executed between NOBL II and BIC on January 24, 1997. The Stock Purchase Agreement provides for the sale of all of the shares of stock in Pro-Edge, Ltd. from its individual shareholders to BIC. In its recitals, and in Article 7, of the Stock Purchase Agreement, various transactions and events were required to occur prior to the closing of the sale and purchase of stock that related to the formation of Pro-Edge, L.P. and NOBL II.

Thus, Pro-Edge, Ltd. (minus its NOBL assets) became the limited partner in a recently-formed limited partnership named Pro-Edge, L.P.[6] Pro Management, L.C. served as the general partner for Pro-Edge, L.P. The Certificate of Limited Partnership of Pro-Edge, L.P. indicated that Pro-Edge, Ltd. II, as the limited partner, contributed at least $3,626,689.00 worth of property to Pro-Edge, L.P. The Stock Purchase Agreement further provided, that as part of the spin-off detailed above, Pro-Edge, L.P. "shall employ all of the Employees which will not be employed by the Surviving Corporation [NOBL II] from and after the Closing Date." *Id.* at 118. With respect to Employee Relations, section 3.28 states:

> (a) Except as set forth in Schedule 3.28, neither Pro-Edge nor NOBL is a party to any written, oral, or implied contract or agreement with any employee or director of Pro-

---

[6]Specifically, the limited partnership came to fruition on December 31, 1996, with the filing of Pro-Edge, L.P.'s Certificate of Limited Partnership.

> Edge or NOBL relating to the employment of any such employee or director, including, but not limited to, any contract or agreement that governs or is related to the terms and conditions of employment or the termination of such employment.

*Id*. at 108. The 1996 Agreement is not one of the contracts listed in Schedule 3.28. *Id.* at 136. The Stock Purchase Agreement also represented that there were no third-party consents required prior to the sale of the stock, except as specifically identified. Dr. Gue's consent is not among the third-party consents identified therein. In addition, the Stock Purchase Agreement contains the following appointment, by its Selling Shareholders, so defined as to include Dr. Gue:

> 2.7    <u>Appointment of Representative</u>. By executing this Agreement, each Selling Shareholder hereby appoints Everett Hoekstra as his, her or its agent and attorney-in-fact (the Shareholders' Representative"), with full power and authority (including power of substitution), except as otherwise expressly provided in this Agreement, in the name of and for and on behalf of the Selling Shareholder, or in his, her or its own name as Shareholders' Representative, to take all actions required or permitted under this Agreement (including giving and receiving all accountings, reports, notices and consents), the Related Agreements and the signing of such Related Agreements . . . .

*Id*. at 91. No written document signed by Everett Hoekstra on behalf of Dr. Gue exists which specifically identifies the 1996 Agreement and represents Dr. Gue's consent to the assignment of the 1996 Agreement from Pro-Edge, Ltd. to Pro-Edge, L.P.

As part of previously described spin-off and stock purchase transaction, those individuals holding shares in Pro-Edge, Ltd. II—again, including Dr. Gue—were given the option of cashing out their remaining shares or converting those shares into partnership units with Pro-Edge, L.P. Dr. Gue elected to retain his full investment in Pro-Edge, L.P.

Adding further to what had already proved to be a difficult and complex transaction, Pro-Edge, L.P., subsequent to its formation, registered and did business under the fictitious name of Trans Ova Genetics, Inc. On February 11, 1997, after the shareholders of Pro-Edge, Ltd. either sold or transferred their stock and acquired limited partnership interests in Pro-Edge, L.P., NOBL II changed its name to Boehringer Ingelheim/NOBL Laboratories, Inc. Eventually, on January 1, 1999, Boehringer Ingelheim/NOBL Laboratories, Inc. merged with BIC to form a Delaware corporation named Boehringer Ingelheim Vetmedica, Inc.[7] In conjunction with the aforementioned transactions, Dr. Gue executed further a Statement of Unanimous Consent to Action Taken in Lieu of a Special Meeting of the Shareholders of Pro-Edge, Ltd. (hereinafter "Statement of Unanimous Consent") on February 11, 1997. *Statement of Unanimous Consent*, Plaintiffs' Supplemental Appx., Exhibit 2, at 9. This document recorded the shareholders' affirmative vote to enter into the transactions contemplated by the Stock Purchase Agreement. It essentially allowed the shareholders of Pro-Edge, Ltd. to "officially" consent and adopt certain resolutions without the need for a formal vote at a special shareholder meeting. Specifically, this document provided:

> THEREFORE BE IT RESOLVED, that the Selling Shareholders hereby vote all of their respective shares of common stock of Pro-Edge[, Ltd.] in favor of (a) the acceptance, ratification and approval of (i) all the Transactions which have occurred prior to, or as of, the date hereof, and (ii) all of the acts of the Shareholders' Representative and all directors and officers of Pro-Edge previously done which relate thereto, and (b) the conclusion of the Transactions which have not occurred prior to, or as of, the date hereof;

---

[7]This entity is no longer associated with the plaintiffs or this lawsuit.

> FURTHER RESOLVED, that the Shareholders'
> Representative, the President and Secretary of Pro-Edge[,
> Ltd.] and such agents and officers as they may designate,
> respectively, are hereby authorized and directed to do or cause
> to be done, on behalf of the Selling Shareholders and Pro-
> Edge[, Ltd.], respectively, all such further acts and things, and
> to execute and deliver, and to cause to be executed and
> delivered, any and all such documents, as the President shall
> deem necessary or advisable for the purpose of carrying out
> the intent of the foregoing resolutions and effecting the
> Transactions and other transactions contemplated by the Stock
> Purchase Agreement . . . .

*Id.*

Following its extensive restructuring, in 1997, Trans Ova Genetics, Inc. determined that it would offer Dr. Gue the opportunity to start up a satellite office in Belgrade, Montana with the goals of generating a customer base in that area and solidifying Trans Ova Genetics, Inc.'s presence in that area. In anticipation of Dr. Gue's imminent relocation to the Belgrade, Montana area, Trans Ova Genetics, Inc. made significant improvements to the property they leased for the Belgrade, Montana office—including the addition of a cattle-housing barn and additional equipment. Prior to his actual relocation, Dr. Gue traveled back and forth between Sioux Center and Belgrade to facilitate this transition. In August 1997, Dr. Gue officially relocated to Belgrade, Montana and become the only resident veterinarian on staff at that location.

Following Dr. Gue's relocation to the Belgrade, Montana area, Pro-Edge, L.P. d/b/a Trans Ova Genetics, Inc. again underwent substantial alterations to its corporate structure. On November 14, 2000, Pro-Edge, L.P. filed articles of incorporation with the Iowa Secretary of State to form Trans Ova Genetics, L.C., of which Pro-Edge, L.P. was the sole member. Although Trans Ova Genetics, L.C. completed its organization as an

Iowa limited liability company in 2000, it remained uncapitalized until August 1, 2003. On this date, a Special Board Meeting of the Board of Supervisors of Pro Management, L.C.—the sole general partner of Pro-Edge, L.P.—was held. At this meeting, the Board of Supervisors adopted resolutions under which Pro-Edge, L.P. capitalized Trans Ova Genetics, L.C. by transferring all of Pro-Edge, L.P.'s assets and liabilities related to its Trans Ova operating division to Trans Ova Genetics, L.C. Under the terms of the resolution, Pro-Edge, L.P. "assign[ed] its leases, contracts and agreements related to its Trans Ova operating division to Trans Ova Genetics[, L.C.]." Specifically, this portion of the resolution provides:

> RESOLVED, FURTHER, that Pro Edge[, L.P.] assign its leases, contracts and agreements related to its Trans Ova operating division to Trans Ova [Genetics, L.C.], including without limitation those leases, contracts and agreements listed on Exhibit "C" to these minutes, upon such terms and conditions and with securing such consents as may be required by the counterparties to such leases, contracts and agreements . . . ."

*Meeting Minutes of the Special Meeting of the Board of Supervisors of Pro Management, L.C.*, Joint Appx., Plaintiffs' Exhibit W, at 57. Although Exhibit "C" to the meeting minutes does not explicitly mention the 1996 Employment Agreement, it makes clear that the enumerated contracts were not intended to be an all-encompassing exclusive list. Rather, the contract states that "[a]ll contracts and agreements in the name of Pro-Edge, L.P. or Trans Ova Genetics which relate to the business of the Trans Ova division of Pro-Edge, L.P., including, without limitation, the [specifically enumerated] contracts and agreements." With respect to the assignment of these agreements, at the end of the list the following "savings clause" appears:

> Should assignment of any of the leases, contracts or

15

agreements on this Exhibit "C" require the consent of the counterparty, and should such consent not be granted, then such lease, contract or agreement shall remain with Pro-Edge, L.P. but Trans Ova Genetics, L.C. shall perform all functions and have all responsibilities under such lease, contract or agreement.

*Id.*

Following this second bout of corporate restructuring, Dr. Gue remained a dutiful employee of Trans Ova Genetics, L.C. until early in 2005, at which time he began contemplating resigning his veterinary position with the company. In late February, Dr. Gue approached an embryologist at the Belgrade, Montana, facility, and discussed whether she would leave Trans Ova Genetics, L.C. to work with him should his plans to terminate his employment with Trans Ova Genetics, L.C. and branch out on his own come to fruition. In March 2005, Dr. Gue incorporated defendant Progenesis in Montana as a close corporation in which he is 75% owner, and his wife is 25% owner. Thereafter, sometime in early March 2005, Dr. Gue contacted Korey Krull, Dr. Gue's direct supervisor at the time, as well as Chief Operations Officer of Trans Ova Genetics, L.C., and provided notice of his intent to terminate his employment with Trans Ova Genetics, L.C. Dr. Gue solidified his resignation by following this conversation with a letter, dated March 16, 2005, which clearly articulated his present intent to terminate his employment and offered his services for the following two weeks should Trans Ova Genetics, L.C., desire him to stay on through that period. Dr. Gue admittedly timed his resignation in coordination with the height of breeding season—April/May/June of each calendar year—such that he would have an immediate customer base for his services following his resignation from Trans Ova Genetics, L.C.

Dr. Gue's March 16, 2005, letter immediately precipitated discussions among Trans

Ova Genetics, L.C., and Dr. Gue regarding the possibility of Dr. Gue staying on as an independent contractor. On Trans Ova Genetics, L.C.'s part, the retention of Dr. Gue on *any* basis—independent contractor or otherwise—was contingent on Dr. Gue's execution of another employment agreement containing a covenant not to compete. As Dr. Gue was not willing to enter into any agreement containing such a restrictive covenant, the negotiations subsided. On April 8, 2005, Dr. Gue resigned his employment with Trans Ova Genetics, L.C. The Trans Ova Genetics, L.C., embryologist whom Dr. Gue initially had approached about leaving the company also resigned her employment and went to work for Dr. Gue at Progenesis.

Following his resignation, Dr. Gue immediately began providing embryo transfer services to Trans Ova Genetics, L.C.'s customers—including some of Trans Ova Genetics, L.C.'s largest and most lucrative customers. Following his separation from Trans Ova Genetics, L.C., Dr. Gue picked up embryos from Trans Ova Genetics, L.C., for Stevenson's Diamond Dot on April 12, 2005, and Riverbend on April 14, 2005—two of Trans Ova Genetics, L.C.'s former clients. Additionally, on April 11, 2005, Dr. Gue took out an internet ad which advertised Progenesis as offering services identical to those offered by Trans Ova Genetics, L.C. On April 20, 2005, counsel for the plaintiffs sent Dr. Gue a letter indicating that his current activities were in violation of the non-compete clause of the 1996 Agreement, and requested that he cease and desist providing competing services to Trans Ova Genetics, L.C.'s customers. Dr. Gue, via his Montana counsel, responded by letter dated April 22, 2005, indicating that the 1996 Agreement was unenforceable under Montana law, and that Dr. Gue's activities were not violative of any enforceable contracts or agreements. Dr. Gue and Progenesis continued providing competing services—to Trans Ova Genetics, L.C.'s customers and possibly others within

the 250-mile radius of the Belgrade, Montana area—through May 18, 2005.[8]

## 2. *Disputed facts*

The parties dispute only two facts that are pertinent to the resolution of the current motion pending before this court. First, the parties dispute whether Dr. Gue consented, in writing, to the assignment of the 1996 Employment Agreement to Pro-Edge, L.P. from Pro-Edge, Ltd. Not surprisingly, the plaintiffs contend Dr. Gue consented to the assignment, and Dr. Gue contends he did not. Dr. Gue contends there is no written consent to the assignment of the 1996 Employment Agreement from Pro-Edge, Ltd. to Pro-Edge, L.P. The plaintiffs contend Dr. Gue's written consent was obtained by virtue of his assent to the terms of the Stock Purchase Agreement. Second, and inextricably intertwined with the first disputed fact, the parties dispute whether the plaintiffs are entitled to enforce the 1996 Employment Agreement. These so-called "facts," however, are really legal conclusions that must be made based on the written terms of the Stock Purchase Agreement. Accordingly, summary judgment is highly appropriate in this case.

The applicable facts and nuances to the parties' arguments will be discussed more in detail, if warranted, in the legal analysis of the plaintiffs' claims below. Suffice it to say, the defendant asserts the plaintiffs never obtained prior written consent from him, and that, therefore, assignment of the 1996 Employment Agreement was never completed. Because proper assignment of the 1996 Employment Agreement never came to fruition, Dr. Gue contends the plaintiffs are improper parties to enforce the terms of the covenant

---

[8]Dr. Gue testified at the preliminary injunction hearing that the reason he continued to provide similar services even after he was served with the Iowa District Court for Sioux County's temporary restraining order on May 11, 2005, was because he could not, professionally or ethically, discontinue certain work that was pending at that time until he was able to find others to provide "cover."

not to compete and that summary judgment should be granted with respect to this claim and that the preliminary injunction issued by this court should be dissolved.

## II. LEGAL ANALYSIS

The court will now turn its attention to a brief survey of the standards applicable to Dr. Gue's motion for summary judgment, then to the application of those standards to the critical issues involved in this case.

### A. Standards For Summary Judgment

The parties here agree generally on the standards applicable to a motion for summary judgment. Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims against that party. *Fed. R. Civ. P.* 56(b). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Bunda v. Potter*, 369 F. Supp. 2d 1039, 1046 (N.D. Iowa 2005); *Steck v. Francis*, 365 F. Supp. 2d 951, 959-60 (N.D. Iowa 2005); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F. Supp. 2d 977, 984 (N.D. Iowa 2004); *Nelson v. Long Lines Ltd.*, 335 F. Supp. 2d 944, 954 (N.D. Iowa 2004); *Soto v. John Morrell & Co.*, 315 F. Supp. 2d 981, 988 (N.D. Iowa 2004); *see also Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906

F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377. Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus.*, 475 U.S. at 586-87). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," i.e., are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th

Cir. 1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994).

Finally, this court notes that summary judgment is particularly appropriate, in a case such as the one currently before the court, "'[w]here the unresolved issues are primarily legal rather than factual . . . .'" *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996) (quoting *Crain v. Bd. of Police Comm'rs*, 920 F.2d 1402, 1405-06 (8th Cir. 1990)). The court will apply these standards to the defendant's motion for partial summary judgment.[9]

### B. Arguments Of The Parties

#### 1.    The defendant's arguments for dismissal

Dr. Gue's primary contention in his Motion For Partial Summary Judgment is essentially that a contract does not exist between Dr. Gue and the plaintiffs to this lawsuit, Pro-Edge, L.P. d/b/a Trans Ova Genetics, Inc. and Trans Ova Genetics, L.C. f/k/a Trans Ova Genetics, Inc. Dr. Gue points out the fact that neither of the plaintiffs was in

---

[9] This court notes that it has jurisdiction to rule on the defendant's Motion For Partial Summary Judgment even though the appeal of this court's issuance of the preliminary injunction is pending before the Court of Appeals for the Eighth Circuit. It is settled that the pendency of such an appeal does not divest a district court of jurisdiction to proceed with other aspects of the case. *See Fed. R. Civ. P.* 62; *see also Janousek v. Doyle*, 313 F.2d 916, 920 (8th Cir. 1963) (noting the filing of an appeal on a district court's order on a preliminary injunction does not divest the court of jurisdiction to proceed with other aspects of the controversy); *accord FTC v. Assail, Inc.*, 98 Fed. Appx. 316, 317 (5th Cir. 2004); *Webb v. GAF Corp.*, 78 F.3d 53, 55 (2d Cir. 1996); *Ry. Labor Executives' Ass'n v. City of Galveston, Tex.*, 898 F.2d 481, 481 (5th Cir. 1990).

existence at the time the 1996 Employment Agreement was entered into. Thus, he argues the only way either of the plaintiffs could have acquired rights to enforce the 1996 Employment Agreement was via a valid assignment—which, pursuant to the express terms of the 1996 Employment Agreement, requires prior written consent by Dr. Gue. Dr. Gue, not surprisingly, contends such prior written consent was never obtained. In support of this contention, Dr. Gue first draws attention to the fact that the plaintiffs do not contest the fact that they failed to obtain Dr. Gue's prior written consent to the assignment of the 1996 Employment Agreement from Pro-Edge, L.P. to Trans Ova Genetics, L.C.[10] Rather, the plaintiffs have consistently argued the contract rights remained with Pro-Edge, L.P. by operation of a "savings clause" encompassed within the resolutions and actions adopted by the Board of Supervisors of Pro Management, L.C. pertaining to Pro-Edge, L.P.'s capitalization of Trans Ova Genetics, L.C. Essentially, this clause operates to "save" the contracts in which proper consent was not obtained by providing, in such a situation, that the contract shall remain with Pro-Edge, L.P., but allowing Trans Ova Genetics, L.C. to perform the functions and responsibilities under the contract at issue. Thus, Dr. Gue contends the plaintiffs have always represented that under this "savings clause," Pro-Edge, L.P. retained the right to enforce the 1996 Employment Agreement. Consequently, the defendant avers Trans Ova Genetics L.C.'s right to enforce, or rather,

---

[10]In his brief, Dr. Gue actually states as follows: "Whether there was a consented-to assignment from Pro-Edge, L.P. to Trans Ova Genetics, *L.P.*, is the easier of the two [assignments] to assess: plaintiffs have never argued that there was a prior writtten consent to that assignment from Gue. *Defendant's Brief In Support Of His Motion For Partial Summary Judgment And Motion To Dissolve Preliminary Injunction* (Doc. No. 45-4), at 8 (emphasis added). Based on the context of these assertions and Dr. Gue's remaining argument on this issue, it is clear he meant to reference Trans Ova Genetics, *L.C.*, not Trans Ova Genetics, *L.P.* This unfortunate typographical error reflects the rather confounding nature of the factual background of this case.

the lack thereof, has never been a contention of the plaintiffs. Rather, the focus has always been on whether prior written consent was obtained from Dr. Gue coinciding with the transfer of assets from Pro-Edge, Ltd. to Pro-Edge, L.P.

To this end, Dr. Gue argues there is not a single document which by its terms specifically assigns the 1996 Employment Agreement to Pro-Edge, L.P. from Pro-Edge, Ltd. With respect to the Stock Purchase Agreement, the defendant argues this document neither mentions Dr. Gue as an employee, nor mentions the assignment of any employment agreement. Dr. Gue contends the Stock Purchase Agreement is limited in its scope to simply a sale of all the shares of Pro-Edge, Ltd. stock from their individual owners to BIC. It does not go so far, contends Dr. Gue, as to assign any assets. Thus, Dr. Gue argues summary judgment should be granted with respect to Count I because the 1996 Employment Agreement was never assigned, and therefore, remained with Pro-Edge, Ltd., an entity who is not a party to this lawsuit.

In the alternative, even if it can be shown or presumed that the 1996 Employment Agreement was assigned, Dr. Gue contends there is no evidence that he provided his prior written consent to such an assignment. Dr. Gue focuses this court's attention on the fact that, for the purposes of the preliminary injunction, only *circumstantial* evidence existed sufficient to infer Gue's consent by virtue of the appointment of Everett Hoekstra as an attorney-in-fact on behalf of all the Selling Shareholders, including Dr. Gue. Thus, at the preliminary injunction stage, the evidence suggested that Dr. Gue's consent could have been obtained via his attorney-in-fact, Everett Hoekstra. Now, however, Dr. Gue contends evidence exists that sufficiently rebuts the court's initial inference. Specifically, in responding to a request for production under Rule 34 of the Federal Rules of Civil Procedure and a request for admission under Rule 36 of the Federal Rules of Civil Procedure, the plaintiffs now admit that "[t]here is no written document that was signed

23

by Everett Hoekstra on behalf of Charles S. Gue, III which specifically identifies the Employment Agreement and contains Charles S. Gue, III's consent to the assignment of the Employment Agreement from Pro-Edge, Ltd. to Pro-Edge, L.P." *Response to Defendant's First Set of Requests for Admissions Directed to Plaintiffs*, Joint Appx., at 154. This admission, at least according to Dr. Gue, sufficiently destroys any presumption that could be made based on the circumstantial evidence available at the preliminary injunction stage. Dr. Gue acknowledges, in anticipation of the plaintiffs' argument, that he also signed the Statement of Unanimous Consent, which recorded his consent to all of the transactions identified in the Stock Purchase Agreement. However, none of the documents taken separately or together, mention his employment agreement in any capacity. Thus, Dr. Gue argues these documents cannot be relied upon as constituting his prior written consent to the assignment of the 1996 Employment Agreement. Accordingly, Dr. Gue contends the preliminary injunction should be dissolved and that summary judgment, with respect to Count I, regarding the issuance of a permanent injunction, should be granted.

### 2. The plaintiffs' arguments in resistance

The plaintiffs first argue that Dr. Gue's assertion that a specific written assignment of the 1996 Employment Agreement must exist is not supported by the terms of the 1996 Employment Agreement. The plaintiffs contend the 1996 Employment Agreement does not require that the assignment itself be in writing; rather, all that is required pursuant to the explicit terms of the 1996 Employment Agreement is that the written *consent* of Dr. Gue be obtained prior to the assignment of the 1996 Employment Agreement to another entity. Hence, the plaintiffs contend the lack of an express written assignment of the 1996 Employment Agreement is of no import. Accordingly, because a formal assignment need not be shown, it is sufficient to demonstrate the 1996 Employment Agreement was

assigned by virtue of the broad language contained in the documents spinning off Trans Ova Genetics, Inc. into Pro-Edge, L.P. The plaintiffs contend such a demonstration has been adequately made because the record in this case clearly documents the global contribution of all Trans Ova Genetics, Inc.'s assets to Pro-Edge, L.P. by virtue of the Stock Purchase Agreement and the Certificate of Limited Partnership. Thus, the plaintiffs argue that this "global contribution" of assets, which included all of Trans Ova Genetics, Inc.'s "personal property," and "intangible assets" and "assets reflected in the books and records," was broad enough to encompass and convey the 1996 Employment Agreement. *Certificate of Limited Partnership*, Joint Appx., at 142. Thus, the plaintiffs aver summary judgment is not appropriate on this particular ground because there is ample evidence that employment agreements, contracts and relationships would be transferred as part of the spin-off of all of Trans Ova Genetics, Inc.'s assets to Pro-Edge, L.P.

With respect to Dr. Gue's second contention–that the agreement cannot be enforced by Pro-Edge, L.P. because his prior written consent to the assignment was never obtained– the plaintiffs argue the evidence shows otherwise. Relying on the Stock Purchase Agreement and the Statement of Unanimous Consent, the plaintiffs contend Dr. Gue's consent is adequately documented in order to survive the Motion For Partial Summary Judgment. Although the plaintiffs agree that Everett Hoekstra did not specifically consent to the assignment of the 1996 Employment Agreement on Dr. Gue's behalf as his attorney-in-fact, they contend such an observation is not fatal because Dr. Gue gave such consent himself. More specifically, the plaintiffs assert that Section 7.2 of the Stock Purchase Agreement indicates that Pro-Edge, L.P. shall employee all of the employees not employed by BIC after the closing date of the transaction. *Stock Purchase Agreement*, Joint Appx., at 118. As Dr. Gue signed the Stock Purchase Agreement and assented to the transactions thereunder, the plaintiffs contend his signature constitutes his recognition and ascension

to the fact that he would be employed by Pro-Edge, L.P. and that the 1996 Employment Agreement would be assigned to Pro-Edge, L.P. In addition to the Stock Purchase Agreement, the plaintiffs contend Dr. Gue further provided his affirmative consent as a result of the "Statement of Unanimous Consent." This statement, aver the plaintiffs, recorded Dr. Gue's consent to the transactions set forth in Article 7 of the Stock Purchase Agreement. In addition, the plaintiffs rely upon the language contained in the Statement of Unanimous Consent whereby the shareholders resolved to vote all of their shares of common stock of Pro-Edge, Ltd. in favor of "the acceptance, ratification and approval" of all the transactions that had occurred either prior to, or as of, the date the Statement of Unanimous Consent was signed and also to all acts which had yet to occur under the Stock Purchase Agreement. The plaintiffs aver this language evinces Dr. Gue's consent and ratification of the assignment of the 1996 Employment Agreement to Pro-Edge, L.P. In recognition of the fact that the Stock Purchase Agreement and Statement of Unanimous Consent were executed *after* the alleged assignment of the 1996 Employment Agreement occurred, the plaintiffs contend that Iowa law holds that an employee can ratify the assignment of his agreement to a new employer. The plaintiffs contend that Dr. Gue was aware of the transaction, continued his employment in the Trans Ova Genetics division after the assignment occurred, and thereafter accepted in writing the transaction. These factors, according to the plaintiffs, are sufficient to constitute ratification of the assignment.

Finally, the plaintiffs assert that, even if Dr. Gue's after-procured consent is insufficient to satisfy the terms of the 1996 Employment Agreement, the reorganization of Trans Ova Genetics, Inc. did not constitute an "assignment." Consequently, the plaintiffs aver that it was not necessary to obtain Dr. Gue's prior written consent. The plaintiffs contend Dr. Gue seeks to obtain refuge in a "mere technicality," and that he should not

be permitted to avoid the terms of the 1996 Employment Agreement by exalting form over substance. The plaintiffs contend such an argument has been rejected in myriad other jurisdictions and that it is was not necessary to "assign" the rights held by Pro-Edge, Ltd. to Pro-Edge, L.P. under the 1996 Employment Agreement because there was no material change in Dr. Gue's contractual obligations and duties. Accordingly, the plaintiffs contend summary judgment is not warranted with respect to Count I.

### 3. *The defendant's reply*

In reply to the plaintiffs' resistance to the defendant's Motion For Partial Summary Judgment, Dr. Gue focuses on the plaintiffs' contention that Stock Purchase Agreement and Statement of Unanimous Consent provide, or in the alternative, substitute for Dr. Gue's prior written consent to the assignment of the 1996 Employment Agreement. Gue reiterates his arguments asserted during the hearing on this matter that the documents the plaintiffs attempt to rely upon all postdate the assignment of Pro-Edge, Ltd.'s assets to Pro-Edge, L.P. Dr. Gue points out that the assignment of assets took place sometime in late December 1996, but the Stock Purchase Agreement and the Statement of Unanimous Consent are dated January 20, 1997, and February 11, 1997, respectively. Thus, even if these documents, together or separately, can be said to evince Dr. Gue's consent, such consent was given after the fact, and that cannot satisfy the express terms of the 1996 Employment Agreement, which require *prior* written consent.

Not surprisingly, Dr. Gue contends further that the plaintiffs' argument with respect to his ratification of the assignment is without merit. Although Dr. Gue agrees that an assignment can generally be ratified in typical cases involving the general rule against the assignability of personal service contracts, Dr. Gue argues this is not a case involving the general rule because the 1996 Employment Agreement specifically defined under what conditions the agreement could be assigned. To allow an after-the-fact ratification, Dr.

Gue argues, would be to disregard the explicit and unambiguous terms of the 1996 Employment Agreement, which Dr. Gue points out, the plaintiffs and/or their predecessors orchestrated and drafted. Second, Dr. Gue argues that the plaintiffs' interpretation of the Statement of Unanimous Consent is illogical and without basis. Although the Statement of Unanimous Consent states that the shareholders ratified the "transactions" identified in the Stock Purchase Agreement, Dr. Gue argues there is no evidence supporting the conclusion that the assignment of the 1996 Employment Agreement was one of the identified "transactions." Accordingly, Dr. Gue contends the plaintiffs are still unable to produce sufficient evidence of Dr. Gue's prior written consent to the 1996 Employment Agreement. Consequently, he urges this court to grant partial summary judgment and dissolve the preliminary injunction because neither plaintiff is a proper party to enforce the terms of the 1996 Employment Agreement.

## C. Is The 1996 Employment Agreement Properly Held By A Plaintiff In This Matter?

### 1. Was the 1996 Employment Agreement included in the transfer of Pro-Edge, Ltd.'s assets to Pro-Edge, L.P.?

As a general rule, an executory contract for personal services is not assignable by either party. *See Orkin Exterminating Co. (Arwell Div.) v. Burnett*, 146 N.W.2d 320, 327 (Iowa 1966) However, Iowa law[11] has long recognized that such agreements can be assigned when the contract expressly provides. *Id.* (citing *Des Moines Blue Ribbon Distribs., Inc. v. Drewrys Ltd.*, 129 N.W.2d 731 (Iowa 1964)). In this case, it is clear that the 1996 Employment Agreement contemplated and permitted assignment, albeit only

---

[11]In a prior decision in this controversy, this court determined Iowa law applied to the case. *See Gue*, 374 F. Supp. 2d at 737-39. For the same reasons articulated in its prior opinion, this court will continue to apply Iowa law.

under certain conditions. Thus, because the 1996 Employment Agreement was readily transferable by virtue of its express terms and Iowa law, the question becomes whether the transfer of assets from Pro-Edge, Ltd. to Pro-Edge, L.P. encompassed the 1996 Employment Agreement. Dr. Gue contends said agreement was excluded from the asset transfer because it was never expressly mentioned anywhere in the documents detailing the transaction. Although this court agrees the 1996 Employment Agreement was neither specifically identified in the Stock Purchase Agreement or the Certificate of Limited Partnership as an "asset," such an observation is not fatal to the plaintiffs' cause of action, at least with respect to this argument.[12] Nothing in the voluminous record before this court indicates, suggests or even remotely implies that a transfer or assignment of the 1996 Employment Agreement be in a specific writing. The only requirement under the terms of the 1996 Employment Agreement is that Dr. Gue's prior consent to an assignment be in writing. Consequently, according to the plain and clear terms of the 1996 Employment Agreement, it appears that no degree of formality is required with respect to the assignment itself. Thus, the issue is not whether the 1996 Employment Agreement was specifically mentioned and transferred in a formal writing because the agreement could have been assigned informally or as part of the global contribution of assets from Pro-Edge, Ltd. to Pro-Edge, L.P. Thus, taking the facts in the light most favorable to the plaintiffs as this court must, it is clear, based on the facts and circumstances surrounding the transaction that the transfer of assets from Pro-Edge, Ltd. to Pro-Edge, L.P. was all-encompassing and global both in nature and effect. Accordingly, the lack of "formal" assignment specifying the 1996 Employment Agreement is of little consequence to the

---

[12]However, as will be detailed below, the lack of any mention of the 1996 Employment Agreement may be indicative of Dr. Gue's knowledge, or rather, his lack thereof, with respect to the alleged assignment.

outcome of this case. Taking the facts in a light most favorable to the plaintiffs, as this court must, an inference is raised, based on the facts surrounding the corporate restructuring and spin-off transactions, that the 1996 Employment Agreement was informally assigned by virtue of the all-encompassing asset transfer. Although the transferred assets could have been detailed with more specificity, especially with respect to assets such as Dr. Gue's Employment Agreement, summary judgment is not warranted on this ground.[13]

## 2. Did the transfer of Pro-Edge, Ltd.'s assets to Pro-Edge L.P. work an "assignment"?

The more difficult question, however, is whether the rights transferred under the 1996 Employment Agreement can be properly enforced by Pro-Edge, L.P. As indicated in the factual background of this case, the 1996 Employment Agreement contemplates assignment, but only after securing the prior written consent of the other party. In their briefs and during the hearing, the parties focused in great detail on whether Dr. Gue's written consent was obtained prior to the assignment of assets from Pro-Edge, Ltd. to Pro-Edge, L.P. pursuant to the terms of the 1996 Employment Agreement. However, before this court can discuss the existence and validity of such written consent, it must first address the plaintiffs' contention that consent was not required because the transactions did

---

[13]The court, however, does note that such a conclusion has become increasingly unpalatable based on Paragraph 3.28 of the Stock Purchase Agreement, which essentially represents that Pro-Edge is not a party to any employee agreements, except those as set forth in Schedule 3.28. This paragraph, although not entirely clear, appears to suggest the 1996 Employment Agreement was terminated. However, it is also possible that this paragraph intended to only inform BIC of Employment Agreements it would be inheriting, and therefore, since Dr. Gue would not be an employee of BIC or NOBL, his agreement was not mentioned. Because this is a motion for summary judgment, the plaintiffs are entitled to the benefit of all reasonable inferences that can be drawn from the record.

not amount to a prohibited assignment within the meaning of the parties' agreement.

The question of whether a merger or other change of corporate form constitutes an "assignment" has never been affirmatively decided under Iowa law. However, there is a dearth of relevant case law from other jurisdictions, and as there is no Iowa law on point, this court will turn to such authority for guidance. A review of the applicable persuasive authority reveals that two distinct lines of thought have emerged with respect to this issue. First, there is the line of thought exemplified by the Sixth Circuit's decision in *PPG Industries, Inc. v. Guardian Industries Corp.*, 597 F.2d 1090 (6th Cir. 1979). In *PPG*, the surviving corporation of a merger argued it had succeeded to certain rights previously owned by the merged corporation irrespective of the fact that the original agreement provided the rights at issue could not be assigned except with the consent of PPG first obtained in writing. *Id.* at 1092. The district court agreed with this contention, primarily because of its belief that the merger occurred by "operation of law" and that consequently, no assignment or transfer within the meaning of the "anti-assignment" clause had occurred. *Id.* at 1093. On appeal, the United States Court of Appeals for the Sixth Circuit reversed the district court's decision. *Id.* at 1095-96. The Sixth Circuit determined it was of no consequence that the transfer had taken place by operation of law (via the state merger statute). *Id.* "A transfer is no less a transfer because it takes place by operation of law rather than by a particular act of the parties. The merger was effected by the parties and the transfer was a result of their act of merging." *Id.* at 1096. The court further emphasized that if the parties had intended an exception in the event of a merger or other structural modification, it would have been a simple matter to draft such an exception into the terms of the contract. *Id.* at 1095. This line of thought has accordingly been applied in analogous situations by various courts. *See, e.g.*, *Koppers Coal & Trans. Co. v. United States*, 107 F.2d 706, 708 (3d Cir. 1939) (interpreting a state merger statute and criticizing

31

as "metaphysical" the notion that no transfer occurs based on the theory of corporate continuity); *Nicolas M. Salgo Assocs. v. Cont'l Ill. Props.*, 532 F. Supp. 279, 282-83 (D.D.C. 1981) (finding "assignment" had occurred where corporation acquired all of the stock of another corporate entity who was a fifty percent general partner in a partnership); *Rother-Gallagher v. Mont. Power Co.*, 522 P.2d 1226, 1228 (Mont. 1974) (finding assignment occurred by virtue of the dissolution of two corporate entities to a contract and the subsequent formation of a partnership which assumed all the duties and obligations of the two corporations); *Jackson v. Moskovitz Agency, Inc.*, 672 S.W.2d 400, 403 (Tenn. 1984) (finding assignment occurred where one corporation was liquidated and its assets distributed to its shareholders who subsequently sold all their assets to another corporation); (finding corporate merger with a shell corporation for tax purposes worked an assignment).

The second line of thought can be gleaned by myriad decisions in various state courts who have chosen to follow the principles initially set forth in *Trubowitch v. Riverbank Canning Co.*, 182 P.2d 182, 190-92 (Cal. 1947). These decisions hold that a mere change in the form of a business entity should not work a prohibited "assignment" where no material change results in the contract obligations and duties of the employee. *See Thames v. Rotary Eng'g Co.*, 315 S.W.2d 589, 591-92 (Tex. Civ. App. 1958) (finding change in partnership personnel or structure did not work a prohibited assignment); *Ruberoid Co. v. Glassman Constr. Co.*, 234 A.2d 875, 878-79 (Md. 1967) (finding an "assignment" within the meaning of the contract did not occur by virtue of sole proprietorship's subsequent incorporation); *Trubowitch*, 182 P.2d at 190-92 (holding a prohibited assignment did not occur as a result of the dissolution of a corporation and subsequent formation of a copartnership); *Sun World Corp. v. Pennysaver, Inc.*, 637 P.2d 1088, 1090-92 (Ariz. Ct. App. 1981) (finding a change in corporate name and place of

incorporation did not constitute an assignment as intended by the parties' agreement); *Alexander & Alexander, Inc. v. Koelz*, 722 S.W.2d 311, 313 (Mo. Ct. App. 1986); *see also Syenergy Methods, Inc. v. Kelly Energy Sys,. Inc.*, 695 F. Supp. 1362, 1364-66 (D.R.I 1988) (holding partial sale of corporate assets to a new corporation did not constitute a prohibited assignment); *Mitsui & Co. v. P.R. Water Res. Auth.*, 528 F. Supp. 768, 791 (D.P.R. 1981) (noting restrictive clauses are not enforced when the transaction is between entities). Thus, although these courts recognize that a transfer does occur when a business entity changes form, such a transfer is not always illegal or prohibited by an anti-assignment clause. *See People ex. rel. Dep't of Pub. Works v. McNamara Corp.*, 28 Cal. App. 3d 641, 648-49 (1973).

This court recognizes that both lines of thought exude certain appeal. For example, the line of thought evinced in *PPG* emphasizes the importance of drafting accurate contracts and places the burden on the drafters to provide an exception in the case of a merger or change of business structure. However, on the other hand, the line of state court decisions recognizes the fluidity of business entities and appear to temper the harsh consequences that potentially can ensue as a result of the formality of shifting the legal form of a business endeavor. For the reasons discussed below, however, this court finds that, on the facts of this case, the *PPG* approach controls. First, it must be noted that Pro-Edge, Ltd. drafted the 1996 Employment Agreement. Pro-Edge, Ltd. is an extremely experienced business entity and should have been savvy to the importance of drafting an explicit and accurate contract. Dr. Gue, although highly educated in the field of veterinary medicine, cannot be held to such a high standard as an individual employee. As the 1996 Employment Agreement clearly contemplated and provided for its assignment and provided the conditions which must be met prior to such an assignment, Pro-Edge Ltd. could have easily gone one step further and defined "assignment" or provided for an exception in the

33

event of a change in corporate structure. Pro-Edge, Ltd. failed to do so and should not be allowed to seek refuge by asserting the transactions that followed were a simple "transfer" and insufficient to constitute an "assignment" within the meaning of the parties' agreement. While it is true the basic rule in interpreting written contracts is that the intent of the parties controls, this intent is determined by the language of the contract unless it is ambiguous. *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 862 (Iowa 1991). An ambiguity does not exist simply because the parties disagree on the meaning of a phrase. *Farm Bureau Mut. Ins. Co. v. Sandbulte*, 302 N.W.2d 104, 108 (Iowa 1981). Rather, in construing a contract, it is a court's duty to give effect to the language of the contract in accordance with its plain and ordinary meaning. *Tom Riley Law Firm, P.C. v. Tang*, 521 N.W.2d 758 (Iowa Ct. App. 1994). In this case, the word "assignment" is not defined by the parties. Accordingly, it should be given its plain and ordinary meaning, which includes any transfer of all or part of one's property, interest or rights to another. *See Black's Law Dictionary* 119 (6th ed. 1990). Accordingly, the transfer of Pro-Edge, Ltd.'s assets to Pro-Edge, L.P. constitutes an "assignment," within the word's plain and ordinary meaning. Finally, this court notes that when Pro-Edge, Ltd. essentially became Pro-Edge, L.P., much more than a mere name change was involved, as excruciatingly detailed in the factual background of this opinion. Pro-Edge, Ltd. went through a fundamental change in its form of ownership. A portion of the corporation was merged and subsequently sold to BIC; the remaining portion was spun off and contributed to an entirely new partnership with a completely new partner—Pro Management, L.C. This is not a case involving a simple merger of a subsidiary into its parent, or a simple change in corporate structure that has little to no effect on the business's employees. Rather, a complex series of legal transactions was involved and essentially resulted in the complete transformation of what used to be known as Pro-Edge Ltd. For these reasons,

the court concludes that under the particular facts of this case, an assignment within the meaning of the 1996 Employment Agreement did occur when Pro-Edge, Ltd. revamped its corporate structure.

### 3. *Did Pro-Edge, Ltd. obtain prior written consent from Dr. Gue?*

Because the court has concluded an "assignment" occurred, thereby requiring Dr. Gue's prior written consent, the next question is whether the plaintiffs obtained such consent, taking the facts in a light most favorable to them. The plaintiffs fully concede that Hoekstra, as Dr. Gue's attorney-in-fact, did not provide the consent required. Instead, the plaintiffs rely on Dr. Gue's own actions—namely, his signature and consent to the Stock Purchase Agreement and the Statement of Unanimous Consent. Unfortunately for the plaintiffs, no reasonable jurist could conclude that the Stock Purchase Agreement and the Statement of Unanimous Consent signed by Dr. Gue constitute his consent to the assignment of the 1996 Employment Agreement. In order to understand the court's conclusion, it is necessary to understand *why* these documents were executed.

Under the Iowa Business Corporation Act, Iowa Code Annotated §§ 490.101 *et seq.*, shareholder—not employee—approval, is required before a corporation may sell its assets other than in the regular course of business, of which the transactions contemplated by Pro-Edge, Ltd. would qualify. *See Iowa Code Ann.* § 490.1202 (West 2005).[14] Accordingly, the purpose of the Stock Purchase Agreement and the Statement of Unanimous Consent was to elicit such consent from the shareholders as was required under

---

[14]The Iowa Business Corporation Act also requires shareholder approval in the case of a merger, but specifically exempts a merger between a parent and subsidiary. *See Iowa Code Ann.* §§ 490.1104 (stating the plan of merger must be submitted to shareholders for approval) & 490.1105 (exempting merger of subsidiary with parent). Therefore, the only transaction not requiring shareholder approval was the merger of NOBL I with Pro-Edge, Ltd.

Iowa law. Without the consent of the shareholders, the Board of Directors could not authorize such an extraordinary transaction. Although the shareholders approved the proposed transaction at their Annual Meeting, the proposal was not complete and dependent upon the completion of negotiations between BIC and Pro-Edge, Ltd. Thus, once the parties' deal was consummated, Pro-Edge, Ltd. needed to obtain shareholder approval of the final agreement. This was done in part, by having the selling shareholders sign the Stock Purchase Agreement. The finalized vote in favor of these transactions is memorialized by the shareholders' signatures as documented on their respective Statements of Unanimous Consent. The Statement of Unanimous Consent was provided to the shareholders in lieu of calling a special meeting, which normally would be required for an official vote. Instead of calling a meeting, the Board of Directors of Pro-Edge, Ltd. determined , as is customary in the business realm, to authorize a vote without a meeting by obtaining written consents from the voting shareholders. *See id.* § 490.704 (authorizing shareholder action without a meeting through written consents). This was the purpose of the Statement of Unanimous Consent, *not*, as the plaintiffs attempt to argue, to secondarily secure Dr. Gue's consent to the assignment of the 1996 Employment Agreement. Indeed, in a January 29, 1997, letter authored by Everett Hoekstra to all of Pro-Edge, Ltd.'s stockholders he states the Statement of Unanimous Consent "simply records your affirmative vote to enter into the transactions contemplated by the Stock Purchase Agreement with [BIC]." It would be inherently unfair to allow the plaintiffs to blur the lines between consent given by Dr. Gue as a shareholder of the corporation with consent that was required of him as an employee. Obviously, if Dr. Gue had not been a shareholder, he never would have signed the Stock Purchase Agreement or the Statement of Unanimous Consent. This is indicative of the limited nature and effect of these

documents.[15]   Consequently, no reasonable factfinder could conclude that Dr. Gue's consent as a selling shareholder to an extraordinary transaction as required under the Iowa Business Corporation Act can somehow perform "double-duty" and also act as his consent to the assignment of his personal employment agreement.   Although Pro-Edge, Ltd. contends such a result exalts "form over substance," this court does not believe this to be the case.   Rather, a contrary conclusion would provide a windfall to the corporation by allowing it to evade the express terms of the 1996 Employment Agreement that it agreed to abide by, and indeed, even crafted itself.

Further, even if the court were persuaded by the plaintiffs' strained interpretation of the Stock Purchase Agreement and the Statement of Unanimous Consent, the fact remains that such documents were executed *after* the 1996 Employment Agreement was assigned to Pro-Edge, L.P., as evidenced by the Certificate of Limited Partnership.   Thus,

---

[15]For these same reasons, even if the plaintiffs were able to produce evidence that Everett Hoekstra consented on behalf of Dr. Gue, which they concede they cannot, such a consent would more than likely exceed what Hoekstra was authorized to do, since the appointment clearly was limited to transactions *on behalf of the Selling Shareholders*. Thus, the consents referred to in paragraph 2.7 are clearly limited to *shareholder* consents required for certain transactions.   The purpose of this appointment was to streamline and facilitate the stock purchase by centralizing the shareholders' authority in one individual. It was not so broad as to allow Hoekstra untrammeled authority to sign employee-related consents.   Although the appointment does indicate Hoekstra may sign the "Related Agreements," which encompasses the "Confidentiality Agreements," the "Deferred Payment Agreement," certain "Employment Agreements," (not including Dr. Gue's) the "Escrow Agreement," and the "Noncompetition and Indemnity Agreement," it is clear that the reason the Related Agreements were included in the authority was to effectuate the setting up and funding of the Escrow Agreement and the Deferred Payment Agreement, the two agreements that affected the selling shareholders.   Although this conclusion may appear to conflict with the court's previous opinion, the court has before it now the benefit of a more complete record and, therefore, a more accurate picture of what transpired during the transition of Pro-Edge, Ltd. to Pro-Edge, L.P.

assuming arguendo, the documents could be construed as Dr. Gue's consent to the assignment, it still would not satisfy the very clear terms of the 1996 Employment Agreement which requires *prior* written consent.

### 4.    *Was the assignment ratified by Dr. Gue?*

Because the plaintiffs have produced no evidence suggesting they secured Dr. Gue's prior written consent to the assignment of the 1996 Employment Agreement, they attempt to rely on a theory of ratification in order to survive Dr. Gue's Motion For Partial Summary Judgment.  Essentially, the plaintiffs contend Dr. Gue ratified the assignment of the 1996 Employment Agreement to Pro-Edge, L.P. because he was aware of the transaction, continued his employment with the Trans Ova Genetics, Inc. division and subsequently consented (by virtue of the Stock Purchase Agreement and Statement of Unanimous Consent) to the assignment.  The plaintiffs' argument fails for primarily two reasons.  First, most of the cases providing for ratification do so in the context of contracts and agreement that are silent with respect to assignability.  *See, e.g.*, *Norlund v. Faust*, 675 N.E.2d 1142, 1151-52 (Ind. Ct. App. 1997).  Contrarily, in this case, the 1996 Employment Agreement defines, with particularity, what is required in order for an assignment to be valid.  To allow ratification in this case would undermine basic contract principles by allowing both parties to evade the plain meaning of the agreement.  Rather, once Pro-Edge, L.P. realized prior written consent had not been obtained, a new employment agreement should have been negotiated between the parties.  Unfortunately, Pro-Edge, L.P. dropped the ball and failed to execute such an agreement with Dr. Gue.  Although Pro-Edge, L.P. was understandably weakened by Dr. Gue's unexpected resignation, and ratification would be a concise way to shore up the plaintiffs' losses, this court finds that where the parties' agreement contains a restriction on assignment, it would be inconsistent to allow them to undermine the very terms they agreed to by reliance on

the doctrine of ratification. The 1996 Employment Agreement was entered into for the benefit of the employing corporation, at that time Pro-Edge, Ltd. When Pro-Edge, Ltd. changed its corporate structure, it was incumbent upon it to obtain Dr. Gue's prior written consent. When such consent was not obtained, it became the obligation of the new entity to then draft and enter into a new employment agreement with Dr. Gue. At that time, if Dr. Gue failed to assent to the new contract terms, Pro-Edge, L.P. would have had the option of releasing him from employment.

Second, as this court has already concluded, the Stock Purchase Agreement and Statement of Unanimous Consent are not susceptible to the interpretation urged by plaintiffs. Thus, the plaintiffs' ratification argument can only be premised on Dr. Gue's knowledge of the asset transfer and his continued employment. Unfortunately for the plaintiffs, this is not enough. Although Iowa case law has recognized the concept of ratification , *see, e.g., Orkin Exterminating Co.*, 146 N.W.2d at 327, Iowa courts have never expressly defined with any degree of particularity the exact parameters of such a ratification. What is clear from the case law that has evolved in other jurisdictions, however, is that when a corporation is dissolved and a new entity is created, continued employment in and of itself is not enough to ratify an assignment. *See Johnston v. Dockside Fueling of N. Am.*, 658 So.2d 618, 619 (Fla. Dist. Ct. App. 1995) ("When a corporation is dissolved and a new one created, the employee's continued employment can not in and of itself be construed as sufficient knowledge and consent to conclude that the assignment was  consented to or ratified by the employee.") (citing *Schweiger v. Hoch*, 223 So.2d 557, 558 (Fla Dist. Ct. App. 1969)); *Norlund v. Faust*, 675 N.E.2d  at 1152-53 (agreeing that "continued employment alone will not constitute consent to the assignment," and maintaining that the parties must have knowledge of the assignment"). Here, the primary flaw in the plaintiffs' argument lies in the fact that nothing in the record indicates

Dr. Gue was aware his employment agreement had been assigned. Although Dr. Gue was aware of the asset transfer generally and the stock purchase transactions as evidenced by his signature on the Stock Purchase Agreement detailing, as indicated previously, Dr. Gue's agreement is not formally mentioned. Even this court, who is overly familiar with the facts of this case, had a difficult time discerning whether the 1996 Employment Agreement was assigned. Although ultimately it concluded sufficient evidence existed of such an assignment to survive summary judgment based on the global nature of the asset transfer to Pro-Edge, L.P., this conclusion was arrived at not by the court's perusal of the Stock Purchase Agreement. Rather, this conclusion was derived from the court's in-depth knowledge of the transfer. There is nothing to suggest Dr. Gue was so intimately familiar with these transactions that he "assumed" the 1996 Employment Agreement was assigned informally, as opposed to terminated. Indeed, the Stock Purchase Agreement appears to suggest the agreement was terminated by its denial of the existence of any employment agreement other than the agreements identified therein—Dr. Gue's not being one of such identified. In essence, no evidence suggests that a person untrained in the law and business such as Dr. Gue completely understood the complex transactions contemplated by the Stock Purchase Agreement. Given that the 1996 Employment Agreement was never "formally" assigned, it would be absurd for this court to attribute such knowledge to Dr. Gue. This is true, particularly in light of the fact that Dr. Gue was operating under the assumption that in order for the agreement to be assigned, his consent must be obtained. Thus, the logical conclusion, once prior written consent was not procured, was that the agreement lapsed. Consequently, even if a theory of ratification was a viable option in this case, Dr. Gue's continued employment, in and of itself, is insufficient indicia of ratification. Accordingly, for the aforementioned reasons, this court **grants** Dr. Gue's Motion For Partial Summary Judgment.

### D. Dissolution Of The Preliminary Injunction

When addressing the plaintiffs' initial motion for a Preliminary Injunction on June 1, 2005, the Court addressed and outlined Rule 65 of the Federal Rules of Civil Procedure and applicable case law relating to the issuance of preliminary injunctions in the Eighth Circuit. *See Gue*, 374 F. Supp. 2d at 734-35. The parties are referred to this Court's previous opinion, as an extensive recitation here would be cumulative.

It is well-settled in this circuit that applications for preliminary injunctions are generally measured against the standards enunciated in *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (*en banc*). These factors include (1) the movant's likelihood of success on the merits of the action; (2) the threat of irreparable harm that could result to the movant if the court did not issue the injunction; (3) the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties; and (4) the public interest. *See Gue*, 374 F. Supp. 2d at 734 (citing *Dataphase Sys., Inc.*, 640 F.2d at 114; *Doctor John's, Inc. v. City of Sioux City, Iowa*, 305 F. Supp. 1022, 1033 (N.D. Iowa 2004); *Branstad v. Glickman,* 118 F. Supp. 2d 925, 937 (N.D. Iowa 2000); *Fed. R. Civ. P.* 65(b)(1)). This Court previously evaluated the *Dataphase* factors with respect to the facts of this case and determined that entry of a preliminary injunction was appropriate. *Gue*, 374 F. Supp. 2d at 747-52. The dissolution of a preliminary injunction is within the sound discretion of the district court, and can be set aside only if it is based upon an error of law or constitutes an abuse of discretion. *See Waste Mgmt., Inc. v. Deffenbaugh*, 534 F.2d 126, 129 (8th Cir. 1976). On this Motion to Dissolve, Dr. Gue must show a change of circumstances, which, upon reevaluation, warrants a different outcome. Here, Dr. Gue has done just that by demonstrating the plaintiffs' inability to succeed on the merits of Count I. Accordingly, the court finds it prudent to **dissolve** the preliminary injunction entered on June 1, 2005,

and modified on January 31, 2006.

## III. CONCLUSION

This controversy embodies what has become the paradox of contract law: A document designed to prevent litigation, actually produces the very litigation it was designed to prevent. It is in this unfortunate scenario that the value of a contract that can mesh simplicity with conscientiousness becomes painfully all too clear. Given the lengthy litigation that has been involved in this case, it is clear that both parties, to some degree, have suffered losses. However, at least for today, Dr. Gue emerges as the victor. Accordingly, Dr. Gue's Motion For Partial Summary Judgment and Motion To Dissolve Preliminary Injunction is hereby **granted** with respect to Count I, and accordingly, the preliminary injunction issued by this court on June 1, 2005 and modified on January 31, 2006, is hereby **dissolved**.

In closing, as it did in its June 1, 2005 order, this court notes that orders with respect to injunctions are appealable as a matter of right. *See* 28 U.S.C. § 1292(a)(1) (stating the courts of appeals shall have jurisdiction of appeals from "[i]nterlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions"). As the issues presented in this controversy are exceedingly close questions, the court encourages the plaintiffs to seek review of this order by the United States Court of Appeals for the Eighth Circuit.

**IT IS SO ORDERED.**

**DATED** this 7th day of March, 2006.

_____
MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA